**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

FEB 0 2 2026

TAMMY H DOWNS, CLERK

By

DEP CLERK

| | |
|---|---|
| Calvin Davis; Todd Fason; NeDraya McGowan; and Robby Riedel, on behalf of themselves and all similarly situated individuals, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) Case No. 4:26-CV-89-KGB |
| Boyce Hamlet, in his official capacity as Chair of the Arkansas Post-Prison Transfer Board; Lindsay Wallace, in her official capacity as Secretary of the Arkansas Department of Corrections; Jim Cheek, in his official capacity as Director of the Arkansas Division of Community Correction; and Jamie Barker, in his official capacity as Chair of the Arkansas Board of Corrections, | ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## COMPLAINT—CLASS ACTION

Plaintiffs Calvin Davis, Todd Fason, NeDraya McGowan, and Robby Riedel (jointly, "Named Plaintiffs"), individually and on behalf of all similarly situated individuals (together with Named Plaintiffs, "Plaintiffs"), file this injunctive civil rights class action complaint against Boyce Hamlet, Chair of the Arkansas Post-Prison Transfer Board ("PPTB"), Lindsay Wallace, Secretary of the Arkansas Department of Corrections ("ADC"), Jim Cheek, Director of the Arkansas Division of Community Correction ("ACC"), and Jamie Barker, Chair of the Arkansas Board of Corrections, in their official capacities (jointly, "Defendants"), and allege as follows:

### INTRODUCTION

1.     This is a civil rights class action complaint filed on behalf of all adult parolees in the custody, or under the supervision, of the ADC who are at risk of imprisonment without

This case assigned to District Judge Baker
and to Magistrate Judge Manny

adequate due process as a result of the unconstitutional practices and procedures of both the ADC and the PPTB with respect to parole and post-release supervision ("parole") revocation proceedings.[1]

2.      Defendants have developed a fundamentally unfair and procedurally flawed parole revocation process that violates Plaintiffs' rights under the Fourteenth Amendment to the United States Constitution as set forth in *Gagnon v. Scarpelli*, 411 U.S. 778 (1973), *Morrissey v. Brewer*, 408 U.S. 471 (1972), and related cases. This Court should declare such procedures unlawful and enjoin them from being used now and in the future.

3.      In direct violation of the United States Constitution, Defendants uniformly refuse to screen parolees for attorney appointments and provide attorneys to parolees at any point in the parole revocation process. This is true even if a parolee is indigent and (1) has a colorable claim that they did not commit an alleged parole violation, (2) has mitigating evidence explaining why revocation is inappropriate, and/or (3) would have difficulty effectively advocating on their own behalf given the complexity of the process or their own mental health, medical, educational, or other challenges.

4.      Every year, thousands of parolees in the State of Arkansas are accused of violating the conditions of their parole and threatened with a return to prison in the form of a parole

---

[1]      Throughout this complaint, "parole" is used to refer to parole as well as post-release supervision; "parolees" is used to refer to both people on parole and people on post-release supervision; and "parole revocation judge" is used to refer to revocation hearing judges for both parole and post-release supervision revocation hearings. Both parole and post-release supervision are subject to the same revocation hearing requirements in Arkansas. *See* Ark. Admin. Code § 158.00.3-2(18) ("For the purposes of this rule, parole is included without limitation in the definition of post-release supervision."). People subject to both forms of supervision overwhelmingly refer to their supervision as "parole." Even the ACC, the agency responsible for overseeing all community supervision, uses "parole" and "post-release supervision" interchangeably. *See, e.g.*, *Programs & Services*, Ark. Div. of Cmty. Corr., https://doc.arkansas.gov/community-correction/programs-services (last visited Feb. 1, 2026).

revocation. The majority of these parolees end up reincarcerated due to a deeply unfair parole revocation process.

5.      Hundreds of parolees at risk of revocation fight to maintain their freedom at complex revocation hearings. Many of them need and are entitled to appointed counsel to help them navigate these arcane proceedings. Yet, as a matter of practice, procedure, and custom, Defendants systematically deny indigent parolees their right to counsel. Defendants fail to even consider whether indigent parolees qualify for the appointment of counsel, at cost to the State, and Defendants fail to appoint counsel to those parolees who do qualify, in violation of the Fourteenth Amendment's Due Process Clause.

6.      As a result of Defendants' failure to appoint counsel for indigent parolees, those parolees are forced to navigate complex revocation hearings alone, without anyone to help ensure Defendants' adherence to other procedural protections—including the right to speak on their own behalf, present evidence and witnesses, and cross-examine adverse witnesses—to which they are also constitutionally entitled.

7.      The lack of attorney screenings and appointed counsel have a particularly adverse impact on parolees with disabilities that impede their capacity to represent themselves at their revocation hearings. Defendants fail to assess whether and what types of accommodations these parolees require, and to provide such accommodations. As a result, parolees with disabilities are effectively denied the opportunity to meaningfully access the parole revocation process because of their disabilities.

8.      Defendants commit a host of other due process violations against parolees in violation of the Fourteenth Amendment. Many parolees are pressured or coerced into involuntarily waiving their preliminary and/or final revocation hearings without full awareness of the consequences of that waiver.

3

9.      Those who refuse to waive and instead move forward with a preliminary and/or final revocation hearing are denied adequate information about their right to counsel and cannot sufficiently exercise their right to present evidence and witnesses on their own behalf.

10.     At these hearings, the presiding revocation hearing judge (also known as a "parole revocation judge" or "PRJ") merely rubber stamps the parole violation report submitted by the community supervision officer ("CSO") or police reports submitted by arresting officers without adequately inquiring into their reliability.[2] Defendants maintain a system that fails to provide parolees with a sufficient opportunity to speak on their own behalf, present evidence and witnesses, or cross-examine adverse witnesses, including the CSOs and arresting officers whose reports serve as bases for the alleged parole violation.

11.     Given these procedurally deficient processes, parole revocation hearings in Arkansas have been and continue to be a sham.

12.     Defendants conduct thousands of unconstitutional revocation proceedings each year. The vast majority of them result in a hearing waiver or a finding of revocation and, in turn, reincarceration. In effect, Defendants' policies, procedures, and customs have created a parole revocation system that arbitrarily rotates parolees in and out of the prison system, often as a result of non-criminal technical violations or unsubstantiated accusations that a parolee committed a new criminal offense.

---

[2]    CSOs are ACC employees "tasked with the supervision of offenders released to post-release supervision or persons who otherwise fall under the supervisory authority of the [ACC]." Ark. Admin. Code § 158.00.3-2. A parole officer ("PO") is a type of CSO. The declarations of parolees submitted as exhibits attached to the Motion for Temporary Restraining Order and/or Preliminary Injunction use "PO" and "CSO" interchangeably.

4

## JURISDICTION AND VENUE

13.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiffs' rights as secured by the Fourteenth Amendment to the United States Constitution. It is also brought under 42 U.S.C. § 12132 and 29 U.S.C. § 794 to redress the deprivation under color of law of the rights of Plaintiffs with disabilities as secured by the Americans with Disabilities Act ("ADA") and the Rehabilitation Act.

14.     This Court has subject matter jurisdiction of Plaintiffs' claims under 28 U.S.C. §§ 1331, 1343(a), and 1367.

15.     Venue is proper in this district under 28 U.S.C. § 1391(b) because events giving rise to the claims asserted in this complaint occurred in this judicial district.

## PARTIES

16.     Plaintiff Calvin Davis is an indigent adult parolee currently in the custody of the ADC. He was taken into custody on January 23, 2026, for allegedly violating the terms of his parole. His revocation proceedings are not yet final. He has a colorable claim that he did not willfully commit the alleged violations and mitigating evidence to justify why he should not be further imprisoned, but he needs assistance to meaningfully present this evidence. Defendants failed and will continue to fail to ensure that Mr. Davis is afforded appropriate process and is represented by counsel during revocation proceedings. When ultimately re-released on parole in the future, Mr. Davis will continue to be at risk for arbitrary and capricious processes relating to alleged parole violations.

17.     Plaintiff Todd Fason is an indigent adult parolee with disabilities who is currently in the custody of the ADC. He was taken into custody on January 22, 2026, for allegedly violating the terms of his parole. His revocation proceedings are not yet final. His final revocation hearing is scheduled for February 3, 2026. He has a colorable claim that he did not willfully commit the

5

alleged violations and mitigating evidence to justify why he should not be further imprisoned, but he needs assistance to meaningfully present this evidence. Defendants failed and will continue to fail to ensure that Mr. Fason is afforded appropriate process and is represented by counsel during revocation proceedings. When ultimately re-released on parole in the future, Mr. Fason will continue to be at risk for arbitrary and capricious processes relating to alleged parole violations.

18.    Plaintiff NeDraya McGowan is an indigent adult parolee currently in the custody of the ADC. He was taken into custody on January 19, 2026, for allegedly violating the terms of his parole. His revocation proceedings are not yet final. He has a colorable claim that he did not willfully commit the alleged violations and mitigating evidence to justify why he should not be further imprisoned, but he needs assistance to meaningfully present evidence. Defendants failed and will continue to fail to ensure that Mr. McGowan is afforded appropriate process and is represented by counsel during revocation proceedings. When ultimately re-released on parole in the future, Mr. McGowan will continue to be at risk for arbitrary and capricious processes relating to alleged parole violations.

19.    Plaintiff Robby Riedel is an indigent adult parolee with disabilities who is currently in the custody of the ADC. He was taken into custody on January 24, 2026, for allegedly violating the terms of his parole. His revocation proceedings are not yet final. He has a colorable claim that he did not willfully commit the alleged violations and mitigating evidence to justify why he should not be further imprisoned, but he needs assistance to meaningfully present this evidence. Defendants failed and will continue to fail to ensure that Mr. Riedel is afforded appropriate process and is represented by counsel during revocation proceedings. When ultimately re-released on parole in the future, Mr. Riedel will continue to be at risk for arbitrary and capricious processes relating to alleged parole violations.

20.     Defendant Boyce Hamlet is the Chair of the PPTB, the revocation review board for all parolees in the State of Arkansas and a sub-department of the ADC. He is the chief executive, administrative, budgetary, and fiscal officer of the PPTB and has supervisory duties over its members and staff. Through its designees, the PPTB conducts parole revocation hearings and issues revocation decisions based on those hearings. Mr. Hamlet is sued in his official capacity.

21.     Defendant Lindsay Wallace is the Secretary of the ADC, the state agency responsible for supervising parolees and for issuing violation reports and warrants based on those reports through its sub-department, the Arkansas Division of Community Correction ("ACC"). Ms. Wallace serves as the department's executive head and may perform all duties to administer the department. People facing alleged parole violations are frequently reincarcerated by the ADC pending resolution of those violations. When an individual's parole is revoked, that individual is reincarcerated by the ADC. Ms. Wallace is sued in her official capacity.

22.     Defendant Jim Cheek is the Director of the ACC, the department within the ADC responsible for administering parole services and providing support services to the PPTB. In this role, he administers the ACC and supervises the administration of all facilities, programs, and services under its jurisdiction. He also cooperates with the PPTB to provide the guidance and services required to ensure a full range of correctional and community correction options for the State of Arkansas. The ACC employs CSOs, who regularly check in with people on parole and report information about those individuals' conduct and condition to the PPTB upon request. The ACC is also responsible for developing procedures to guide CSOs in determining the appropriate response to a parole violation. Mr. Cheek is sued in his official capacity.

23.     Defendant Jamie Barker is the Chair of the Arkansas Board of Corrections, which has supervisory power and control over the ACC and performs all functions with respect to the management and control of the ACC. The Board of Corrections has the power to develop and

7

approve policy and management decisions for the ACC; coordinate the implementation and continued utilization of community correction options in support of established sentencing policies; and establish minimum standards for supervision, contact, programming, housing, and employee hiring within the parameters of all divisions encompassed under its control. Mr. Barker is sued in his official capacity.

24.     At all times relevant to this complaint, Defendants Hamlet, Wallace, Cheek, and Barker all acted under color of law.

## ALLEGATIONS OF FACT

25.     In 2023, more than 6,200 Arkansans on parole were re-incarcerated because of a parole revocation, a new sentence, or other reasons. Ex. 1 (BJS 2023) at 33.[3] That year, Arkansas reincarcerated more parolees than any other state with reported data, topping even more populous states like California and Texas. *See id.* at 31, 33.

26.     One critical reason for these high parolee reincarceration rates in Arkansas is Defendants' failure to implement any system by which adult indigent parolees may request and obtain counsel at cost to the State. As a result, thousands of parolees every year are removed from their communities and put back in prison, despite having colorable claims they did not commit the parole violation or mitigating evidence justifying the violation.

27.     The harms caused by Defendants' wholesale denial of counsel are made worse by the fact that Defendants also frequently fail to provide parolees with key procedural protections in their parole proceedings, including the right to cross-examine adverse witnesses and present

---

[3]     Unless otherwise indicated, "Ex. __" refers to exhibits attached to the Motion for Temporary Restraining Order and/or Preliminary Injunction.

witnesses and evidence on their own behalf—despite the fact that they are legally required under Supreme Court precedent, including *Morrissey*.

28.    The result is that the State of Arkansas is operating a sham system of revocation that unjustly strips thousands of parolees of their freedom each year.

**How Parole Revocations Should Proceed Under Arkansas Law**

29.    In theory, Defendants should conduct parole revocation proceedings according to the standardized procedures outlined in the Arkansas Code. *See* Ark. Code Ann. §§ 16-93-705, 16-93-1908. In practice, however, Defendants fall far short of complying with these procedures.

30.    According to the Arkansas Code, the parole revocation process may begin in one of two ways.

31.    The ACC may prepare a violation report describing and providing evidence of a parolee's alleged violation. The PPTB will then review this report and determine whether to issue a warrant for the parolee's arrest or a notice to appear to answer a charge of a parole violation. If the parolee is arrested, they will be held in a county or regional jail pending their final revocation hearing.

32.    Alternatively, a CSO may arrest a parolee who violates a condition of their supervision without a warrant by providing the parolee with a written statement documenting the alleged violation, taking the parolee to a detention facility, and presenting the official in charge of that facility with the statement. In this scenario, the parolee will be held at the facility pending the PPTB's final decision as to their revocation.

33.    In either case, parolees must be provided with a copy of their violation report, a notice of the parole violation action, and a form inquiring as to whether they want to waive their right to a hearing.

34.    Parolees accused of violating one or more conditions of their parole are entitled to both a preliminary and final revocation hearing.[4]

35.    Parolees may waive their right to (1) only their preliminary revocation hearing or (2) both their preliminary and final revocation hearing.[5] In the latter case, parolees must first be informed of any possible outcomes of the revocation hearing before they are allowed to waive.

36.    Waivers must be voluntarily and intelligently made. They cannot be the result of threats, promises, or any form of coercion.

37.    A parolee who waives their right to both a preliminary and final revocation hearing must agree to a term of incarceration. The length of the term depends on the type of violation and the original crime of conviction. This reincarceration generally takes one of three forms.

38.    *First*, a parolee may be reincarcerated in an ADC facility for six months. At the conclusion of this term, they will appear before the PPTB for a release eligibility hearing.

39.    *Second*, a parolee may be remanded to suspended imposition of revocation with a 90-day reinstatement. However, this option is not available to parolees who (1) have a pending charge involving an offense for which a hearing is mandatory, *see supra* ¶ 35 n.5, (2) were violated for firearm possession after being on active supervision for a violent crime involving a firearm, and/or (3) were on post-release supervision for fewer than 90 days since their most recent release

---

[4]    There are two limited exceptions to this rule under Arkansas regulations. *First*, if a parolee is arrested and their final revocation hearing is conducted within fourteen days, a preliminary hearing is not required. Ark. Admin. Code § 158.00.3-4.2(c). *Second*, if a parolee is convicted of a new felony offense and sentenced to a term of imprisonment of twelve months or longer, their parole may be administratively revoked without a formal revocation hearing. *Id.* § 158.00.3-4.1(a).

[5]    A parolee that has been charged with Capital Murder or Murder in the First Degree cannot waive a revocation hearing. Ark. Admin. Code § 158.00.3-4.5(d). Additionally, a revocation waiver hearing must be conducted for parolees charged with certain felonies. *Id.* § 158.00.3-4.5(c).

from Suspended Imposition of Revocation. In order to be released at the end of the 90-day period, the parolee must maintain good behavior and obtain an approved home plan.

40.    *Third*, a parolee may be reincarcerated in an ACC facility as part of the Supervision Sanction Program ("SSP"). This option is available only for parolees who have committed technical violations. SSP participants are held for 90 to 180 days at a Supervision Sanction Center and released back to post-release supervision thereafter.

41.    If a parolee does not waive their right to at least a final revocation hearing, their hearing is held near the place of their alleged violation or arrest. Hearings may take place in person at parole offices or virtually via phone or videoconference.

42.    During their hearing, a parolee has the right to testify on their own behalf, call and question their own witnesses, introduce relevant evidence to refute the allegations made against them, and confront and cross-examine adverse witnesses. This last right may be limited if the PRJ, the PPTB, or the PPTB's designee finds good cause for not allowing confrontation and cross-examination.

43.    After completion of the hearing, the presiding PRJ must decide whether, by a preponderance of the evidence, the parolee has failed to comply with the conditions of their parole. Potential decisions include reinstatement of parole, reinstatement of parole with additional or modified conditions, deferment until the outcome of the parolee's criminal court case, revocation of the parolee's parole along with an appropriate alternative to incarceration, and revocation of the parolee's parole resulting in reincarceration.

44.    If a parolee's parole is revoked, the PPTB or its designee must provide the parolee with a written statement of the evidence relied on and the reasons for revocation within seven days of the revocation hearing.

11

45.    Parolees have the right to appeal a revocation decision within 30 days of the revocation hearing decision. The PPTB will then review the appeal and decide whether to affirm, reverse, or amend the hearing decision or to schedule an appearance by the parolee before the PPTB for further consideration.

**How Parole Revocation Is Actually Happening in Arkansas**

46.    In reality, Defendants fail to provide parolees with a variety of procedural protections to which they are legally entitled under controlling Supreme Court precedent, including *Gagnon* and *Morrissey*.

### *Failure to Appoint Counsel to Indigent Parolees*

47.    Arkansas lacks any system for screening parolees to determine if they are constitutionally entitled to appointed counsel at their parole revocation hearings. *See* Ex. 7 (PPTB Policies FOIA Resp.) at 3 (admitting that neither the ADC nor the PPTB have any internal policy or guidelines around the appointment of counsel other than Ark. Admin Code § 158, which does not allow for the appointment of counsel).

48.    In fact, a recently adopted administrative rule regarding parole revocation explicitly states that parolees "shall not have the right to have counsel appointed by the State." Ark. Admin. Code § 158.00.3-4.2(g)(2).

49.    When parolees request counsel for their revocation hearings, Defendants routinely deny these requests, often with limited or no screening beforehand. *See, e.g.*, Ex. 3 (J. Russell Decl.) ¶ 18; Ex. 4 (A. Guyton Decl.) ¶¶ 13–14; Ex. 5 (L. Torres-Delgado Decl.) ¶ 10; Ex. 6 (A. Campos Decl.) ¶ 8.

50.    As a result, Arkansas fails to provide appointed counsel to many indigent parolees who are constitutionally entitled to it.

51.     Defendants' policies and practices in this regard directly violate the requirements of due process established in *Gagnon*, which held that appointed counsel should be provided upon the parolee's request where there is "a timely and colorable claim" that the parolee "has not committed the alleged violation of the conditions upon which he is at liberty" or "a timely and colorable claim" that "even if the violation is a matter of public record or is uncontested, there are substantial reasons which justified or mitigated the violation and make revocation inappropriate, and . . . the reasons are complex or otherwise difficult to develop or present." 411 U.S. at 790. The Court further held that, "[i]n passing on a request for the appointment of counsel, the responsible agency also should consider, especially in doubtful cases, whether the probationer appears to be capable of speaking effectively for himself." *Id.* at 790–91.

52.     Thus, *Gagnon* affirmed that the right to counsel was "[p]resumptive[]" in three categories of cases: (1) where there is a colorable claim the parolee did not commit the violation; (2) where there is substantial evidence in mitigation of the violation, making revocation inappropriate; and (3) where the parolee is incapable of speaking effectively for themself. *Id.*

53.     A significant percentage of indigent parolees in Arkansas fall within one or more of the *Gagnon* categories.

54.     *First*, many parolees have, at the very least, a colorable claim that they did not commit the alleged violation. A sizable number of parolees are accused of violating the terms of their parole solely on the basis of their CSO's allegations that they committed a non-criminal technical violation, such as failing to check in with their CSO. *See, e.g.*, Ex. 13 (C. Brown Decl.) ¶ 6. In such cases, little evidence is offered in the violation report beyond listing the violation itself.

55.     Similarly, parolees frequently are accused of violating the terms of their parole merely because they have been arrested on suspicion of committing a new criminal offense. *See, e.g.*, Ex. 43 (C. Davis Decl.) ¶ 15. Sometimes the arrests themselves are unlawful. More often,

these criminal charges are dismissed in a court of law as unfounded. *See, e.g.*, Ex. 12 (A. Pacheco Decl.) ¶¶ 3, 5. Defendants' policies and procedures allow parolees to be deemed to have violated their parole and reincarcerated based solely on the fact that the parolee was subject to arrest on a probable cause standard rather than the preponderance of the evidence standard required in making the revocation decision.

56.     *Second*, even in cases where the alleged violation is uncontested, many parolees have substantial reasons mitigating the violation. Because of the complexity of developing such evidence, parolees are often incapable of presenting these mitigating circumstances on their own. Most parolees have difficulty developing such evidence in the first place while they are detained in county jails prior to their revocation hearing. *See, e.g.*, Ex. 27 (D. Beshears Decl.) ¶ 9; Ex. 28 (S. Rhodes Decl.) ¶¶ 15, 21; A. Guyton Decl. ¶ 8; Ex. 16 (M. Walker Decl.) ¶ 23; Ex. 29 (S. Higgins Decl.) ¶ 14. Further, Defendants have not established a system through which an unrepresented incarcerated person facing revocation can summon witnesses or obtain evidence for use at their hearings. Without a formal system, people facing revocation are forced to rely on the same people who have written their violation reports—CSOs—to gather potentially mitigating evidence on their behalf. CSOs systematically fail to gather such mitigating evidence as they are, as a matter of course, seeking to gather evidence to violate the parolee. *See, e.g.*, M. Walker Decl. ¶ 30; Ex. 30 (J. Vanderpool Decl.) ¶¶ 8, 12. As a result, very few people facing revocation are able to present their own witnesses or evidence at revocation hearings.

57.     *Third*, a number of parolees are unable to speak and advocate on their own behalf. *See, e.g.*, A. Guyton Decl. ¶¶ 13–14, 16; Ex. 19 (O. Burnell Decl.) ¶¶ 16–17; Ex. 47 (A. Dillard Decl.) ¶ 11. This is particularly true because parolees who are under the supervision of the ADC tend to have low rates of educational achievement and literacy and high rates of mental health disorders and educational and cognitive disabilities. The Arkansas Correctional School District

("ACSD") found that educational and reading levels among adults under the supervision of the ADC is lower than among the non-prison population. Ex. 39 (ACSD Dyslexia Screening & Intervention Plan) at 2. A 2020 study likewise found that many ADC staff members believed that a large percentage of ACSD students had undiagnosed learning disabilities. Ex. 41 (Dewey Study) at 64–65. These studies are consistent with national data showing that, on average, incarcerated adults have lower literacy and numeracy scores than their non-incarcerated counterparts. *See* Ex. 40 (Rampey Survey) at 6–7.

58.    Similarly, the ADC's own data shows a high prevalence of mental health concerns among incarcerated people. In 2023, over 1,500 people incarcerated in ADC facilities went on suicide watch at some point during the year; over 2,800 people in ADC facilities used psychotropic medications; and there were over 6,000 mental health intakes admitted to the ADC's three specialized mental health units. *See* Ex. 37 (Bid Solicitation) at 3–4, 6. A 2022 study conducted at Arkansas's largest county detention facility—a major feeder facility for ADC prisons—found that 62.6% of people in custody there screened positive for anxiety, 50.3% for depression, and 44.2% for post-traumatic stress disorder. Ex. 38 (Zielinski Study) at 3.

59.    Because of the Defendants' policies and practices, class members are denied screening for counsel and are unable to prepare for or effectively defend themselves at their parole revocation hearings. The result is that each year, the majority of people who proceed with a revocation hearing are being needlessly revoked. Technical violations in particular can often be remediated by an adjustment of the parolee's conditions of parole, without full-scale revocation. Yet, without counsel to aid in the presentation of such mitigating evidence, the hearing officer and PPTB systematically fail to take it into consideration.

### *Failure to Obtain Voluntary and Intelligent Waivers*

60.    Upon information and belief, many parolees are coerced or forced to waive one or both of their revocation hearings without full awareness of the consequences of that waiver or their rights if they were to have a hearing. *See, e.g.*, Ex. 10 (J. Thompson Decl.) ¶ 13; Ex. 11 (S. Fancher Decl.) ¶¶ 11–12; A. Pacheco Decl. ¶¶ 7–9; Ex. 14 (J. Calvert Decl.) ¶¶ 7–8; Ex. 15 (G. Greer Decl.) ¶¶ 8–10; Ex. 17 (A. Boyd Decl.) ¶ 9; Ex. 18 (B. Baker Decl.) ¶ 19.

61.    CSOs do this in a number of ways. They pressure parolees into waiving by telling them that they would not be successful at a hearing based on the allegations in their violation report. *See, e.g.*, M. Walker Decl. ¶ 15; J. Thompson Decl. ¶ 8; C. Brown Decl. ¶¶ 8–9; Ex. 25 (J. Hawkins Decl.) ¶ 12; Ex. 23 (K. Luneau Decl.) ¶¶ 8–9; G. Greer Decl. ¶ 8. They display dissatisfaction and frustration when parolees ask questions about, or otherwise suggest that they might be considering, a hearing. *See, e.g.*, Ex. 24 (M. Whitaker Decl.) ¶ 8. Or they inform parolees of their right to a final revocation hearing but fail to mention their right to a preliminary hearing, thereby depriving them of an opportunity to make their case as to why probable cause of their alleged violations does not exist. *See, e.g.*, Ex. 20 (P. Callahan Decl.) ¶ 8; M. Walker Decl. ¶ 18; Ex. 21 (D. Pruitt Decl.) ¶¶ 6, 23.

62.    Some parolees choose to waive their right to a revocation hearing and instead accept a parole violation sentence based on false information they receive from their CSO regarding the nature of that violation sentence. *See, e.g.*, Ex. 26 (J. Pharris Decl.) ¶¶ 8–13; S. Fancher Decl. ¶¶ 6, 12; D. Beshears Decl. ¶¶ 8, 12–13; K. Luneau Decl. ¶¶ 25–27. Though a parolee's CSO may claim that the parolee will be released from custody after serving the violation sentence, in reality, unless the parolee is placed in the Supervision Sanction Program or on suspended imposition of

revocation, the parolee will merely go before the PPTB for a parole eligibility hearing at the conclusion of their violation term and may not be released at all.

63.     This waiver process generally happens in just a matter of minutes, while the parolee is in custody at a secure facility, before a CSO, without any prior access to a law library, and without access to counsel. *See, e.g.*, J. Thompson Decl. ¶ 16; A. Boyd Decl. ¶ 7; Ex. 22 (J. Johnson Decl.) ¶ 14; K. Luneau Decl. ¶ 6.

64.     As a result, the vast majority of parolees alleged to have violated the conditions of their parole waive their right to a hearing. Between March and December 2023, 2,309 of 3,427 people—approximately 67%—accused of a parole violation waived their right to a hearing. Ex. 2 (Parole Revocation Data) at 2.

### *Failure to Provide Other Due Process Protections*

65.     Parolees who choose not to waive their right to a hearing are entitled to a variety of procedural protections under controlling Supreme Court precedent such as *Morrissey*. These protections include, but are not limited to:

a. The right and opportunity to receive adequate written notice of the allegations and evidence against the parolee prior to their preliminary revocation hearing;

b. The right and opportunity to speak on their own behalf at both their preliminary and final revocation hearing;

c. The right to develop evidence in advance of their preliminary and final revocation hearing;

d. The right to access legal materials required in order for the parolee to participate meaningfully in their revocation proceedings;

    e.   The right and opportunity to present written evidence and witnesses at both the preliminary and final revocation hearing;

    f.   The right to have an actual hearing before a fair and impartial decision maker;

    g.   The right to remain silent during revocation proceedings; and

    h.   The right and opportunity to confront and cross-examine adverse witnesses at both the preliminary and final revocation hearing, unless the hearing officer specifically finds good cause for not allowing confrontation.

66.    Yet Defendants' policies and practices make it difficult, if not impossible, for parolees to actually prepare for or defend themselves during their hearings.

67.    Defendants frequently fail to provide parolees with their violation reports, preventing parolees from fully understanding their alleged violations and making it difficult for them to prepare for their revocation hearings. *See, e.g.*, B. Baker Decl. ¶ 18; M. Walker Decl. ¶ 17; Ex. 8 (S. Miner Decl.) ¶ 11.

68.    Parolees are denied adequate notice of their legal rights or access to the necessary legal resources to participate meaningfully in the parole revocation process. *See, e.g.*, S. Miner Decl. ¶¶ 14, 17–18; Ex. 9 (D. Warren Decl.) ¶¶ 9–10; J. Thompson Decl. ¶¶ 9–10; S. Fancher Decl. ¶¶ 8–9; A. Pacheco Decl. ¶¶ 7–8; C. Brown Decl. ¶ 10; J. Calvert Decl. ¶¶ 8; G. Greer Decl. ¶ 9; M. Walker Decl. ¶ 8. Defendants fail to provide parolees with any information about the relevant evidentiary standards for parole revocation hearings. *See* Ex. 32 (Notice of Parole Violation Action & Revocation Hearing Waiver Forms). They also do not provide parolees notice about their Fifth Amendment right to remain silent in such hearings, even in cases where parolees are facing revocation based on new criminal charges. *See id.*

69.    Though some parolees may receive written forms with limited notice of their due process rights, they are often not afforded sufficient time or assistance to read through them before signing them. *See, e.g.*, J. Thompson Decl. ¶ 13; J. Calvert Decl. ¶ 7; G. Greer Decl. ¶ 10; J. Hawkins Decl.¶ 14. Moreover, the information in the written forms often conflicts with verbal instructions parolees receive from their CSOs. *See, e.g.*, L. Torres-Delgado Decl. ¶ 10 (parolee informed by CSO that he could not be appointed an attorney for his hearing); A. Campos Decl. ¶¶ 8–9 (parolee informed by CSO that he could not be appointed an attorney for his hearing and that he could not cross-examine the arresting officer); J. Johnson Decl. ¶ 8 (parolee informed by CSO that his desired witnesses "would not be permitted to attend the [revocation] hearing because they were not present at the scene of [parolee's] arrest").

70.    For parolees detained in a county jail or another detention facility before their hearing, Defendants may not provide access to legal resources or materials about the revocation process. *See, e.g.*, Ex. 31 (T. Fason Decl.) ¶ 17.

71.    Parolees in detention also face obstacles in contacting potential witnesses and gathering mitigating evidence. They generally cannot access the phone unless they have sufficient funds in their account. *See, e.g.*, D. Beshears Decl. ¶ 9; S. Rhodes Decl. ¶¶ 15, 21; S. Higgins Decl. ¶ 14; J. Johnson Decl. ¶ 13. Even those who do have funds may not be allowed regular access to phones or may not have the means to obtain the phone numbers of the people they would like to contact. *See, e.g.*, A. Guyton Decl. ¶ 8; M. Walker Decl. ¶ 23; K. Luneau Decl. ¶ 16.

72.    Given these barriers, parolees have no other choice but to seek assistance from their CSOs—the very individuals responsible for initiating revocation proceedings against them and testifying against them at their revocation hearings. *See, e.g.*, M. Walker Decl. ¶ 30; J. Vanderpool Decl. ¶¶ 8, 12; K. Luneau Decl. ¶¶ 30–31; M. Whitaker Decl. ¶ 20. This gives rise to a systemic

conflict of interest and all but ensures that revocation hearings are stacked against parolees from the get-go.

73.    The final revocation hearings conducted by the PPTB through its designees, the PRJs, are rote affairs that fail to deliver any of the due process protections guaranteed by the U.S. Constitution, many of which are also enshrined under Arkansas law.

74.    CSOs and arresting officers regularly do not attend revocation hearings, or else they send another CSO or law enforcement officer who lacks personal knowledge to testify to the contents of the violation and arrest reports. *See, e.g.*, Ex. 33 (S. Elwood Decl.) ¶ 17; S. Miner Decl. ¶ 16; B. Baker Decl. ¶ 12; C. Davis Decl. ¶ 16. This reliance on multiple levels of hearsay evidence prevents parolees from exercising their right to cross-examination. Even when CSOs and arresting officers do attend hearings, PRJs regularly prevent parolees from cross-examining them or severely limit the scope of their cross-examination. *See, e.g.*, S. Miner Decl. ¶ 18; J. Vanderpool Decl. ¶ 13; S. Rhodes Decl. ¶ 26; K. Luneau Decl. ¶ 28; M. Whitaker Decl. ¶¶ 21–22; Ex. 34 (S. Collins Decl.) ¶ 13.

75.    Defendants also frequently deny parolees their right to speak on their own behalf. Those parolees who are allowed to testify are often cut off by the PRJ before they have finished providing their full statement. *See, e.g.*, S. Higgins Decl. ¶ 31; K. Luneau Decl. ¶ 29.

76.    Defendants also often deny parolees the opportunity to contest their alleged parole violation by presenting documentary and physical evidence or live witnesses who can provide mitigating or exculpatory evidence on the parolee's behalf. Family members and advocates who seek to serve as witnesses at their loved one's hearing are regularly denied access to the hearings and prohibited from participating on the parolee's behalf. *See, e.g.*, M. Walker Decl. ¶ 30; S. Rhodes Decl. ¶¶ 18, 22; Ex. 35 (J. Swinford Decl.) ¶¶ 10–11; K. Luneau Decl. ¶¶ 30–31.

77.    Following the hearings, Defendants frequently fail to provide parolees written copies of hearing decisions. *See, e.g.*, S. Miner Decl. ¶ 20; M. Whitaker Decl. ¶ 25; J. Johnson Decl. ¶ 18; J. Swinford Decl. ¶ 14. Instead, parolees are forced to ask jail officers or family members to look up the outcomes of their hearings. *See, e.g.*, M. Walker Decl. ¶ 31.

78.    Defendants also fail to provide parolees adequate information on how to appeal a revocation decision. This lack of instruction, along with an inability to properly develop the record through evidence and witness testimony, inhibits parolees' ability to meaningfully appeal their revocations. In addition, because Defendants do not consistently provide parolees with documentation of the final revocation decision, Plaintiffs lack the documentation and record necessary to file an appeal. *See, e.g.*, M. Walker Decl. ¶ 31; S. Miner Decl. ¶ 20; Ex. 36 (D. Henson Decl.) ¶ 14; S. Rhodes Decl. ¶ 29.

79.    The systematic and ongoing violations described in the preceding paragraphs result in the arbitrary imprisonment of thousands of people in Arkansas prisons. Parolees are consistently subjected to months of unreviewable incarceration without process or remedy. As a result of Defendants' practices, procedures, and customs, Plaintiffs and the members of the class have suffered and continue to suffer well-established violations of their right to due process under the Fourteenth Amendment to the U.S. Constitution.

## CLASS ACTION ALLEGATIONS

80.    Plaintiffs bring this complaint as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(1) and (b)(2).

**Proposed Class**

81.    The class is defined as all adult parolees who are in the custody, or under the supervision, of the ADC, and who currently face, or will in the future face, parole revocation proceedings administered by Defendants.

82.     The proposed class satisfies the requirements of Fed. R. Civ. P. 23(a)(1) as the class is so numerous that joinder of all members is impractical. In 2023, more than 22,000 people were on parole in the State of Arkansas. BJS 2023 at 31. Between March 2023 and December 2023, more than 3,400 parolees in Arkansas were subject to parole revocation proceedings. Parole Revocation Data at 1. Thus, there are thousands of people in the proposed class. While the PPTB fails to provide accurate public information about the exact number of people charged with violating their parole each year, it is certain that Defendants track the population of people in their custody who are subject to revocation proceedings, and so the applicable class is easily ascertainable.

83.     Joinder is not warranted as the vast majority of the class members are without the means to retain an attorney to represent them in a civil rights lawsuit. Even if the class members could afford to litigate, individual litigation would be an unnecessary burden on Arkansas's federal courts because the class is too numerous. And due to the nature of the State's revocation proceedings, the class is an inherently transitory population. The class includes many future members whose names are not known, since new people are released from prison and placed on parole each day and Defendants initiate parole revocation proceedings several times each week. Thus, as long as Defendants continue their current revocation practices, there will be a constant class of parolees suffering the constitutional violations alleged in this complaint.

84.     Plaintiffs and the members of the class are similarly situated for the purposes of asserting the claims alleged in this complaint on a common basis. Pursuant to Rule 23(a)(2), there are questions of law and fact common to all class members. These include:

> a.  Whether Defendants' policy and practice of systematically denying attorney screenings and appointed counsel to parolees under the supervision of the ADC at

22

their parole revocation hearings violates the Fourteenth Amendment to the U.S. Constitution;

b.  Whether Defendants' parole revocation procedures, under which parolees are frequently denied the opportunity to speak on their own behalf, present evidence and witnesses, and cross-examine adverse witnesses, and have an actual parole hearing that is conducted by a fair and impartial decision maker, fail to provide parolees with adequate due process as required by the Fourteenth Amendment;

c.  Whether Defendants or their designees systematically coerce or force parolees to waive one of both of their revocation hearings without providing accurate or sufficient information about the consequences of that waiver;

d.  Whether Defendants or their designees fail to provide parolees access to legal resources prior to their revocation hearings;

e.  Whether Defendants or their designees fail to provide parolees a meaningful opportunity to develop evidence (including witness testimony) in advance of their revocation hearings;

f.  Whether Defendants or their designees systematically prevent parolees from testifying on their own behalf at their revocation hearings;

g.  Whether Defendants or their designees systematically prevent parolees from presenting documentary and physical evidence and witness testimony at their revocation hearings; and

h.  Whether Defendants or their designees systematically prevent parolees from cross-examining adverse witnesses at their revocation hearings.

85.    Because the practices and procedures challenged in this complaint apply with equal force to the individual Named Plaintiffs and the other members of the class, the claims of the

23

individual Named Plaintiffs are typical of the class and thus meet the requirements of Rule 23(a)(3).

86.    The class action likewise meets the related requirements of Rule 23(a)(4). The individual Named Plaintiffs will fairly and adequately represent the interests of the class. They possess a strong personal interest in the subject matter of the lawsuit and are represented by experienced counsel with expertise in complex civil rights litigation. Plaintiffs' counsel from the Roderick & Solange MacArthur Justice Center, Latham & Watkins LLP, and the ACLU of Arkansas are experienced litigators in complex federal civil rights matters. They have previously litigated injunctive class actions across the country involving parole revocation proceedings, disability rights, and the rights of prisoners and people serving criminal sentences, and have the legal knowledge and resources to fairly and adequately represent the interests of all class members in this action.

87.    A class action is appropriate under Rule 23(b)(1), as it is the only practicable means by which the individual Named Plaintiffs and the class members can challenge Defendants' unconstitutional parole revocation processes. Individualized litigation presents a potential for inconsistent or contradictory judgments, which would force Defendants to adopt conflicting revocation procedures for different class members and increase the delay and expense to all parties and the judicial system. By contrast, a class action will result in substantial benefit to the litigants by establishing clear standards for the State's parole revocation system and to the Court by allowing the Court to resolve numerous individual claims based on a single set of proof in a case concerning Defendants' uniform policies, practices, and procedures.

88.    A class action is also appropriate under Rule 23(b)(2), as Defendants have acted and failed to act on grounds generally applicable to the class: their policies, procedures, and

practices (and their concomitant lack of policies) have affected all class members. Accordingly, final injunctive and declaratory relief is appropriate to the class as a whole.

**Proposed Subclass of Parolees with Disabilities**

89.    Plaintiffs also seek certification of a subclass of all adult parolees who are in the custody, or under the supervision, of the ADC; who have a disability, as defined by 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B); who need accommodations in order to meaningfully access and participate equally in the parole revocation process; and who currently face, or in the future will face, parole revocation proceedings administered by Defendants.

90.    This proposed subclass, too, is so numerous that joinder of all members is impracticable. A high percentage of people under the supervision of the ADC struggle with literacy. *See* ACSD Dyslexia Screening & Intervention Plan at 4; Dewey Study at 64–65; *see also* Rampey Survey at 6–7. Likewise, records from the ADC documenting psychotropic medication use and suicide watch rates suggest that hundreds if not thousands of people in Arkansas prisons struggle with mental health concerns. Bid Solicitation.

91.    As with the full class, individual litigation would be costly and impracticable. And the subclass, too, includes many future members whose names are not known, since new people with disabilities are released from prison and placed on parole each day, and Defendants initiate parole revocation proceedings several times each week.

92.    Named Plaintiffs Todd Fason and Robby Riedel and the members of the subclass are similarly situated for the purposes of asserting the claims alleged in this complaint on a common basis. There are questions of law and fact common to all subclass members. These include:

　　　　　　a.    Whether Defendants' policy and practice of systematically failing to screen parolees with disabilities for appointed counsel and denying appointed counsel at

parole revocation hearings to parolees with disabilities under the supervision of the ADC violates the ADA and the Rehabilitation Act;

b.  Whether Defendants fail to assess whether and what types of reasonable accommodations parolees with disabilities require at their parole revocation hearings; and

c.  Whether Defendants fail to provide reasonable accommodations to parolees with disabilities at their parole revocation hearings. Examples of such accommodations include, but are not limited to:

    i.  Assistance with reading written materials;

    ii.  Clear explanations of the parole revocation process and related rights of parolees;

    iii.  In-person hearings;

    iv.  Access to medications;

    v.  Access to durable medical equipment (including, but not limited to, glasses and hearing aids);

    vi.  Access to assistive technology (including, but not limited to, text-to-speech devices and screen-readers);

    vii.  Large-print materials; and

    viii.  Permission to testify in writing.

93.  Because the practices and procedures challenged in this complaint—specifically, the Defendants' failure to screen for counsel and to accommodate people with disabilities in parole revocation proceedings—apply with equal force to Named Plaintiffs Todd Fason and Robby Riedel and the other members of the subclass, the claims of Todd Fason and Robby Riedel are typical of the subclass.

26

94.     Named Plaintiffs Todd Fason and Robby Riedel will fairly and adequately represent the interests of the subclass. They possess a strong personal interest in the subject matter of the lawsuit and are represented by experienced counsel with expertise in complex civil rights litigation, as set forth above.

95.     Individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the judicial system. By contrast, a class action will result in substantial benefit to the litigants and the Court by allowing the Court to resolve numerous individual claims based on a single set of proof in a case concerning Defendants' uniform policies, practices, and procedures.

96.     Defendants have also acted on grounds generally applicable to the subclass: their policies, procedures, and practices (as well as their lack thereof) concerning the treatment of people with disabilities in parole revocation proceedings have affected all subclass members. Accordingly, final injunctive and declaratory relief is appropriate to the subclass as a whole.

## INDIVIDUAL PLAINTIFF ALLEGATIONS

**Calvin Davis**

97.     Calvin Davis is an indigent adult currently in ADC custody. He has been accused of violating his parole by being charged with a new criminal offense. Mr. Davis has been detained at the Faulkner County Detention Center ("FCDC") on a parole hold since January 23, 2026. Although the criminal court released him on a bond and ankle monitor for the criminal charges underlying his alleged parole violation, he remains in detention pursuant to his parole hold.

98.     On January 23, 2026, a CSO came to give him paperwork related to his alleged parole violation. During this visit, Mr. Davis did not have time to read through and understand the paperwork.

99.     The CSO told Mr. Davis that the hearing was mandatory, but also told him that he could change his mind and waive the hearing. Mr. Davis was confused about his options.

100.     The CSO did not orally inform him of his right to a preliminary revocation hearing and did not ask whether he wanted to waive his right to such a hearing.

101.     The CSO did not orally inform him of his right to present witnesses at his revocation hearing and did not provide any paperwork that Mr. Davis could use to write down the names and contact information of his witnesses. Mr. Davis would like to have witnesses present testimony at his hearing to support his account of the events underlying his new criminal charge. He would also like to call his CSO, who he was told would not be present at the hearing. If he were provided the means to call his CSO, he would want to be able to question his CSO about his positive progress on parole, including the fact that he has attended all of his meetings with his CSO, passed every drug test, maintained employment, and has otherwise complied with the terms of his release.

102.     The CSO did not orally inform him of his right to be represented by counsel during his revocation hearing and did not say anything about the possibility of being screened for and appointed no-cost counsel for his hearing if he could not afford to hire an attorney. Mr. Davis cannot afford to hire a private attorney and would like to be screened for appointed counsel.

103.     Mr. Davis has not been informed of the date of his final revocation hearing. Fourteen days after January 23, 2026, the date of his arrest, is February 6, 2026.

104.     Mr. Davis is diagnosed with anxiety and takes Zoloft daily to manage his anxiety. Since he has been detained, he has not had access to this medication. Without his medication, he feels less in control of his emotions. His CSO and/or officials at FCDC are aware of his disability.

105.     Mr. Davis has been successful on parole. He consistently attends his appointments with his CSO, pays his monthly fees, and has not tested positive for any drugs.

28

106.    Mr. Davis has a colorable claim that he did not commit one or more of his alleged parole violations, has mitigating evidence to justify why he should not be further imprisoned, and needs assistance to meaningfully present evidence. He has witnesses and documentary evidence supporting his account of events, including video footage of the alleged incident. If provided an opportunity to obtain and present evidence, and with the assistance of counsel, he would have the opportunity to demonstrate that revocation is unwarranted. Defendants failed and will continue to fail to ensure that Mr. Davis is afforded appropriate process and screened for and appointed counsel during his parole revocation proceedings.

107.    When ultimately re-released on parole in the days ahead, Mr. Davis will continue to be at risk for arbitrary and capricious processes relating to alleged parole violations. This is particularly true given Mr. Davis's mental health diagnosis.

**Todd Fason**

108.    Todd Fason is an indigent adult currently in ADC custody. He has been accused of violating his parole by being charged with a new criminal offense, failing to maintain education or employment, staying away from his residence without permission from his CSO, failing a drug test, and missing an appointment with his CSO. He was arrested in relation to one or more of these violations on January 22, 2026, and detained at FCDC.

109.    The day after his arrest, Mr. Fason's CSO visited him in jail and provided him with a violation report listing his alleged violations. Mr. Fason noted that some of the violations in the report seemed inaccurate. For example, the violation report alleged that he had been arrested and charged with a misdemeanor that was violent or sexual in nature, but Mr. Fason does not recall being charged with such an offense.

110.    Mr. Fason's CSO informed him that he would need to proceed with a revocation hearing but suggested that he could later waive his right to a hearing and accept a six-month parole

violation instead. Mr. Fason was confused about his options but stated that he wanted to proceed with a hearing.

111.    Mr. Fason's CSO did not orally inform him of his right to a preliminary revocation hearing and did not ask whether he wanted to waive his right to such a hearing.

112.    His CSO did not orally inform him of his right to present evidence at his revocation hearing. Mr. Fason would like to present medical records, including a doctor's note that he had offered to provide to his CSO regarding an upcoming surgery he is having for a leg injury. Mr. Fason uses a bicycle as his primary mode of transportation but had not been able to ride his bicycle because of his leg injury. As a result, he was unable to attend a mandatory class and missed an appointment with his parole officer. He attempted to arrange alternative transportation but could not successfully coordinate it because he lost cellular service.

113.    His CSO did not orally inform him of his right to present witnesses at his revocation hearing and did not provide any paperwork that Mr. Fason could use to write down the names and contact information of his witnesses. Mr. Fason would like to have his sister and a staff member at the rehabilitation center at which he was accepted to testify as witnesses at his hearing. His sister could provide more details about his alleged criminal charge and talk about how committed he has been to meeting with his CSO, even going so far as to travel three hours by bicycle to appointments when he could not get a ride to the parole office. The rehabilitation center staff member would be able to testify about his struggles with substance use and his recent acceptance into a drug treatment program at the rehabilitation center.

114.    His CSO did not orally inform him of his right to be represented by counsel during his revocation hearing and did not say anything about the possibility of being screened for and appointed no-cost counsel for his hearing if he could not afford to hire an attorney. Mr. Fason cannot afford to hire a private attorney and would like to be screened for appointed counsel.

115.   Mr. Fason has been diagnosed with attention-deficit/hyperactivity disorder ("ADHD"). He has been prescribed Dextroamphetamine to treat his ADHD symptoms, but he has not been provided this medication while detained at FCDC. When he is not on medication for his ADHD, he has difficulty concentrating, being productive, organizing documents, and meaningfully participating in legal proceedings unassisted. Officials at FCDC, where Mr. Fason is currently being housed, are aware of his disability.

116.   Because of past trauma, including his experience as a victim of police brutality, Mr. Fason is hypervigilant. He is often disturbed by loud noises in his surroundings, has difficulty sleeping, and has recurring nightmares and flashbacks to traumatic incidents in his past.

117.   Mr. Fason has struggled with substance use disorder. Prior to his arrest, he was actively seeking treatment and had recently gotten off the waitlist for a treatment program. Because of his incarceration, he has not been able to attend that program.

118.   Mr. Fason also suffers from high blood pressure, has a hematoma in his leg that will require surgery, and experiences chronic migraines because of a previous concussion.

119.   Mr. Fason never finished high school. The highest level of education he completed was the eleventh grade.

120.   Mr. Fason's hearing date is currently scheduled for February 3, 2026.

121.   Mr. Fason has a colorable claim that he did not commit one or more of his alleged parole violations, has mitigating evidence to justify why he should not be further imprisoned, and needs assistance to meaningfully present evidence. Defendants failed and will continue to fail to ensure that Mr. Fason is afforded appropriate process and screened for and appointed counsel during his parole revocation proceedings.

31

122. When ultimately re-released on parole in the days ahead, Mr. Fason will continue to be at risk for arbitrary and capricious processes relating to alleged parole violations. This is particularly true given Mr. Fason's mental health diagnosis and history of substance use and abuse.

**NeDraya McGowan**

123. NeDraya McGowan is an indigent adult currently in ADC custody. He has been accused of violating his parole by being charged with a new criminal offense. He was arrested in relation to this violation on January 19, 2026, and detained at the Garland County Detention Center.

124. The following day, he met with his CSO who informed him he would receive a 90-day sanction if he waived his revocation hearing. His CSO later informed him that he was not eligible for the 90-day sanction, but said he would receive a six-month parole violation sentence if he waived his hearing. Mr. McGowan stated that he would proceed with a hearing.

125. His CSO did not inform him of his right to a preliminary revocation hearing and did not ask him if he wished to waive his right to such a hearing.

126. The CSO did not orally inform him of his right to present witnesses or evidence.

127. His CSO did not orally inform him of his right to be represented by counsel during his revocation hearing and did not say anything about the possibility of being screened for and appointed no-cost counsel for his hearing if he could not afford to hire an attorney. Mr. McGowan cannot afford to hire a private attorney and would like to be screened for appointed counsel.

128. Although Mr. McGowan has phone access, he does not know when his final revocation hearing will be, so he cannot provide notice to potential witnesses. Fourteen days after January 19, 2026, the date of his arrest, is February 2, 2026.

129.    Mr. McGowan has limited access to legal resources while incarcerated. Although the detention center where he is incarcerated has a law library on its tablets, the information is very limited.

130.    Mr. McGowan has a colorable claim that he did not commit one or more of his alleged parole violations, has mitigating evidence to justify why he should not be further imprisoned, and needs assistance to meaningfully present evidence. Defendants failed and will continue to fail to ensure that Mr. McGowan is afforded appropriate process and screened for and appointed counsel during his parole revocation proceedings.

131.    When ultimately re-released on parole in the days ahead, Mr. McGowan will continue to be at risk for arbitrary and capricious processes relating to alleged parole violations.

**Robby Riedel**

132.    Robby Riedel is an indigent adult currently in ADC custody. He believes that he has been accused of violating his parole by being charged with a new criminal offense and for a technical violation, though he has not yet received a violation report. He was arrested in relation to one or more of these alleged violations on January 24, 2026, and detained at the Pulaski County Regional Detention Facility ("PCRDF").

133.    Mr. Riedel has not yet met with his CSO regarding his alleged parole violations. When he does, Mr. Riedel plans to invoke his right to a revocation hearing.

134.    Mr. Riedel does not yet know the date of his final revocation hearing. Fourteen days after January 24, 2026, the date of his arrest, is February 7, 2026.

135.    Mr. Riedel plans to request that his girlfriend serve as a witness at his revocation hearing. His girlfriend, the alleged victim of his new alleged criminal offense, can testify that she does not intend to press charges against him and speak more about his experience on parole.

136.    Mr. Riedel is near-sighted and uses glasses. He was not able to bring any glasses to the PCRDF at the time he was arrested.

137.    Mr. Riedel has struggled with substance abuse for over 15 years.

138.    Mr. Riedel has been diagnosed with anxiety and depression. He takes Wellbutrin and Seroquel to treat these conditions. When he is not on his medications, he has trouble sleeping, experiences feelings of hopelessness, and is constantly on edge, all of which make it hard for him to focus and gather his thoughts. Mr. Riedel is not currently receiving his medications while in jail.

139.    Mr. Riedel has a colorable claim that he did not commit one or more of his alleged parole violations, has mitigating evidence to justify why he should not be further imprisoned, and needs assistance to meaningfully present evidence. Defendants failed and will continue to fail to ensure that Mr. Riedel is afforded appropriate process and screened for and appointed counsel during his parole revocation proceedings.

140.    When ultimately re-released on parole in the days ahead, Mr. Riedel will continue to be at risk for arbitrary and capricious processes relating to alleged parole violations. This is particularly true given Mr. Riedel's mental health diagnoses and history of substance use and abuse.

## COUNT I

### 42 U.S.C. § 1983 Right to Due Process
### Under the Fourteenth Amendment to the United States Constitution
### *By All Plaintiffs, On Behalf of Themselves and All Others Similarly Situated,*
### *Against All Defendants*

141.    Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

142.    Plaintiffs seek injunctive and declaratory relief against all Defendants to prevent the continued violation of the rights of Plaintiffs and the class they represent.

143.    As a matter of policy, practice, and custom, Defendants systematically fail to screen parolees to determine whether they are eligible for counsel, at cost to the State, as required under *Gagnon v. Scarpelli*. They fail to appoint counsel to those parolees who do qualify—namely, indigent parolees who have a colorable claim that they did not commit an alleged parole violation; have mitigating evidence explaining why revocation is inappropriate; and/or would have difficulty effectively advocating on their own behalf given the complexity of the process or their own mental health, medical, educational, or other challenges.

144.    Defendants also fail to provide parolees with revocation proceedings that protect their rights to procedural due process. As a result of Defendants' policies, practices, and customs, parolees are affirmatively barred from developing and/or accessing evidence and witnesses that they are entitled to present during their revocation proceedings. Parolees are unable to speak on their own behalf, present evidence and witnesses, and cross-examine adverse witnesses. This inability to develop the underlying record limits parolees' right to meaningfully appeal the hearing decision they eventually receive.

145.    Compounding these procedural deficiencies, Defendants fail to provide parolees with a substantive hearing before a fair and unbiased decision maker. Instead, Defendants supply

parolees with procedures that amount to little more than a rubberstamping of the recommendations of CSOs.

146.    Consequently, Defendants are in continuous violation of Plaintiffs' rights and the rights of the members of the class under the Fourteenth Amendment to the United States Constitution.

## COUNT II

### Disability Discrimination in Violation of Title II of the
### Americans with Disabilities Act, 42 U.S.C. § 12132
***By Todd Fason and Robby Riedel, On Behalf of Themselves and All Others Similarly Situated,***
***Against All Defendants***

147.    Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

148.    Multiple subclass members, including Named Plaintiffs Todd Fason and Robby Riedel, have documented mental, intellectual, cognitive, and physical disabilities. These include ADHD, anxiety, and depression. Such disabilities impair the subclass members' ability to effectively advocate on their own behalf.

149.    The subclass members with such disabilities have a clear record of their disabilities, and they have been regarded as having such disabilities by Defendants, including at the time of the events described in this complaint.

150.    The subclass members therefore are disabled within the meaning of the ADA, 42 U.S.C. § 12102.

151.    The ADC and the PPTB are public entities within the meaning of 42 U.S.C. § 12131.

152.    As people on parole in the custody of the ADC, the subclass members with disabilities are qualified to receive the benefits of the services, programs, and activities Defendants

provide. They are thus qualified individuals with a disability within the meaning of 42 U.S.C. § 12131(2).

153. Defendants' failure to assess whether and what types of accommodations Plaintiffs with disabilities require, and to provide such accommodations, deprives Plaintiffs with disabilities of meaningful access to the parole revocation hearing process. This includes Defendants' failure to screen any parolees to determine whether they are eligible for counsel, at cost to the State, as required under *Gagnon*, and Defendants' failure to appoint counsel to those parolees who do qualify.

154. Defendants' systematic failure to assess whether and what types of accommodations Plaintiffs with disabilities require, and to provide such accommodations, has the effect of subjecting Plaintiffs with disabilities to discrimination on the basis of disability.

155. As a result of Defendants' failure to conduct attorney screenings and appoint counsel at revocation hearings, the subclass members with disabilities must represent themselves at those hearings, even if their disabilities make it difficult or impossible to do so.

156. Thus, Defendants deny the subclass members with disabilities benefits of the services, programs, or activities of a public entity.

157. Defendants thereby violate the subclass members' rights under Title II of the ADA, 42 U.S.C. § 12132.

## COUNT III

**Disability Discrimination in Violation of § 504 of the Rehabilitation Act, 29 U.S.C. § 794**
*By Todd Fason and Robby Riedel, On Behalf of Themselves and All Others Similarly Situated,*
*Against All Defendants*

158.    Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

159.    Multiple subclass members, including Named Plaintiffs Todd Fason and Robby Riedel, have documented mental, intellectual, cognitive, and physical disabilities. These include ADHD, anxiety, and depression. Such disabilities impair the subclass members' ability to effectively advocate on their own behalf.

160.    The subclass members with such disabilities have a clear record of their disabilities, and they have been regarded as having such disabilities by Defendants, including at the time of the events described in this complaint.

161.    The subclass members therefore are disabled within the meaning of § 504 of the Rehabilitation Act, 29 U.S.C. §§ 794 and 705(20).

162.    The ADC and the PPTB are the recipients of federal financial assistance, and their parole revocation proceedings constitute programs or activities within the meaning of 29 U.S.C. § 794(b).

163.    As people on parole in the custody of the ADC, the subclass members with disabilities are qualified to receive the benefits of the services, programs, and activities the ADC provides.

164.    Defendants' failure to assess whether and what types of accommodations Plaintiffs with disabilities require, and to provide such accommodations, deprives Plaintiffs with disabilities of meaningful access to the parole revocation hearing process. This includes Defendants' failure to screen any parolees to determine whether they are eligible for counsel, at cost to the State, as

38

required under *Gagnon*, and Defendants' failure to appoint counsel to those parolees who do qualify.

165.   Defendants' systematic failure to assess whether and what types of accommodations Plaintiffs with disabilities require, and to provide such accommodations, has the effect of subjecting Plaintiffs with disabilities to discrimination on the basis of disability.

166.   As a result of Defendants' failure to conduct attorney screenings and appoint counsel at revocation hearings, the subclass members with disabilities must represent themselves at those hearings, even if their disabilities make it difficult or impossible to do so.

167.   Thus, Defendants deny the subclass members with disabilities benefits of the services, programs, or activities of a public entity receiving federal funding.

168.   Defendants thereby violate the subclass members' rights under § 504 of the Rehabilitation Act, 29 U.S.C. § 794.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the class they seek to represent respectfully pray that this Court enter judgment in their favor and against Defendants in the following manner:

1.   Enter an order certifying a class of all adult parolees who are in the custody, or under the supervision, of the ADC, and who currently face, or will in the future face, parole revocation proceedings administered by Defendants.

2.   Enter an order certifying a subclass of all adult parolees who are in the custody, or under the supervision, of the ADC; who have a disability, as defined by 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B); who need accommodations in order to meaningfully access and participate equally in the parole revocation process; and who currently face, or in the future will face, parole revocation proceedings administered by Defendants.

3.      Adjudge and declare that the policies, practices, conduct, and omissions described in this complaint are in violation of the rights of Plaintiffs and the putative class they seek to represent under the Fourteenth Amendment to the United States Constitution.

4.      Adjudge and declare that the policies, practices, conduct, and omissions described in this complaint are in violation of the rights of all Plaintiffs with disabilities and the putative subclass members with disabilities under Title II of the ADA, 42 U.S.C. § 12132, and § 504 of the Rehabilitation Act, 29 U.S.C. § 794.

5.      Preliminarily and permanently enjoin Defendants, their agents, employees, and all persons under their control from subjecting Plaintiffs and the putative class and subclass they seek to represent from the unlawful policies, practices, conduct, and omissions described in this complaint.

6.      Retain jurisdiction of this case until such time as Defendants have fully complied with all orders of the Court, and there is reasonable assurance that the Defendants will continue to comply in the future with these orders.

7.      Award Plaintiffs reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988.

8.      Award Plaintiffs and the class they represent such other and further relief as the Court deems just and proper.

40

DATED: February 2, 2026    Respectfully submitted,

By: _____

John C. Williams (Ark. Bar No. 2013233)
Hadiyah Cummings (Md. Bar No. 2504281001)
ARKANSAS CIVIL LIBERTIES UNION FOUNDATION, INC.
904 West 2nd Street
Little Rock, AR 72201
Tel.: 501-374-2842
john@acluarkansas.org
hadiyah@acluarkansas.org

Bridget Geraghty (*motion to appear pro hac vice forthcoming*)
Emily C. Keller (*motion to appear pro hac vice forthcoming*)
Olivia Fritz (*motion to appear pro hac vice forthcoming*)
RODERICK & SOLANGE MACARTHUR JUSTICE CENTER
160 East Grand Avenue, 6th Floor
Chicago, IL 60611
Tel.: 312-503-8282
Fax: 312-503-0891
bridget.geraghty@macarthurjustice.org
emily.keller@macarthurjustice.org
olivia.fritz@macarthurjustice.org

Samir Deger-Sen (*motion to appear pro hac vice forthcoming*)
S.Y. Jessica Hui (*motion to appear pro hac vice forthcoming*)
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Tel.: 212-906-1200
Fax: 212-751-4864
samir.deger-sen@lw.com
jess.hui@lw.com

Christine C. Smith (*motion to appear pro hac vice forthcoming*)
Chanelle N. Jones (*motion to appear pro hac vice forthcoming*)
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
Tel.: 202-637-2200
Fax: 202-637-2201
christine.smith@lw.com
chanelle.jones@lw.com

*Attorneys for Plaintiffs and the Proposed Class*

41