**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| Calvin Davis; Todd Fason; NeDraya McGowan; and Robby Riedel, on behalf of themselves and all similarly situated individuals, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 4:26-cv-89-KGB |
| Boyce Hamlet, in his official capacity as Chair of the Arkansas Post-Prison Transfer Board; Lindsay Wallace, in her official capacity as Secretary of the Arkansas Department of Corrections; Jim Cheek, in his official capacity as Director of the Arkansas Division of Community Correction; and Jamie Barker, in his official capacity as Chair of the Arkansas Board of Corrections, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**BRIEF IN SUPPORT OF**
**MOTION FOR TEMPORARY RESTRAINING ORDER**
**AND/OR PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ....................................................................................................1

BACKGROUND ....................................................................................................3

    A.    How Parole Revocation Should Work Under Arkansas Regulations .....................4

        1.    Commencement of Revocation Proceedings .................................4

        2.    Revocation Hearings ...............................................................5

    B.    How Parole Revocation Works In Practice .........................................................8

        1.    Defendants Fail to Appoint Counsel to Indigent Parolees.........................8

        2.    Defendants Fail To Provide Parolees With Adequate Notice Of Their Rights And Regularly Coerce Parolees Into Waiving Those Rights .........................................................................................9

        3.    Defendants Fail To Provide Due Process Protections Leading Up To Revocation Hearings .......................................................10

        4.    Defendants Fail to Provide Due Process Protections During Revocation Hearings..................................................................12

        5.    Defendants Fail To Accommodate People With Disabilities ...................13

    C.    The Parties ..................................................................................15

ARGUMENT ....................................................................................................18

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ...................................19

    A.    Plaintiffs Are Likely To Succeed On The Merits Of Their Fourteenth Amendment Claim ........................................................................19

        1.    Defendants Are Violating Plaintiffs' Right To Counsel............................19

        2.    Defendants Are Violating Plaintiffs' Other Due Process Rights..............21

            a.    Defendants Fail To Provide Adequate Notice Of Plaintiffs' Rights And Regularly Coerce Plaintiffs To Waive Those Rights ................................................................22

            b.    Defendants Do Not Provide Constitutionally Sufficient Process In Connection With Parole Revocation Hearings............26

B. Plaintiffs Are Likely To Succeed On The Merits Of Their Disability Discrimination Claims ........................................................................ 30

1. Plaintiffs Are Likely To Succeed On Their ADA Claim .......................... 31

a. Plaintiffs Are Qualified Individuals With Disabilities, And Parole And The Parole Revocation Process Are Qualifying Programs .................................................................................... 31

b. Plaintiffs Are Likely To Be Excluded From Or Denied The Benefits Of The Parole Revocation Process By Reason Of Their Disabilities .............................................................................. 33

2. Plaintiffs Are Likely To Succeed On Their Rehabilitation Act Claim ..................................................................................................... 38

II. ABSENT AN INJUNCTION, PLAINTIFFS WILL SUFFER IRREPARABLE HARM ......................................................................................................... 38

A. Plaintiffs Have Been And Will Continue To Be Deprived Of Their Constitutional Rights ............................................................................ 38

B. Plaintiffs Have Been And Will Continue To Be Incarcerated Without Due Process ................................................................................................... 39

C. Plaintiffs With Disabilities Have Been And Will Continue To Be Deprived Of Equal Treatment ................................................................................ 39

III. THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVOR INJUNCTIVE RELIEF .................................................................................. 40

IV. PROVISIONAL CLASS CERTIFICATION IS WARRANTED ..................... 42

CONCLUSION .................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Argenyi v. Creighton Univ.*,
   703 F.3d 441 (8th Cir. 2013) ...............................................................33

*Armstrong v. Davis*,
   275 F.3d 849 (9th Cir. 2001) ..........................................................35, 37

*Bahl v. Cnty. of Ramsey*,
   695 F.3d 778 (8th Cir. 2012) .....................................................30, 32, 38

*Battle v. United Parcel Servs., Inc.*,
   438 F.3d 856 (8th Cir. 2006) ...............................................................32

*Bircoll v. Miami-Dade Cnty.*,
   480 F.3d 1072 (11th Cir. 2007) ...........................................................32

*Bonnette v. D.C. Court of Appeals*,
   796 F. Supp. 2d 164 (D.D.C. 2011) .....................................................40

*Cooper v. Lockhart*,
   489 F.2d 308 (8th Cir. 1973) ...............................................................19

*DeBoer v. Mellon Mortg. Co.*,
   64 F.3d 1171 (8th Cir. 1995) ...............................................................44

*Diaz v. Kaiser*,
   No. 25-cv-5071, 2025 WL 3011852 (N.D. Cal. Sept. 16, 2025) ...................39

*Elrod v. Burns*,
   427 U.S. 347 (1976) ..........................................................................38

*Faheem-El v. Klincar*,
   600 F. Supp. 1029 (N.D. Ill. 1984) ................................................30, 41

*Farella v. Anglin*,
   734 F. Supp.3d 863 (W.D. Ark. 2024) ..........................................38, 39, 41

*Folkerts v. City of Waverly, Iowa*,
   707 F.3d 975 (8th Cir. 2013) ...............................................................31

*Gagnon v. Scarpelli*,
   411 U.S. 778 (1973) ...........................................................19, 21, 37, 45

*Gasca v. Precythe*,
   500 F. Supp. 3d 830 (W.D. Mo. 2020), *aff'd in part, rev'd in part and remanded*, 83 F.4th 705 (8th Cir. 2023) ................................................23, 25, 26, 40

*Gasca v. Precythe*,
   83 F.4th 705 (8th Cir. 2023) ................................................................20, 21

*Gresham v. Windrush Partners, Ltd.*,
   730 F.2d 1417 (11th Cir. 1984) ................................................................39

*Hapern v. Wake Forest Univ. Health Servs.*,
   669 F.3d 454 (4th Cir. 2012) ................................................................32

*Hickman v. Ark. Bd. of Pardons & Paroles*,
   361 F. Supp. 864 (E.D. Ark. 1973)................................................................22

*Holt v. Kelley*,
   No. 19-cv-81, 2020 WL 5821958 (E.D. Ark. Sept. 30, 2020)................................38

*Hopkins v. Jegley*,
   508 F. Supp. 3d 361 (E.D. Ark. 2020) ................................................................42

*Kimmelman v. Morrison*,
   477 U.S. 365 (1986)................................................................41

*Kroupa v. Nielsen*,
   731 F.3d 813 (8th Cir. 2013) ................................................................18

*Little Rock Fam. Plan. Servs. v. Jegley*,
   549 F. Supp. 3d 922 (E.D. Ark. 2021)................................................................38, 40

*Maria S. v. Garza*,
   No. 13-cv-108, 2015 WL 4394745 (S.D. Tex. July 15, 2015) ................................26

*Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
   78 F.4th 1011 (8th Cir. 2023) ................................................................38

*Morrissey v. Brewer*,
   408 U.S. 471 (1972)................................................................ passim

*Ne. Fla. Chapter of Assoc. Gen. Contractors v. City of Jacksonville*,
   508 U.S. 656 (1993)................................................................39

*Padres Unidos de Tulsa v. Drummond*,
   783 F. Supp. 3d 1324 (W.D. Okla. 2025) ................................................................43

*Page v. King*,
   932 F.3d 898 (9th Cir. 2019) ................................................................39

iv

*Phelps-Roper v. Nixon*,
    545 F.3d 685 (8th Cir. 2008), *overruled on other grounds by Phelps-Roper v.*
    *City of Manchester*, 697 F.3d 678 (8th Cir. 2012)..................................................41

*R.I.L-R v. Johnson*,
    80 F. Supp. 3d 164 (D.D.C. 2015) .........................................................................43

*Randolph v. Rodgers*,
    170 F.3d 850 (8th Cir. 1999) .........................................................................33, 35

*Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*,
    826 F.3d 1030 (8th Cir. 2016) ..............................................................................42

*Sajous v. Decker*,
    No. 18-cv-2447, 2018 WL 2357266 (S.D.N.Y. May 23, 2018) .............................39

*Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*,
    821 F.3d 992 (8th Cir. 2016) ................................................................................44

*Tumey v. Mycroft AI, Inc.*,
    27 F.4th 657 (8th Cir. 2022) ................................................................................18

*Turtle Island Foods SPC v. Soman*,
    424 F.Supp. 3d 552 (E.D. Ark. 2019) ...................................................................42

*United States v. Cronic*,
    466 U.S. 648 (1984)..............................................................................................41

*United States v. Melendez-Castro*,
    671 F.3d 950 (9th Cir. 2012).................................................................................26

*United States v. Taylor*,
    747 F.3d 516 (8th Cir. 2014).................................................................................24

*Winn v. Cook*,
    945 F.3d 1253 (10th Cir. 2019) ............................................................................39

## STATUTES AND REGULATIONS

29 U.S.C. § 705(9)(B)................................................................................................49

29 U.S.C. § 794(a) ....................................................................................................42

42 U.S.C. § 12102 .....................................................................................................49

42 U.S.C. § 12102(1)(A)......................................................................................35, 36

42 U.S.C. § 12102(4)(A)............................................................................................35

42 U.S.C. § 12131(2) ........................................................................................ 36

42 U.S.C. § 12132 ............................................................................................ 34

Ark. Admin. Code § 158 .................................................................................. 10

Ark. Admin. Code § 158.00.3-2 .................................................................. 3, 5

Ark. Admin. Code § 158.00.3-3.1(c) ............................................................... 4

Ark. Admin. Code § 158.00.3-4.2(b) ........................................................ 12, 47

Ark. Admin. Code § 158.00.3-4.2(c) .......................................................... 6, 12

Ark. Admin. Code § 158.00.3-4.2(d)(1) ........................................................... 5

Ark. Admin. Code § 158.00.3-4.2(g)(1) ........................................................... 8

Ark. Admin. Code § 158.00.3-4.2(g)(2) .............................................. 1, 8, 10, 22

Ark. Admin. Code § 158.00.3-4.3(a)(2) ....................................................... 9, 15

Ark. Admin. Code § 158.00.3-4.3(b)(1) ........................................................... 9

Ark. Admin. Code § 158.00.3-4.5(a)(2) ........................................................... 6

Ark. Admin. Code § 158.00.3-4.5(d) ............................................................... 6

Ark. Admin. Code § 158.00.3-5.1(b)(3) ......................................................... 10

Ark. Admin. Code § 158.00.4.5(a) ................................................................... 6

Ark. Code Ann. § 12-27-105(b)(1)(A) ........................................................... 20

Ark. Code Ann. § 158.00.3-4.1(a) ................................................................... 6

Ark. Code Ann. § 158.00.3-4.5(c) ................................................................... 6

Ark. Code Ann. § 158.00.3-5.2(b) ................................................................. 10

Ark. Code Ann. § 16-93-1908(a)(1)(A) ........................................................... 4

Ark. Code Ann. § 16-93-1908(a)(1)(C) ........................................................... 4

Ark. Code Ann. § 16-93-1908(a)(3) ................................................................. 5

Ark. Code Ann. § 16-93-1908(a)(4) ................................................................. 5

Ark. Code Ann. § 16-93-1908(a)(5) ................................................................. 5

Ark. Code Ann. § 16-93-1908(a)(6) ........................................................................... 9

Ark. Code Ann. § 16-93-1908(b)(1) ........................................................................... 7

Ark. Code Ann. § 16-93-1908(b)(1)(4) ..................................................................... 29

Ark. Code Ann. § 16-93-1908(b)(2) ........................................................................... 7

Ark. Code Ann. § 16-93-1908(b)(4) ........................................................................... 8

Ark. Code Ann. § 16-93-1908(b)(6) ........................................................................... 7

Ark. Code Ann. § 16-93-1908(b)(7)(A) ...................................................................... 7

Ark. Code Ann. § 16-93-1908(b)(7)(B) ...................................................................... 7

Ark. Code Ann. § 16-93-1908(c)(1)(A) ................................................................ 6, 7, 8

Ark. Code Ann. § 16-93-1908(c)(1)(A)(3) ................................................................. 29

Ark. Code Ann. § 16-93-1908(c)(3) ........................................................................... 8

Ark. Code Ann. § 16-93-1908(c)(4) ........................................................................... 9

Ark. Code Ann. § 16-93-1908(d)(1) ..................................................................... 9, 30

Ark. Code Ann. § 16-93-1908(d)(2) ..................................................................... 8, 9

Ark. Code Ann. § 16-93-705(a)(1)(A)(i) .................................................................... 4

Ark. Code Ann. § 16-93-705(a)(1)(A)(ii) ................................................................... 4

Ark. Code Ann. § 16-93-705(a)(3) ............................................................................ 4

Ark. Code Ann. § 16-93-705(a)(4) ............................................................................ 5

Ark. Code Ann. § 16-93-705(a)(5) ............................................................................ 5

Ark. Code Ann. § 16-93-705(a)(6) ............................................................................ 9

Ark. Code Ann. § 16-93-705(b)(1) ............................................................................ 7

Ark. Code Ann. § 16-93-705(b)(1)(4) ...................................................................... 29

Ark. Code Ann. § 16-93-705(b)(2) ............................................................................ 7

Ark. Code Ann. § 16-93-705(b)(4) ............................................................................ 8

Ark. Code Ann. § 16-93-705(b)(5) ............................................................................ 7

Ark. Code Ann. § 16-93-705(b)(6) ............................................................................ 7

Ark. Code Ann. § 16-93-705(b)(7) ............................................................................ 7

Ark. Code Ann. § 16-93-705(c)(1)(A) .......................................................... 6, 7, 8, 27

Ark. Code Ann. § 16-93-705(c)(1)(A)(3) ................................................................. 29

Ark. Code Ann. § 16-93-705(c)(3) ............................................................................ 8

Ark. Code Ann. § 16-93-705(c)(4) ............................................................................ 9

Ark. Code Ann. § 16-93-705(d)(1) ...................................................................... 9, 29

Ark. Code. Ann. § 16-93-705(d)(2) ..................................................................... 8, 9

Minn. R. 2940.4200 ................................................................................................. 40

Iowa Code § 908.2A ................................................................................................ 46

S.D. Codified Laws § 7-16A-10 .............................................................................. 46

## RULES

Fed. R. Civ. P. 23(a) ...............................................................................................43

Fed. R. Civ. P. 23(a)(1) ...........................................................................................43

Fed. R. Civ. P. 23(a)(2) ...........................................................................................44

Fed. R. Civ. P. 23(a)(3) ...........................................................................................44

Fed. R. Civ. P. 23(a)(4) ...........................................................................................44

Fed. R. Civ. P. 23(b)(1) ......................................................................................43, 44

Fed. R. Civ. P. 23(b)(2) ......................................................................................43, 45

Fed. R. Civ. P. 65(c) ..........................................................................................42, 46

## OTHER AUTHORITIES

*Programs & Services*, Ark. Div. of Cmty. Corr.,
     https://doc.arkansas.gov/community-correction/programs-services (last visited
     Feb. 1, 2026) ....................................................................................................3

## INTRODUCTION

More than fifty years ago in two landmark decisions, the Supreme Court laid out the procedural protections to which people facing revocation of their parole are entitled. Those protections include the right to have state-appointed counsel in certain circumstances, to cross-examine adverse witnesses, and to present favorable evidence and witnesses. Yet the Arkansas Post-Prison Transfer Board ("PPTB"), the Arkansas Department of Corrections ("ADC"), and the Arkansas Division of Community Correction ("ACC"), and their representatives (together, "Defendants"), routinely deprive Plaintiffs of these and other rights.

Most egregiously, Defendants ban the provision of state-appointed counsel to indigent parolees. Arkansas regulations provide that parolees "shall not have the right to have counsel appointed by the State" in any circumstance. Ark. Admin. Code § 158.00.3-4.2(g)(2). But controlling Supreme Court and Eighth Circuit precedent say the exact opposite: Plaintiffs are entitled to counsel when (i) they have a colorable claim that they are innocent of the alleged violation of parole, (ii) there are mitigating circumstances that explain or justify the violation, or (iii) they cannot speak effectively on their own behalf. Defendants' abject failure to provide counsel in these circumstances—or even to screen for whether these circumstances exist—is a clear and flagrant violation of Plaintiffs' rights.

Defendants also fail to provide many of the other procedural protections to which Plaintiffs are entitled under governing law. While Defendants' regulations purport to allow parolees to cross-examine adverse witnesses and present favorable evidence and witnesses, Defendants frequently prevent parolees from doing so in practice. Defendants prohibit parolees from confronting the arresting officers whose word is often the only basis for sending parolees back to jail, cut off parolees' testimony or lines of questioning, and deprive them of adequate opportunities to obtain favorable evidence or contact witnesses. Defendants also regularly coerce parolees to waive their

rights to their parole revocation hearings altogether, without full knowledge or understanding of the consequences of such waivers.

These procedural failings uniquely harm people with disabilities, who are routinely deprived of meaningful access to the parole revocation process as a result. Such individuals are prevented from fully participating in the revocation process, including because they are unable to adequately represent themselves without counsel and because they are unable to fully comprehend their revocation proceedings due to cognitive, mental health, physical, or other disabilities. Defendants refuse to offer even the most basic accommodations to parolees with diagnosed disabilities, such as access to glasses or hearing aids and access to prescribed and much-needed medication to treat mental health or cognitive disabilities.

Every day that Defendants' unlawful parole revocation process proceeds, Plaintiffs are faced with mounting irreparable harms. They are denied their constitutional rights, subjected to incarceration and the associated loss of liberty without due process, and deprived of equal treatment. The State of Arkansas has an interest in following the law, and any minor inconvenience from the added expense of providing Plaintiffs with their constitutional rights and reasonable accommodations for their disabilities cannot outweigh the significant harms to Plaintiffs.

Dozens of parolees are accused of violating the conditions of their parole each day. Most final revocation hearings occur within two weeks of arrest. *See* Ark. Admin. Code 158.00.3-4.2(b)–(c). Plaintiffs Calvin Davis, Todd Fason, NeDraya McGowan, and Robby Riedel (jointly, "Named Plaintiffs") all expect to have their revocation hearings by the end of this week or early next. One of the Named Plaintiffs, Mr. Fason, currently has a revocation hearing scheduled for tomorrow (February 3). And so, every day without a temporary restraining order or preliminary injunction means that more people, including the Named Plaintiffs, will face final revocation

hearings without counsel and, as a result, may be reincarcerated without due process or equal treatment. This Court's swift intervention is necessary to prevent these unconstitutional proceedings.

Accordingly, Plaintiffs respectfully request that this Court grant a temporary restraining order and/or preliminary injunction enjoining Defendants from carrying out their unlawful parole revocation process and requiring them to provide the Named Plaintiffs and the putative class they represent with the procedural protections and reasonable accommodations to which they are entitled under longstanding law.

## BACKGROUND

Arkansas returns more parolees to prison than any other state with reported data, including significantly more populous states like California and Texas.[1] Ex. 1 (BJS 2023) at 33.[2] In 2023 alone, more than 22,000 people were on parole in Arkansas, and more than 6,200 (approximately 28%) were reincarcerated, including following parole revocation. *See id.* at 31, 33. Between March and December 2023, more than 3,400 parolees in Arkansas were subject to parole revocation

---

[1]    Throughout this brief, "parole" is used to refer to parole as well as post-release supervision; "parolees" is used to refer to both people on parole and people on post-release supervision; and "parole revocation judge" is used to refer to revocation hearing judges for both parole and post-release supervision revocation hearings. Both parole and post-release supervision are subject to the same revocation hearing requirements in Arkansas. *See* Ark. Admin. Code § 158.00.3-2(18) ("For the purposes of this rule, parole is included without limitation in the definition of post-release supervision."). People subject to both forms of supervision overwhelmingly refer to their supervision as "parole." Even the ACC, the agency responsible for overseeing all community supervision, uses "parole" and "post-release supervision" interchangeably. *See, e.g.*, *Programs & Services*, Ark. Div. of Cmty. Corr., https://doc.arkansas.gov/community-correction/programs-services (last visited Feb. 1, 2026).

[2]    Unless otherwise indicated, "Ex. __" refers to exhibits attached to this Motion for Temporary Restraining Order and/or Preliminary Injunction.

proceedings. Ex. 2 (Parole Revocation Data) at 2. The parole revocation process is thus a significant part of Arkansas's carceral system.

Arkansas has a number of regulations that govern the parole revocation process. While those regulations purport to provide some procedural protections, they are routinely disregarded in the real world. And other constitutional guarantees, like the right to state-appointed counsel, are outright banned by the regulations themselves. Below, Plaintiffs first lay out how the parole revocation process should work under Arkansas's regulations and then how it works in practice.

**A.    How Parole Revocation Should Work Under Arkansas Regulations**

1.    Commencement of Revocation Proceedings

Parole revocation proceedings begin in one of two ways.

The ACC may prepare a violation report describing and providing evidence of a parolee's alleged violation. *See* Ark. Code Ann. §§ 16-93-705(a)(1)(A)(ii), 16-93-1908(a)(1)(C); Ark. Admin. Code § 158.00.3-3.1(c). Based on this report, "the Post-Prison Transfer Board may issue a warrant for the arrest of the parolee for violation of any conditions of parole," or it "may issue a notice to appear to answer a charge of a violation." Ark. Code Ann. § 16-93-705(a)(1)(A)(i); *see also id.* § 16-93-1908(a)(1)(A). Any warrant issued by the PPTB will permit "plac[ing] the parolee in custody at any suitable detention facility pending a hearing." *Id.* § 16-93-705(a)(3); *see also id.* § 16-93-1908(a)(3).

In the alternative, a community supervision officer ("CSO") may prepare "a written statement setting forth that the parolee, in the judgment of the [CSO], violated conditions of his or her parole."[3] *Id.* § 16-93-705(a)(4); *see also id.* § 16-93-1908(a)(4). The CSO may then arrest—or

---

[3] CSOs are ACC employees "tasked with the supervision of offenders released to post-release supervision or persons who otherwise fall under the supervisory authority of the [DCC]." Ark.

direct the arrest of—the parolee without a warrant. *Id.* § 16-93-705(a)(4); *see also id.* § 16-93-1908(a)(4). If the CSO takes the parolee to a detention facility and presents the written statement to the official in charge of the detention facility, the parolee will be "detain[ed] . . . pending disposition." *Id.* § 16-93-705(a)(5); *see also id.* § 16-93-1908(a)(5).

In either case, parolees must be provided with a copy of their violation report, a notice of the parole violation action, and a form inquiring as to whether they want to waive their right to a hearing. *See* Ark. Admin. Code § 158.00.3-4.2(d)(1).

### 2.    Revocation Hearings

Persons accused of violating one or more conditions of their post-release supervision are entitled to both a preliminary and final revocation hearing.[4]

Parolees may waive their right to either (1) a preliminary hearing only, or (2) both a preliminary and a final hearing.[5] Under the regulations, waivers must be "knowingly and intelligently" made. Ark. Code Ann. § 16-93-705(c)(1)(A); *see also id.* § 16-93-1908(c)(1)(A). That means that "[t]he offender must voluntarily and intelligently agree to waive his or her right to the revocation hearing and attest that the decision to waive was not the result of any . . . threats, . . . promises, or . . . form of coercion." Ark. Admin Code § 158.00.3-4.5(a)(2). Before a parolee can waive, he or she must be informed of any possible outcomes, as well as agree to "a

---

Admin. Code § 158.00.3-2. A parole officer ("PO") is a type of CSO. The declarations of parolees submitted as exhibits attached to this Motion for Temporary Restraining Order and/or Preliminary Injunction use "PO" and "CSO" interchangeably.

[4] There are two limited exceptions to this rule. *First*, if a parolee is arrested and their final revocation hearing is conducted within fourteen days, a preliminary hearing is not required. Ark. Admin. Code § 158.00.3-4.2(c). *Second*, if a parolee is convicted of a new felony offense and sentenced to a term of imprisonment of twelve months or longer, their parole may be administratively revoked without a formal revocation hearing. *Id.* § 158.00.3-4.1(a).

[5] A parolee that has been charged with Capital Murder or Murder in the First Degree cannot waive a revocation hearing. Ark. Admin. Code § 158.00.3-4.5(d). Additionally, a revocation waiver hearing must be conducted for parolees charged with certain felonies. *Id.* § 158.00.3-4.5(c).

term of incarceration that is dependent on the facts surrounding the violation or violations of the conditions of post-release supervision." Ark. Admin. Code § 158.00.4.5(a).

Absent a waiver, the preliminary hearing occurs before a revocation hearing judge (also known as a "parole revocation judge" or "PRJ"). Ark. Code Ann. § 16-93-705(b)(2); *see also id.* § 16-93-1908(b)(2). Its purpose is "to determine whether there is reasonable cause to believe that [the parolee] has violated a condition of parole." *Id.* § 16-93-705(b)(1); *see also id.* § 16-93-1908(b)(1). If the PRJ finds "reasonable cause," the PRJ may "return the parolee to parole supervision" and "may impose additional supervision conditions in response to the violating conduct," *id.* § 16-93-705(b)(6), or may order the parolee to be "placed in custody" until the final revocation hearing, *id.* § 16-93-705(b)(5); *see also id.* § 16-93-1908(b)(6). If the PRJ "does not find reasonable cause," the parolee must be released from custody. *Id.* § 16-93-705(b)(7); *see also id.* § 16-93-1908(b)(7)(A). But the PPTB may still hold a final revocation hearing. *Id.* § 16-93-705(b)(7); *see also id.* § 16-93-1908(b)(7)(B).

A final revocation hearing must be held by the PPTB or its designee (usually, the PRJ) "within a reasonable period of time after the parolee's arrest." *Id.* § 16-93-705(c)(1)(A); *see also id.* § 16-93-1908(c)(1)(A). Parole cannot be revoked "except after a parole revocation hearing." *Id.* § 16-93-705(c)(1)(A); *see also id.* § 16-93-1908(c)(1)(A).

At these hearings, Arkansas regulations provide that a parolee has "the right . . . to be represented by counsel." *Id.* § 16-93-705(b)(4), (c)(3); *see also id.* § 16-93-1908(b)(4), (c)(3). But a parolee "shall not have the right to have counsel appointed by the State" under any circumstances. Ark. Admin. Code § 158.00.3-4.2(g)(2). Thus, while parolees may bring their own attorney if they have one, Arkansas regulations prevent the State from appointing counsel for any indigent parolees.

Under Arkansas regulations, parolees are also theoretically entitled to a number of procedural protections. They have the right to "hear and controvert evidence" against them and "offer evidence in [their] own behalf." Ark. Code Ann. § 16-93-705(b)(4), (c)(3); *see also id.* § 16-93-1908(b)(4), (c)(3). They may testify on their own behalf, *id.* § 16-93-705(d)(2), but they must also be informed of their right not to testify, Ark. Admin. Code § 158.00.3-4.2(g)(1); *see also* Ark. Code Ann. § 16-93-1908(d)(2). They may call and question their own witnesses and introduce relevant evidence to refute the allegations in the violation report, regardless of its admissibility under the rules of evidence. Ark. Code. Ann. § 16-93-705(d)(2); *see also id.* § 16-93-1908(d)(2). And they may "confront and cross-examine adverse witnesses," unless the PRJ or the PPTB "specifically finds good cause for not allowing confrontation." *Id.* § 16-93-705(d)(1); *see also id.* § 16-93-1908(d)(1).

After the final hearing, the PPTB must determine whether "by a preponderance of the evidence, . . . the parolee has inexcusably failed to comply with a condition of his or her parole." *Id.* § 16-93-705(a)(6); *see also id.* § 16-93-1908(a)(6). Potential decisions include reinstatement of post-release supervision, reinstatement of post-release supervision with additional or modified conditions, deferment until the outcome of the parolee's criminal court case, revocation of the parolee's post-release supervision along with an appropriate alternative to incarceration, and revocation of the parolee's post-release supervision resulting in reincarceration. *See* Ark. Admin Code § 158.003-4.3(b)(1). If parole is revoked, the PPTB must "prepare and furnish to the parolee a written statement of evidence relied on and the reasons for revoking parole" within seven days of the revocation hearing. Ark. Code Ann. § 16-93-705(c)(4); Ark. Admin. Code § 158.00.3-4.3(a)(2); *see also id.* § 16-93-1908(c)(4).

Parolees have the right to appeal a revocation decision within 30 days of the decision. *See* Ark. Admin Code § 158.003-5.1(b)(3). The PPTB will then review the appeal and decide whether to affirm, reverse, or amend the hearing decision, or to schedule an appearance by the parolee before the PPTB for further consideration. *Id.* § 158.003-5.2(b).

### B.    How Parole Revocation Works In Practice

Under Arkansas's ban on state-appointed counsel, indigent parolees are not provided counsel even when they have colorable claims of innocence or mitigating circumstances, or are otherwise unable to speak effectively on their own behalf. And contrary to Arkansas regulations, parolees are routinely denied adequate notice of their rights, are coerced into making uninformed and involuntary waivers of their hearings, and are deprived of the procedural protections that the law affords. As a result, most parolees who are accused of violating the conditions of their parole are reincarcerated. *See* Parole Revocation Data at 2–4.

#### 1.    Defendants Fail to Appoint Counsel to Indigent Parolees

As noted above, Arkansas regulations provide that parolees have the right to "be represented by counsel" but not "to have counsel appointed by the State." Ark. Admin. Code § 158.00.3-4.2(g)(2). Consistent with that rule, Defendants routinely deny requests for counsel. *See, e.g.*, Ex. 3 (J. Russell Decl.) ¶ 18; Ex. 4 (A. Guyton Decl.) ¶¶ 13–14; Ex. 5 (L. Torres-Delgado Decl.) ¶ 10; Ex. 6 (A. Campos Decl.) ¶ 8. In response to a FOIA request, the ADC and the PPTB admitted that they have no internal policies or guidance for appointing counsel beyond Ark. Admin Code § 158, which does not currently provide for the appointment of counsel. Ex. 7 (PPTB Policies FOIA Resp.) at 3.

      2.    <u>Defendants Fail To Provide Parolees With Adequate Notice Of Their Rights</u>
              <u>And Regularly Coerce Parolees Into Waiving Those Rights</u>

Defendants also fail to provide parolees with adequate notice of their rights to and at their preliminary and final hearings and, instead, regularly coerce parolees into waiving those rights. Within days after a person is arrested on an alleged parole violation, their CSO visits them to urge them to waive their right to a final revocation hearing. CSOs rarely explain what a final revocation hearing entails or the rights that the parolee would have at that hearing. *See, e.g.*, Ex. 8 (S. Miner Decl.) ¶¶ 14, 17–18; Ex. 9 (D. Warren Decl.) ¶¶ 9–10; Ex. 10 (J. Thompson Decl.) ¶¶ 9–11; Ex. 11 (S. Fancher Decl.) ¶¶ 8–10; Ex. 12 (A. Pacheco Decl.) ¶¶ 7–9; Ex. 13 (C. Brown Decl.) ¶¶ 9–10; Ex. 14 (J. Calvert Decl.) ¶¶ 7–8; Ex. 15 (G. Greer Decl.) ¶¶ 8–10; Ex. 16 (M. Walker Decl.) ¶¶ 8, 19–20; Ex. 17 (A. Boyd Decl.) ¶ 9; Ex. 18 (B. Baker Decl.) ¶ 19; Ex. 19 (O. Burnell Decl.) ¶¶ 9–10. And CSOs almost never inform parolees that they might have a right to a preliminary revocation hearing. *See, e.g.*, Ex. 20 (P. Callahan Decl.) ¶ 8; M. Walker Decl. ¶ 18; Ex. 21 (D. Pruitt Decl.) ¶¶ 6, 23; Ex. 22 (J. Johnson Decl.) ¶ 7.

Even when people are provided written forms listing their rights during hearings, Defendants fail to provide them adequate time to review and understand their rights. *See, e.g.*, A. Boyd Decl. ¶ 7; J. Calvert Decl. ¶ 7; G. Greer Decl. ¶ 10; J. Thompson Decl. ¶ 13. The waiver process typically happens in a matter of minutes, while the parolee is in custody at a secure facility, before a CSO, without any prior access to a law library or counsel. *See, e.g.*, J. Thompson Decl. ¶ 16 (waiver process "lasted about five minutes"); Ex. 23 (K. Luneau Decl.) ¶¶ 6–7 (waiver process "lasted for only 2 minutes" and parolee "did not have time to read" violation report); Ex. 24 (M. Whitaker Decl.) ¶ 16 (waiver process "lasted around seven minutes"). Parolees are frequently rushed into making waiver decisions. *See, e.g.*, A. Boyd Decl. ¶ 7 ("I wa[i]ved th[e] hearing because I felt pressured to do so. I did not read the waiver form because I felt like my PO was

rushing me."). CSOs frequently pressure parolees into waiving, such as by telling them that they will not be successful at a hearing based on the allegations in their violation report, *see, e.g.*, C. Brown Decl. ¶¶ 8–9; M. Walker Decl. ¶ 15; J. Thompson Decl. ¶ 8; K. Luneau Decl. ¶¶ 8–9; Ex. 25 (J. Hawkins Decl.) ¶ 12, or displaying dissatisfaction and frustration when parolees ask questions about, or otherwise consider, going to a hearing, *see, e.g.*, M. Whitaker Decl. ¶ 8. CSOs sometimes even encourage parolees to accept a parole violation, instead of attending a hearing, by presenting the parolee with inaccurate information regarding the precise nature of the violation, by failing to provide the parolee with a copy of the violation report detailing the precise nature of the allegations against them, or by misleading parolees into believing that they will be released from custody after serving the violation when in reality they will be required to stand for a parole eligibility hearing before the PPTB at the end of their violation term. *See, e.g.*, G. Greer Decl. ¶ 8; S. Fancher Decl. ¶¶ 6, 12; J. Phariss Decl. ¶¶ 8–13; 12–13; K. Luneau Decl. ¶¶ 25–27; J. Johnson Decl. ¶¶ 5, 11; Ex. 26 (J. Pharris Decl.) ¶¶ 8–13; Ex. 27 (D. Beshears Decl.) ¶¶ 8.

As a result, the vast majority of parolees waive their rights to one or both of their hearings—but without full awareness of their rights if they were to proceed to a hearing or the consequences of their waiver. Between March and December 2023, 2,309 of the 3,427 people accused of a parole violation (approximately 67%) waived their right to a hearing. *See* Parole Revocation Data at 2.

3.    Defendants Fail To Provide Due Process Protections Leading Up To Revocation Hearings

For those parolees who do not waive their rights, Defendants' policies and practices make it difficult—sometimes impossible—for parolees to adequately prepare or defend themselves. Parolees are not informed of their right to a preliminary hearing, nor do Defendants generally conduct preliminary hearings, even when final revocation hearings are conducted more than fourteen days after the parolee's arrest, *see* Ark. Admin. Code 158.00.3-4.2(b)–(c), meaning that

parolees often spend weeks in jail with little information about their alleged parole violations and without any determination as to whether the allegations against them are supported by probable cause, *see, e.g.*, D. Pruitt Decl. ¶¶ 6, 8, 23 (parolee who was arrested on November 19, 2025, was not informed of right to preliminary revocation hearing and was not asked if he wanted to waive right to preliminary revocation hearing, but did not have final revocation hearing until December 30, 2025); J. Johnson Decl. ¶¶ 4, 7, 14 (similar; November 29, 2025 arrest, December 16, 2025 hearing); M. Walker Decl. ¶¶ 12, 14, 25, 27 (similar; September 21, 2025 arrest, October 9, 2025 hearing); P. Callahan Decl. ¶¶ 4, 8, 11 (similar; July 12, 2025 arrest, August 7, 2025 hearing). In some instances, parolees have not even seen their violation reports, making it difficult to know what charges they are defending against. *See, e.g.*, B. Baker Decl. ¶ 18 (parolee saw violation report for the first time after his final revocation hearing); J. Johnson Decl. ¶ 11 (parolee did not receive violation report before or during his revocation hearing and has, to this day, still never seen it).

In addition, while detained prior to their hearings, parolees face multiple obstacles to making phone calls, making it substantially more difficult for parolees to communicate with potential witnesses or secure mitigating evidence prior to their revocation hearing. Parolees generally cannot access phones unless they have sufficient funds in their account. *See, e.g.*, D. Beshears Decl. ¶ 9; Ex. 28 (S. Rhodes Decl.) ¶¶ 15, 21; Ex. 29 (S. Higgins Decl.) ¶ 14; J. Johnson Decl. ¶ 13. And even with the requisite funds, parolees may not be allowed regular access to phones or may not be given the means to obtain the phone numbers of the people they would like to contact. *See, e.g.*, A. Guyton Decl. ¶ 8; M. Walker Decl. ¶ 23; K. Luneau Decl. ¶ 16. Lacking other options, many parolees seek assistance from their CSOs, creating a clear conflict of interest given that those CSOs are typically responsible for initiating parole revocation proceedings and

often testify against parolees at revocation hearings. *See, e.g.*, M. Walker Decl. ¶ 30; Ex. 30 (J. Vanderpool Decl.) ¶¶ 8, 12; K. Luneau Decl. ¶¶ 30–31; M. Whitaker Decl. ¶ 20.

Parolees are also often denied access to the legal resources required to meaningfully participate in the parole revocation process. Access to law libraries is inconsistent and facility-specific. *See, e.g.*, Ex. 31 (T. Fason Decl.) ¶ 17. Neither the notice of parole violation nor the revocation hearing waiver form provided to parolees includes information about the relevant evidentiary standards for revocation hearings or the right to remain silent in such hearings. *See* Ex. 32 (Notice of Parole Violation Action & Revocation Hearing Waiver Forms). To the extent that the written forms provide some notice of other due process rights, the information in the written forms often conflicts with verbal instructions parolees receive from their CSOs. *See, e.g.*, L. Torres-Delgado Decl. ¶ 10 (parolee informed by CSO that he could not be appointed an attorney for his hearing); A. Campos Decl. ¶¶ 8–9 (parolee informed by CSO that he could not be appointed an attorney for his hearing and that he could not cross-examine the arresting officer); J. Johnson Decl. ¶ 8 (CSO suggested that parolee's desired witnesses "would not be permitted to attend the [revocation] hearing because they were not present at the scene of [parolee's] arrest").

4.    Defendants Fail to Provide Due Process Protections During Revocation Hearings

The final revocation hearings are cursory, brief, and fail to deliver the due process protections guaranteed by the U.S. Constitution and Arkansas regulations. At every turn, Defendants hamper a parolee's ability to contest his or her parole violation. For instance, the CSO who prepared the violation report and the arresting offer who prepared the arrest report often do not attend the hearing. *See, e.g.*, Ex. 33 (S. Elwood Decl.) ¶ 17; S. Miner Decl. ¶ 16. At best, they send other CSOs or law enforcement officers who lack personal knowledge to testify to the contents of the reports, thereby preventing parolees from being able to fully cross-examine these

officers about the contents of the reports. S. Elwood Decl. ¶ 17; S. Miner Decl. ¶ 16. And even when the CSOs and arresting officers who drafted the reports attend the hearings, PRJs often and without explanation prevent parolees from cross-examining them or severely limit the scope of that cross-examination. *See* S. Miner Decl. ¶ 18; L. Torres-Delgado Decl. ¶ 13; J. Vanderpool Decl. ¶ 13; K. Luneau Decl. ¶ 28; M. Whitaker Decl. ¶¶ 21–22; Ex. 34 (S. Collins Decl.) ¶ 13.

Defendants often hamstring parolees' ability to testify on their own behalf, denying them the right to speak or cutting them off before they have provided their full statement. *See* S. Higgins Decl. ¶ 31; K. Luneau Decl. ¶ 29. Defendants frequently make it difficult for witnesses to attend hearings or to submit statements in support of parolees. *See, e.g.*, D. Pruitt Decl. ¶¶ 22, 25; S. Rhodes Decl. ¶¶ 18, 22. Indeed, family members and advocates who seek to serve as witnesses at their loved one's hearings are regularly denied access to those hearings and prohibited from participating. *See, e.g.*, Ex. 35 (J. Swinford Decl.) ¶ 10; S. Collins Decl. ¶ 14.

In addition, parolees are frequently not informed of the results of their hearings—much less within seven days of their hearings, as Arkansas regulation requires. *See* Ark. Admin. Code § 158.00.3-4.3(a)(2); *see, e.g.*, M. Whitaker Decl. ¶ 25; J. Johnson Decl. ¶ 18; J. Swinford ¶ 14. Nor are they informed of their right to appeal the PRJ's decision. *See, e.g.*, S. Collins Decl. ¶¶ 15–16; D. Pruitt ¶¶ 27–28. Even if they were so informed, parolees often lack the written documentation of a final revocation decision and record necessary to file an appeal. *See, e.g.*, M. Walker Decl. ¶ 31; S. Miner Decl. ¶ 20; Ex. 36 (D. Henson Decl.) ¶ 14; S. Rhodes Decl. ¶ 29.

5.    <u>Defendants Fail To Accommodate People With Disabilities</u>

The impact of Defendants' procedural failings falls disproportionately on people with disabilities. Such individuals comprise a significant portion of parolees. Many parolees have mental health issues and other disabilities that limit their cognitive functions. In 2023, over 1,500 people incarcerated in ADC facilities went on suicide watch at some point during the year; over

2,800 people in ADC facilities used psychotropic medications; and over 6,000 mental health intakes were admitted to the ADC's three specialized mental health units. *See* Ex. 37 (Bid Solicitation) at 3–4, 6. And a 2022 study conducted at Arkansas's largest county detention facility found that 62.6% of people in custody there screened positive for anxiety, 50.3% for depression, and 44.2% for post-traumatic stress disorder ("PTSD"). Ex. 38 (Zielinski Study) at 3. Incarcerated adults also tend to have low educational levels and literacy compared to the non-prison population, which are often indicative of learning disabilities. *See* Ex. 39 (ACSD Dyslexia Screening & Intervention Plan) at 2; Ex. 40 (Rampey Survey) at 6–7. And they tend to have higher rates of educational and cognitive disabilities. *See* Ex. 41 (Dewey Study) at 64–65.

But parolees with mental health disabilities, intellectual disabilities, and other disabilities that limit their cognitive function are routinely denied access to counsel. *See, e.g.*, A. Guyton Decl. ¶¶ 2, 12–16 (parolee with cognitive impairments due to recent brain surgery denied counsel); O. Burnell Decl. ¶¶ 10, 16 (parolee who had been in "special education classes all throughout school" was not informed of his right to counsel, was "never asked about [his] comprehension ability," and "had difficulty understanding what was happening during the [revocation] hearing").

They are also often not permitted to take their usual, necessary medication on the day of the hearing. *See, e.g.*, J. Johnson Decl. ¶¶ 16–17 (parolee who is prescribed medication for schizophrenia and bipolar disorder was not given his medication on day of hearing; "[a]s a result, [he] became extremely upset and could not focus," and "struggled to testify on [his] own behalf"); K. Luneau Decl. ¶¶ 23–24 (parolee with borderline personality disorder, reactive attachment disorder, manic bipolar disorder, and anxiety was not given her usual medication, making "it hard for [her] to follow and understand the hearing" or "properly interact with the PRJ and arresting officer," and causing her to become "reactive and easy to anger"); M. Whitaker Decl. ¶ 19 (parolee

with ADHD was not given his usual medication, causing him to "struggle[] to focus throughout [his] revocation hearing").

Parolees with disabilities are also routinely coerced into waiving their rights to hearings based on inaccurate or incomplete information, including about their rights at the hearing. *See, e.g.*, S. Fancher Decl. ¶¶ 6, 13–14; J. Calvert Decl. ¶¶ 5–7; A. Campos Decl. ¶¶ 10–11.

In addition, Defendants have deprived parolees with certain physical disabilities, including hard-of-hearing/deaf individuals and vision-impaired/blind individuals, of the accommodations and interpretative services that they need to fully participate in the parole revocation process. For example, multiple parolees with vision impairments were provided paperwork they could not read due to lack of access to eyeglasses. C. Brown Decl. ¶ 7; G. Greer Decl. ¶ 10. And multiple parolees with hearing impairments could not hear—much less properly participate in—their revocation proceedings. *See, e.g.*, B. Baker Decl. ¶¶ 13–16.

### C.    The Parties

Plaintiffs Calvin Davis, Todd Fason, NeDraya McGowan, and Robby Riedel are individuals who are currently detained awaiting revocation proceedings. Mr. Fason's final revocation hearing has been scheduled for February 3, 2026. At the time of this motion's filing, none of the other Named Plaintiffs have received their hearing dates, but all expect that their hearings will be scheduled within 14 days of their arrest, *i.e.*, by the end of this week or early next week. *See* Ex. 42 (N. McGowan Decl.) ¶ 13 (arrested January 19, 2026); Ex. 43 (C. Davis Decl.) ¶ 16 (arrested January 23, 2026); Ex. 44 (R. Riedel Decl.) ¶ 15 (arrested January 24, 2026).

Plaintiff Calvin Davis is an indigent adult parolee currently in the custody of the ADC. C. Davis Decl. ¶¶ 3, 13. He has been diagnosed with anxiety, which makes him feel less in control of his emotions. *Id.* ¶ 10. He was taken into custody on January 23, 2026, for allegedly violating the terms of his parole. *Id.* ¶ 16. He takes 200 milligrams of Zoloft daily to treat his anxiety and has

not had access to his medication while incarcerated, even though Defendants are aware of his anxiety. *Id.* ¶ 10. His revocation proceedings are not yet final. He has a colorable claim that he did not willfully commit the alleged violations and mitigating evidence to justify why he should not be further imprisoned, but he needs assistance to meaningfully present this evidence. *See id.* ¶¶ 15–16. Defendants failed and will continue to fail to ensure that Mr. Davis is afforded appropriate process and is represented by counsel during revocation proceedings. When ultimately re-released on parole in the future, Mr. Davis will continue to be at risk for arbitrary and capricious processes relating to alleged parole violations.

Plaintiff Todd Fason is an indigent adult parolee with disabilities who is currently in the custody of the ADC. T. Fason Decl. ¶¶ 3, 10, 13. He has been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"), which makes it difficult for him to focus and organize information. *Id.* ¶ 10. He takes 30 milligrams of Dextroamphetamine daily to manage his ADHD. *Id.* He is also hypervigilant, struggles with a substance use disorder, suffers from high blood pressure, has a hematoma in his leg that will require surgery, and experiences chronic migraines because of a previous concussion. Compl. ¶¶ 116–18. He was taken into custody on January 22, 2026, for allegedly violating the terms of his parole. T. Fason Decl. ¶¶ 14, 16. He has not had access to his ADHD medication while incarcerated, even though Defendants are aware of his disability. *Id.* ¶¶ 10–11. His revocation proceedings are not yet final. His final revocation hearing is scheduled for February 3, 2026. Compl. ¶ 120. He has a colorable claim that he did not willfully commit the alleged violations and mitigating evidence to justify why he should not be further imprisoned, but he needs assistance to meaningfully present this evidence. T. Fason Decl. ¶ 15. Defendants failed and will continue to fail to ensure that Mr. Fason is afforded appropriate process and is represented by counsel during revocation proceedings. When ultimately re-released on

16

parole in the future, Mr. Fason will continue to be at risk for arbitrary and capricious processes relating to alleged parole violations.

Plaintiff NeDraya McGowan is an indigent adult parolee currently in the custody of the ADC. N. McGowan Decl. ¶¶ 3, 10. He was taken into custody on January 19, 2026, for allegedly violating the terms of his parole. *Id.* ¶ 13. His revocation proceedings are not yet final. *See id.* ¶ 14. He has a colorable claim that he did not willfully commit the alleged violations and mitigating evidence to justify why he should not be further imprisoned, but he needs assistance to meaningfully present evidence. *Id.* ¶ 12. Defendants failed and will continue to fail to ensure that Mr. McGowan is afforded appropriate process and is represented by counsel during revocation proceedings. When ultimately re-released on parole in the future, Mr. McGowan will continue to be at risk for arbitrary and capricious processes relating to alleged parole violations.

Plaintiff Robby Riedel is an indigent adult parolee with disabilities who is currently in the custody of the ADC. R. Riedel Decl. ¶¶ 3, 12. He has been diagnosed with anxiety and depression, which impact his daily life, and he takes Wellbutrin and Seroquel to manage the symptoms of these conditions. *Id.* ¶ 10. He also wears glasses to correct his vision. *Id.* ¶ 11. He was taken into custody on January 24, 2026, for allegedly violating the terms of his parole. *Id.* ¶¶ 13, 15. He has not had access to his medication or glasses while incarcerated. *See* Compl. ¶¶ 136, 138. His revocation proceedings are not yet final. R. Riedel Decl. ¶ 16. He has a colorable claim that he did not willfully commit the alleged violations and mitigating evidence to justify why he should not be further imprisoned, but he needs assistance to meaningfully present this evidence. *Id.* ¶ 14. Defendants failed and will continue to fail to ensure that Mr. Riedel is afforded appropriate process and is represented by counsel during revocation proceedings. When ultimately re-released on parole in the future, Mr. Riedel will continue to be at risk for arbitrary and capricious processes relating to alleged parole violations.

Defendants are the official representatives of the PPTB, ADC, ACC, and the Arkansas Board of Corrections. Boyce Hamlet is the Chair of the PPTB, the revocation review board for all parolees in the State of Arkansas and a sub-department of the ADC. Compl. ¶¶ 20–23. The PPTB conducts parole revocation hearings and issues revocation decisions based on those hearings. *Id.* ¶ 20. Defendant Lindsay Wallace is the Secretary of the ADC, the state agency responsible for supervising parolees and for issuing violation reports and warrants based on those reports through its sub-department, the ACC. *Id.* ¶ 21. When a person's parole is revoked, that person is reincarcerated by the ADC. *Id.* Defendant Jim Cheek is the Director of the ACC, the department within the ADC responsible for administering parole services. *Id.* ¶ 22. The ACC employs CSOs, who regularly check in with people on parole and report information about those individuals' conduct and condition to the PPTB upon request. *Id.* The ACC is also responsible for developing procedures to guide CSOs in determining the appropriate response to a parole violation. *Id.* Defendant Jamie Barker is the Chair of the Arkansas Board of Corrections, which has supervisory power and control over the ACC. Ark. Code Ann. § 12-27-105(b)(1)(A); Compl. ¶ 23.

## ARGUMENT

Courts consider four factors in assessing a motion for a temporary restraining order or preliminary injunction: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013); *see also Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir. 2022) ("[T]he standard for analyzing a motion for a temporary restraining order is the same as a motion for a preliminary injunction."). All four factors weigh in favor of relief here.

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A.    Plaintiffs Are Likely To Succeed On The Merits Of Their Fourteenth Amendment Claim

It is well-settled that Plaintiffs have a liberty interest in parole that is protected by the Fourteenth Amendment's Due Process Clause. *See Morrissey v. Brewer*, 408 U.S. 471, 482 (1972); *Cooper v. Lockhart*, 489 F.2d 308, 312 (8th Cir. 1973) ("The law is now established that due process is required in parole revocation proceedings."). Over five decades ago, the Supreme Court laid out the procedural protections that apply to people facing revocation of parole. *See Morrissey*, 408 U.S. at 484–89; *Gagnon v. Scarpelli*, 411 U.S. 778, 790 (1973). Those protections include the right to state-appointed counsel in certain circumstances, to cross-examine adverse witnesses, and to present favorable evidence and witnesses. *See Morrissey*, 408 U.S. at 484–89; *Gagnon*, 411 U.S. at 790. Yet Defendants routinely deny these rights and others to Plaintiffs. Immediate relief is warranted.

### 1.    Defendants Are Violating Plaintiffs' Right To Counsel

The Supreme Court has laid out three circumstances in which the State must appoint counsel to people facing revocation of parole. Specifically, the State must provide counsel when there is a "timely and colorable claim (i) that [the parolee] has not committed the alleged violation of the conditions upon which he is at liberty; or (ii) that, even if the violation is a matter of public record or is uncontested, there are substantial reasons which justified or mitigated the violation and make revocation inappropriate, and that the reasons are complex or otherwise difficult to develop or present." *Gagnon*, 411 U.S. at 790. The Supreme Court has further provided that (iii) "in doubtful cases," counsel should be provided when the parolee does not "appear[] to be capable of speaking effectively for himself." *Id.* at 791.

As the Eighth Circuit has explained, "[c]onducting revocation hearings without required counsel violates due process." *Gasca v. Precythe*, 83 F.4th 705, 712 (8th Cir. 2023). Yet despite this clear precedent, Arkansas recently amended its administrative code to provide that parolees "shall not have the right to have counsel appointed by the State"—full stop. Ark. Admin. Code § 158.00.3-4.2(g)(2). That flat ban on state-provided counsel is a per se violation of the Fourteenth Amendment and directly conflicts with governing Supreme Court and Eighth Circuit precedent.

Consistent with that regulation, Defendants do not appear to have any mechanism for screening parolees to determine if counsel is constitutionally required under *Gagnon*. Indeed, in response to a FOIA request, the ADC and the PPTB admitted that they have no internal policies or guidance whatsoever for appointing counsel. *See* PPTB Policies FOIA Resp. at 3. Because "*Gagnon* requires [the entity that] administers the parole system[] to make 'the decision as to the need for counsel,'" *Gasca*, 83 F.4th at 712, Defendants' utter failure to provide any process for doing so is a clear violation of the law.

This failure to screen parolees extends to those who plainly qualify for the appointment of counsel under *Gagnon* and have expressly requested the assistance of counsel. For example, Mr. Antonio Guyton, a parolee suffering from the lingering cognitive effects of a recent brain surgery who had substantial, mitigating evidence to explain his alleged violation, recently requested and was denied state-appointed counsel. A. Guyton Decl. ¶¶ 2, 12–14, 16–17. Likewise, Mr. Jimmy Russell, a parolee diagnosed with PTSD who had a colorable claim of innocence, requested and was denied state-appointed counsel. J. Russell Decl. ¶¶ 4–6, 10, 18, 23; *see also* L. Torres-Delgado Decl. ¶¶ 10, 15, 17 (parolee with colorable claim of innocence was denied state-appointed counsel).

20

Defendants also routinely fail to record their reasons for rejecting the provision of state-appointed counsel—an independent violation of the Fourteenth Amendment. *Gagnon* provides that "[i]n every case in which a request for counsel at a preliminary or final hearing is refused, the grounds for refusal should be stated succinctly in the record." 411 U.S. at 791; *see also Gasca*, 83 F.4th at 712 (same). Yet Defendants have no written guidance requiring as much, and they frequently fail to do so. *See, e.g.*, A. Guyton Decl. ¶¶ 13–15 (PRJ rejected request for counsel); Ex. 45 (A. Guyton Revocation Documents) (no notation of request or reasons for denial).

### 2.    Defendants Are Violating Plaintiffs' Other Due Process Rights

Defendants also routinely deny Plaintiffs their other rights to due process.

The Supreme Court has laid out important procedural protections that apply at the preliminary and final revocation hearings. "At the preliminary hearing," a "parolee is entitled to notice of the alleged violations of . . . parole, an opportunity to appear and to present evidence in his own behalf, a conditional right to confront adverse witnesses, an independent decisionmaker, and a written report of the hearing." *Gagnon*, 411 U.S. at 786. At the final hearing, due process protections include:

> (a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole.

*Morrissey*, 408 U.S. at 489. Yet Defendants routinely fail to notify parolees of these rights and to allow for their effective vindication. Defendants also routinely coerce parolees to involuntarily waive their rights to a preliminary or final hearing without full knowledge and understanding.

21

a.      *Defendants Fail To Provide Adequate Notice Of Plaintiffs' Rights*
        *And Regularly Coerce Plaintiffs To Waive Those Rights*

As an initial matter, Defendants do not provide parolees with adequate notice of their rights. As this Court has previously recognized, such rights "are of little value if parolees are not made fully aware of their content and meaning." *Hickman v. Ark. Bd. of Pardons & Paroles*, 361 F. Supp. 864, 867 (E.D. Ark. 1973). Without full knowledge of their rights, parolees cannot make an informed and voluntary decision to waive them. Yet that is precisely what Defendants coerce parolees to do—often on a rushed timeline and based on inaccurate or incomplete information.

Defendants routinely fail to adequately inform parolees of their rights, such as their right to counsel, their right to cross-examine adverse witnesses, and their right to present favorable evidence and witnesses in advance of their hearings. *See supra* at 9–13; *see, e.g.*, S. Miner Decl. ¶¶ 14, 17–18; D. Warren Decl. ¶¶ 9–10. Within days after a person is arrested on an alleged parole violation, their CSO visits them to pressure them into waiving their right to a hearing. *See, e.g.*, Ex. 46 (K. Barnes Decl.) ¶¶ 4, 6–7 (two days); S. Collins Decl. ¶¶ 3, 5 (three days); A. Guyton Decl. ¶ 5 (three or four days). At those meetings, CSOs regularly fail to advise parolees of their rights. *See, e.g.*, J. Thompson Decl. ¶¶ 9–11; S. Fancher Decl. ¶¶ 8–10; A. Pacheco Decl. ¶¶ 7–9; C. Brown Decl. ¶¶ 9–10; J. Calvert Decl. ¶¶ 7–8; G. Greer Decl. ¶¶ 8–10; M. Walker Decl. ¶¶ 19–20, 24; A. Boyd Decl. ¶ 9. In one extreme instance, a parolee was informed the day after his arrest that he had allegedly violated the terms of his parole, was not provided his violation paperwork, was not verbally informed of his rights, and had his final revocation hearing "[a]pproximately one hour after [he] met with [his] CSO." S. Miner Decl. ¶¶ 6–8, 11–15.

Even when people are provided written forms listing their rights, Defendants frequently fail to provide adequate time to review and understand those rights. *See, e.g.*, K. Luneau Decl. ¶¶ 6–7 (waiver process "lasted for only 2 minutes" and parolee "did not have time to read"

violation report); A. Boyd Decl. ¶ 7 (parolee "did not read the waiver form because [he] felt like [his] PO was rushing [him]"). And even when parolees are ultimately orally informed of their rights, it often comes too late. For example, one parolee learned he had the right to have witnesses testify on his own behalf only *during* his hearing, at which point it was "impossible . . . to contact witnesses" as "the hearing had already started." S. Miner Decl. ¶ 17. Another person, whose parole was revoked because of a new claim of alleged assault, similarly learned that he could call witnesses only during the hearing. O. Burnell Decl. ¶¶ 4, 14. Had he known prior to the hearing, he could—and would—have called witnesses, including the alleged victim who "would have been able to testify about how [the parolee was] not the person who assaulted them," as well as an alibi witness who could have "testif[ied] to [the parolee's] whereabouts when the alleged victim was assaulted." *Id.* ¶ 19.

Parolees also are not informed of the relevant evidentiary standards at preliminary and final hearings, despite the Supreme Court's specific admonition that a "parolee should be given notice that the [preliminary] hearing will take place and that its purpose is to determine whether there is probable cause to believe [the parolee] has committed a parole violation." *Morrissey*, 408 U.S. at 486-87. Often, parolees are not even informed of their right to a preliminary hearing. *See, e.g.*, J. Russell Decl. ¶ 11 (CSO did not distinguish between preliminary and final hearings); P. Callahan Decl. ¶ 8; M. Walker Decl. ¶ 18; A. Boyd Decl. ¶ 9; B. Baker Decl. ¶ 8; O. Burnell Decl. ¶ 8.

Courts in this circuit have previously held that the failure to provide "timely" notice of such rights "constitutes a violation of due process." *Gasca v. Precythe*, 500 F. Supp. 3d 830, 846 (W.D. Mo. 2020), *aff'd in part, rev'd in part and remanded*, 83 F.4th 705 (8th Cir. 2023). The same is true here. In the absence of timely notice of their rights, parolees are unable to meaningfully exercise those rights and are deprived of their Fourteenth Amendment protections.

Relatedly, Defendants frequently coerce parolees to waive their rights to a preliminary and/or final revocation hearing without adequately informing parolees of the claimed violations of parole and the consequences of any waiver. "[T]o be effective a waiver must be knowingly and voluntarily made." *United States v. Taylor*, 747 F.3d 516, 519 (8th Cir. 2014); *see* Ark. Code Ann. § 16-93-705(c)(1)(A). But CSOs often procure waivers without knowing and voluntary assent. In particular, CSOs often pressure parolees into waiving by telling them that they will not be successful at their hearing, offering inaccurate information about their alleged violations, failing to provide parolees with copies of their violation reports, or misleading them into believing that they will be released upon serving the violation (when, in reality, they must undergo a new parole hearing). *See, e.g.*, S. Fancher Decl. ¶¶ 6, 12; J. Phariss Decl. ¶¶ 8–13; C. Brown Decl. ¶¶ 8–9; D. Beshears Decl. ¶¶ 8–13; K. Luneau Decl. ¶¶ 25–27; J. Johnson Decl. ¶ 11; Ex. 47 (A. Dillard Decl.) ¶¶ 6–7. And as noted above, CSOs often procure waivers without informing parolees of their rights. *See supra* at 9–10.

Some parolees waive under pressure from their CSOs, despite having evidence of actual innocence or mitigating evidence that would explain or justify their alleged violations. For example, one parolee waived despite having evidence of lack of culpability and good character because his CSO (inaccurately) told him that if he did not, he would have to wait a year to even have a hearing. S. Fancher Decl. ¶¶ 6, 12. Another waived after being told that if he proceeded with a hearing, he would get a six-month sentence rather than a 90-day one. J. Phariss Decl. ¶ 8. He did so despite having strong mitigating evidence, including testimony from his CSO that he was "doing everything [he] should be" and that "if it were up to [the CSO], [he] would not be violated." *Id.* ¶ 6. And in the end, he still served six months due to a lack of bed availability at his halfway house—a possibility he was never informed of when he chose to waive. *Id.* ¶¶ 9–13. Yet

another parolee requested a hearing but instead of having one scheduled, his CSO returned two weeks later to say that "having a hearing would be a waste of time since [the PRJ] would find [him] guilty of something." C. Brown Decl. ¶¶ 8–9. Feeling "pressured by [his] CSO," he waived, even though he knew portions of the violation report were inaccurate and he was actually innocent of some allegations. *Id.* ¶¶ 6, 11.

Additionally, Defendants regularly coerce parolees to waive even when they know the waiver is not intelligent. For instance, one parolee was allowed to waive despite stating that he "did not fully understand the consequences" of his waiver. J. Thompson Decl. ¶¶ 12–14. Another was permitted to waive even though he is "functionally illiterate" and could not read or understand any of the paperwork associated with his alleged violation and waiver. J. Calvert Decl. ¶¶ 6–7; *see id.* ¶ 5 (stating that he waived because his CSO threatened he "could be incarcerated for many years" if he did not).

Courts in the Eighth Circuit have recognized that the sorts of erroneous, misleading, and coercive statements that Arkansas CSOs routinely make undermine the knowing and voluntary nature of the waiver. In *Gasca*, the district court held that a waiver of a preliminary or final parole revocation hearing "that is the result of inaccurate or incomplete information or that is coerced or encouraged is unknowing and involuntary." *Gasca*, 500 F. Supp. 3d at 850–51. There, Missouri officials regularly pressured parolees to waive hearings, including by telling them that they "would likely be released" if they waived, that the hearing would have no effect because "the parole board 'typically [sticks] to what they've already made up their mind to do,'" and that the hearing result would likely be unfavorable because "it was [the parolee's] word against the police that arrested [her].'" *Id.* The same sort of pressure tactics are being used here. Arkansas CSOs promise liberty that will not come and threaten parolees that exercising their constitutional right to a hearing may

result in a longer sentence. As *Gasca* explained, "[p]ressuring parolees to waive … the hearings to which they are constitutionally entitled under *Morrissey* is a violation of due process." *Id.*

Other courts have reached similar conclusions in comparable contexts. For instance, the Ninth Circuit has recognized that informing a noncitizen that he is "eligible for voluntary departure" but "in the same breath" stating that the noncitizen "would not get the relief if he applied for it" undermines the knowing and voluntary nature of the noncitizen's waiver. *United States v. Melendez-Castro*, 671 F.3d 950, 954 (9th Cir. 2012); *see also Maria S. v. Garza*, No. 13-cv-108, 2015 WL 4394745, at *4-6, *14 (S.D. Tex. July 15, 2015) (collecting cases holding that failing to accurately inform immigrants of the consequences of waiving their rights to challenge deportation violates the Due Process Clause). Accordingly, Plaintiffs are likely to succeed on this claim.

> b.  *Defendants Do Not Provide Constitutionally Sufficient Process In Connection With Parole Revocation Hearings*

For those parolees who do not waive their parole revocation hearings, Defendants fail to provide constitutionally sufficient process leading up to and at those hearings. In theory, Arkansas law guarantees parolees the right to "confront and cross-examine adverse witnesses," "hear and controvert evidence against" them, and "offer evidence in [their] own behalf." Ark. Code Ann. §§ 16-93-705(d)(1), (b)(1)(4), (c)(1)(A)(3); *id.* §§ 16-93-1908(d)(1), (b)(1)(4), (c)(1)(A)(3). But in practice, these guarantees are illusory.

Even before their hearings, parolees' efforts to prepare a defense are frequently stymied by Defendants' failure to provide any formal system or process for parolees to contact witnesses and gather evidence. Defendants hold parolees in jail pending revocation proceedings and do not provide them with clear and consistent avenues for preparing a defense while detained. Due to their incarceration, parolees are often unable to gather exculpatory or mitigating evidence. *See, e.g.*, D. Warren Decl. ¶¶ 4, 9, 13, 16 (parolee was unable to contact his therapist or obtain medical

records regarding his PTSD and schizophrenia, which could have served as mitigating evidence). Many parolees cannot afford the jail fees to phone potential mitigating witnesses, and even when they can, they are often unable to do so due to timing restrictions on when they can call or lack of access to witnesses' phone numbers. *See, e.g.*, D. Beshears Decl. ¶ 9 ("I had witnesses that I believe would have helped my case, but I did not have money on my books so could not use the phone at [the jail] to contact them."); A. Guyton Decl. ¶ 8 (parolee could not contact his desired witnesses because he did not have their "phone numbers memorized" and could not access his cell phone "to look up the numbers"); S. Rhodes Decl. ¶ 21 (parolee "did not have any funds in [his] account to pay for a phone call" to his wife to inform her of his rescheduled hearing date).

In practice, parolees are frequently left to rely on their CSOs to contact potential mitigating witnesses—a clear conflict of interest, as those CSOs are usually the ones who have initiated the revocation process in the first place. *See, e.g.*, M. Walker Decl. ¶ 30 ("The PRJ asked my current CSO to call my desired witness," but "when I called my desired witness the day after my hearing, he informed me that he had never received a call from my CSO."); J. Vanderpool Decl. ¶¶ 8, 12 (parolee asked CSO to locate witness who was incarcerated at Washington County but witness did not appear); S. Rhodes Decl. ¶¶ 18, 22 (CSO told parolee she would inform his wife that his hearing was rescheduled but failed to do so; after parolee's wife did not show up on date of rescheduled hearing, CSO claimed that it was parolee's "responsibility to contact any desired witnesses"); K. Luneau Decl. ¶ 31 (parolee's stepmother tried to get in contact with PO by phone, mail, and email to submit a statement on parolee's behalf, but PO said that she did not want to talk to stepmother because parolee's witnesses were "none of her business"); M. Whitaker Decl. ¶ 20 ("My PO did not explain to me that she would be making a case against me. I thought this entire time that she was on my side.").

27

Moreover, access to law libraries to prepare a defense is inconsistent and facility-specific. *See* T. Fason Decl. ¶ 17. And no form provided to parolees includes any information about the relevant evidentiary standards for parole revocation hearings, or a parolee's right to remain silent. *See* Notice of Parole Violation Action & Revocation Hearing Waiver Forms.

Even when parolees are able to overcome these hurdles and prepare their own defense, they are often prevented from fully presenting that defense at their hearings. The hearings themselves are cursory, brief, and rote. *See, e.g.*, M. Whitaker Decl. ¶ 24 (hearing took "approximately ten minutes"). The CSOs and arresting officers who prepared the violation and arrest reports, respectively, often do not attend hearings or send their colleagues in their stead. *See, e.g.*, S. Elwood Decl. ¶ 17 (different officer present); S. Miner Decl. ¶ 16 (no arresting officer present); B. Baker Decl. ¶ 12 (different CSO). This severely limits parolees' ability to meaningfully cross-examine the witnesses against them. And even when the CSOs and arresting officers do attend the hearings, PRJs often, and without explanation, prevent parolees from cross-examining them or, at best, sharply curtail the scope of their cross-examination without providing good cause to do so. *See* S. Miner Decl. ¶ 18 ("I was not given the chance to cross-examine my CSO. Nobody explained why I could not do so."); J. Vanderpool Decl. ¶ 13 ("No one offered me the chance to cross examine" "[m]y CSO and the arresting officer."); S. Rhodes Decl. ¶ 26 ("I was not permitted to cross-examine my CSO, even though she testified against me. Nobody explained why I was not allowed to cross-examine her."); K. Luneau Decl. ¶ 28 ("I asked the PRJ if I could ask the arresting officer questions. The PRJ said no."); S. Collins Decl. ¶ 13 ("I attempted to cross-examine the law enforcement officer . . . . However, when I asked my first question, the PRJ interrupted me and claimed that the question was not an actual question. Because of this comment, I felt discouraged from asking any more questions.").

Further compounding the unfairness of these proceedings, Defendants often severely limit a parolee's ability to testify on his or her own behalf, introduce evidence, or call his or her own witnesses. *See* D. Warren Decl. ¶ 13 ("I was not given the chance to ask [my witness] any questions to elicit testimony from her."). For example, parolees are frequently prohibited from speaking on their own behalf or are cut off by the PRJ before providing their full statement. *See, e.g.*, S. Higgins Decl. ¶ 31 (parolee "attempted to testify on [his] own behalf, but one of the CSOs interrupted [him] and told [him] to stop talking"); K. Luneau Decl. ¶ 29 (PO "cut [parolee] off halfway through [her] statement," and "PRJ did not let [her] continue reading"). Defendants also make it difficult for witnesses to attend hearings or submit statements in support of parolees. *See, e.g.*, D. Pruitt Decl. ¶¶ 22, 25 (parolee's hearing rescheduled day-of three times, and parolee's brother, who showed up to previous two hearings, was unable to take off work to attend the third scheduled, actual hearing); S. Rhodes Decl. ¶¶ 18, 22 (parolee's wife showed up to hearing; hearing was rescheduled, and CSO promised to inform parolee's wife of new date; wife did not show up to rescheduled hearing, and CSO told parolee it was parolee's responsibility to contact wife). And they have sometimes even denied witnesses access to hearings or prohibited them from participating, even when they might have had mitigating evidence. *See, e.g.*, S. Collins Decl. ¶ 14 (parolee's mother "permitted to stay in the hearing as an observer" but was not allowed to "testify on [parolee's] behalf"). For example, Mr. Jeffrey Swinford was arrested for possession of a gun while fishing at a state park with his girlfriend. J. Swinford Decl. ¶ 4. The gun had been found in the vehicle that his girlfriend drove to meet him, but Mr. Swinford had neither traveled in that vehicle to the park nor known of the gun. *Id.* Mr. Swinford's girlfriend planned to testify that the gun belonged to her, and that he did not know the gun was in the vehicle. *Id.* ¶ 10. And his friend planned to testify that she drove him to the state park in a separate car from the car his girlfriend

29

drove. *Id.* ¶ 11. Both showed up to Mr. Swinford's revocation hearing; but both were wrongly told that Mr. Swinford did not have a hearing scheduled for that day. *Id.* ¶¶ 10–11.

In addition, parolees are frequently not informed of the results of their hearings—much less provided the "written statement . . . as to the evidence relied on and reasons for revoking parole" that due process requires. *Morrissey*, 408 U.S. at 489; *see, e.g.*, M. Whitaker Decl. ¶ 25; J. Johnson Decl. ¶ 18; J. Swinford Decl. ¶ 14; S. Miner Decl. ¶ 20. Nor are they informed of their right to appeal the PRJ's decision. *See, e.g.*, S. Collins Decl. ¶¶ 15–16; D. Pruitt ¶¶ 27–28. Even if they were so informed, parolees often lack the written documentation and record necessary to file an appeal. *See, e.g.*, M. Walker Decl. ¶ 31; S. Miner Decl. ¶ 20; D. Henson Decl. ¶ 14; S. Rhodes Decl. ¶ 29.

In all these ways, Defendants routinely deprive Plaintiffs of due process. Plaintiffs are therefore likely to succeed on their constitutional claim. *See, e.g.*, *Faheem-El v. Klincar*, 600 F. Supp. 1029, 1038 (N.D. Ill. 1984) (granting preliminary injunction barring Illinois officials from "forbidding the testimony of witnesses at preliminary parole revocation hearings").

**B.    Plaintiffs Are Likely To Succeed On The Merits Of Their Disability Discrimination Claims**

Plaintiffs are likely to succeed on the merits of their disability discrimination claims, too. The Eighth Circuit has held that "[t]he [Americans with Disabilities Act ("ADA")] and § 504 of the Rehabilitation Act are 'similar in substance' and, with the exception of the Rehabilitation Act's federal funding requirement, 'cases interpreting either are applicable and interchangeable' for analytical purposes." *Bahl v. Cnty. of Ramsey*, 695 F.3d 778, 783 (8th Cir. 2012) (citation omitted). Under each of these statutes, Plaintiffs are likely to succeed on their claims because Defendants routinely deprive them of an equal opportunity to access parole and the parole revocation process based on their disabilities.

30

1.    <u>Plaintiffs Are Likely To Succeed On Their ADA Claim</u>

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To succeed on an ADA claim, Plaintiffs must prove four elements: (1) they are disabled within the meaning of the statute; (2) they are qualified for the program; (3) they have been excluded from or denied the benefits of the program by reason of their disability, and (4) the program is run by a public entity. *See Folkerts v. City of Waverly, Iowa*, 707 F.3d 975, 983 (8th Cir. 2013). Here, the first, second, and fourth elements are all easily met, and Plaintiffs are likely to succeed on the third element too.

a.    *Plaintiffs Are Qualified Individuals With Disabilities, And Parole And The Parole Revocation Process Are Qualifying Programs*

*First*, Plaintiffs Todd Fason and Robby Riedel have a disability within the meaning of the ADA. The ADA defines a disability as "a physical or mental impairment that substantially limits one or more major life activities[.]" 42 U.S.C. § 12102(1)(A). Congress has made clear that the term "disability" "shall be construed in favor of broad coverage." *Id.* § 12102(4)(A).

Mr. Fason has been diagnosed with attention-deficit/hyperactivity disorder ("ADHD"), for which he has been prescribed Dextroamphetamine. T. Fason Decl. ¶ 10. He took his medication daily while released, but he is not currently receiving this medication while in jail. *Id.* When he is unmedicated, he has difficulty concentrating, being productive, organizing documents, and meaningfully participating in legal proceedings unassisted. *Id.* Officials at the Faulkner County Detention Center are aware of his disability. *Id.* ¶ 11.

Mr. Riedel suffers from anxiety and depression, for which he has been prescribed Wellbutrin and Seroquel. R. Riedel Decl. ¶ 10. He took his medication regularly while released,

but he is not currently receiving his medication while in jail. Compl. ¶ 138. When he is not on his medications, he has trouble sleeping, experiences feelings of hopelessness, and is constantly on edge, all of which make it hard for him to focus and gather his thoughts. *Id.*

It cannot reasonably be disputed that ADHD, anxiety, and depression are "mental impairments." 42 U.S.C. § 12102(1)(A). These mental impairments affect "one or more major life activities," *id.*—namely, Mr. Fason and Mr. Riedel's "ability to perform cognitive functions," such as "thinking and concentrating"—"on the level of an average person,'" *Battle v. United Parcel Servs., Inc.*, 438 F.3d 856, 861 (8th Cir. 2006). Mr. Fason and Mr. Riedel thus each have a disability within the meaning of the ADA. *See id.* at 861 (depression and anxiety are ADA-qualifying disabilities); *Hapern v. Wake Forest Univ. Health Servs.*, 669 F.3d 454, 462 (4th Cir. 2012) ("ADHD and anxiety . . . constitute disabilities giving rise to protection under the Rehabilitation Act and ADA.").

*Second*, Mr. Fason and Mr. Riedel qualify for parole and the process that accompanies a parole revocation determination. A "qualified individual with a disability" under the ADA is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). Mr. Fason and Mr. Riedel satisfy this element by virtue of their participation in parole.

*Finally*, parole is a service, program, or activity of a public entity. As the Eighth Circuit has explained, "[c]ourts have broadly construed the 'services, programs, or activities' language in the ADA to encompass 'anything a public entity does.'" *Bahl*, 695 F.3d at 787 (quoting *Bircoll v.*

32

*Miami-Dade Cnty.*, 480 F.3d 1072, 1084 (11th Cir. 2007)). That language plainly encompasses Defendants' provision of parole and parole revocation proceedings.

> b.    *Plaintiffs Are Likely To Be Excluded From Or Denied The Benefits Of The Parole Revocation Process By Reason Of Their Disabilities*

Named Plaintiffs Mr. Fason and Mr. Riedel and the putative class they represent are also likely to be excluded from or denied the benefits of the parole revocation process by reason of their disabilities. "[T]he ADA and [Rehabilitation Act] require that otherwise qualified individuals receive 'meaningful access' to programs and activities." *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999) (citation omitted). "[M]eaningful access" means exactly that: access that is meaningful. Mere access or "limited participation" do not suffice. *Id.*; *see also Argenyi v. Creighton Univ.*, 703 F.3d 441, 449 (8th Cir. 2013) ("[T]he ADA 'guarantees the disabled more than mere access to public facilities; it guarantees them full and equal enjoyment.'" (citation omitted)).

Defendants are likely to deprive Mr. Fason and Mr. Riedel of meaningful access to the parole revocation process in multiple ways, including by depriving them of their right to state-appointed counsel and failing to provide reasonable accommodations that would enable them to fully understand and participate in their parole revocation proceedings. In addition to their likely deprivation of procedural due process rights, Mr. Fason and Mr. Riedel are likely to be deprived of specific accommodations they need to have meaningful access to their revocation hearings. Mr. Fason is currently being deprived of medications that he takes to treat ADHD, while Mr. Riedel is currently being deprived of medications that he takes to treat anxiety and depression. If they are not provided their medications prior to their hearings, they will not be able to meaningfully participate in those hearings equally with people who do not face mental health challenges.

The past experiences of other people with disabilities reinforce the likelihood that Mr. Fason and Mr. Riedel will be deprived of the reasonable accommodations they need to participate equally in the parole revocation process. Defendants routinely deprive parolees with mental health and cognitive disabilities of the medications they need to meaningfully participate in their revocation hearings. *See, e.g.*, K. Luneau Decl. ¶¶ 23–24 (parolee with borderline personality disorder, reactive attachment disorder, manic bipolar disorder, and anxiety was not given her usual medication, impairing her ability to understand the hearing and interact with others at the hearing); J. Johnson Decl. ¶¶ 2, 16 (parolee with diagnosed schizophrenia and bipolar disorder was not given his medication, and "[a]s a result, . . . became extremely upset and could not focus on what was happening" while cross-examining his arresting officer); M. Whitaker Decl. ¶¶ 19, 28 (parolee who was diagnosed with, took special classes for, and was prescribed medication for ADHD was not given his medication and struggled to focus at and understand the hearing).

Defendants have also deprived plaintiffs with certain physical disabilities, including hard-of-hearing/deaf individuals and vision-impaired/blind individuals, of the interpretative services that they need to fully participate in the parole revocation process. For example, multiple parolees with vision impairments were provided paperwork they could not read due to lack of access to eyeglasses. C. Brown Decl. ¶ 7; G. Greer Decl. ¶ 10. Mr. Riedel also wears eyeglasses, to which he has not had access while in jail. Compl. ¶ 136. And parolees with hearing impairments were denied the aids necessary to hear the revocation proceedings. *See, e.g.*, B. Baker Decl. ¶¶ 13–16.

Take, for example, Mr. Brandon Baker. Due to his tinnitus, he can hear only "a ringing noise and echo in [his] ears," making it "very hard and [i]n some instances impossible for [him] to hear when someone is speaking to [him]" unless he wears hearing aids or is able to "read the speaker's lips." B. Baker Decl. ¶¶ 13–14. But he did not have his hearing aids while incarcerated

or at his revocation hearing. *Id.* ¶ 14. And at his hearing, his arresting officer dialed in by phone. *Id.* ¶ 15. When Mr. Baker informed his CSO that he was "having trouble hearing" the arresting officer, the CSO moved the phone closer, but Mr. Baker still could not hear. *Id.* Later in the hearing, Mr. Baker again informed his CSO that he "could not hear" the discussion about the operative police report. *Id.* ¶ 16. The CSO ignored him entirely. *Id.* Mr. Baker explains in his declaration that he did not see his police report until after the hearing, and that had he seen the report, he "could have disproved" the "misinformation" in the report. *Id.* ¶ 17.

Failure to provide necessary interpretive aids is a well-recognized violation of the ADA. For instance, this Court has previously recognized that a hearing-impaired plaintiff had stated a prima facie claim under the ADA for a sign language interpreter in order to meaningfully access an internal prison disciplinary hearing. *Randolph*, 170 F.3d at 857–59; *see also Armstrong v. Davis*, 275 F.3d 849, 864 (9th Cir. 2001) (holding that being "unable to comprehend various parts of the parole and parole revocation process" is an "actual injury" under the ADA and Rehabilitation Act). Plaintiffs are thus likely to succeed on their claim for reasonable accommodations to ensure people with disabilities can participate equally in the revocation process.

In addition, as described above, Defendants routinely deprive people on parole of their right to counsel and other due process rights. That deprivation uniquely harms people with mental health disabilities, intellectual disabilities, or other disabilities affecting cognitive function.

The experience of Mr. Antonio Guyton is illustrative. Mr. Guyton is recovering from brain surgery, which "impacts [his] ability to communicate and understand information," especially "in rushed or complex situations." A. Guyton Decl. ¶ 2. During his hearing, Mr. Guyton informed the PRJ that he had recently had brain surgery, "which made it hard . . . to keep up," that he "had never

received a copy of his violation report," that he "did not have a lawyer and would like to have one," and that he "would like to have witnesses" but had been unable to contact them while in jail. *Id.* ¶ 13. Despite these reasonable requests, the PRJ did not postpone the hearing, screen Mr. Guyton for the appointment of counsel, or offer any assistance in contacting witnesses. *Id.* ¶ 14. As a result, Mr. Guyton was forced to cross-examine his CSO on his own, which he struggled to do due to his cognitive impairments, and was unable to present any favorable witnesses. *Id.* ¶ 12. As Mr. Guyton explains in his declaration, he "would have greatly benefited" from the assistance of counsel, who could have contacted favorable witnesses, more effectively cross-examined adverse witnesses, and advised Mr. Guyton on his right to remain silent and whether and how to testify on his own behalf given his pending criminal case. *Id.* ¶ 16.

Unfortunately, Mr. Guyton's experience is all too typical of Defendants' failures to provide counsel and other accommodations, such as assistance reading documents, assistance understanding forms and procedures, assistance communicating in writing, or access to required medication. *See, e.g.*, O. Burnell Decl. ¶¶ 16-17 (parolee who had been assigned to special education classes and suffers from depression had difficulty understanding what was happening during hearing but was not provided counsel); *supra* at 14–15 (describing deprivation of needed medications).

Defendants' coercive waiver practices also heavily impact people with disabilities, who are frequently not provided accommodations they need to understand their rights and make a voluntary waiver. For example, Mr. Samuel Fancher, who suffers from schizoaffective disorder and PTSD, waived his right to a hearing based on his CSO's inaccurate warning that he would have to "wait a year to have a hearing then likely serve another year in prison." S. Fancher Decl. ¶¶ 6, 13–14. That CSO was aware of Mr. Fancher's disabilities, which impact Mr. Fancher's ability

to "full[y] consider and understand the consequences of [his] decisions," but the CSO nevertheless failed to inform Mr. Fancher that he had a right to be screened for and appointed an attorney. *Id.* ¶¶ 9, 13. Another parolee with head trauma that causes seizures and memory issues waived after he was told that he would receive a one-year sentence if he proceeded with a hearing rather than a six-month sentence. D. Beshears Decl. ¶¶ 3, 8. Most of the charges underlying his violation were later dropped, but despite now having served nearly nine months on a six-month sentence, he still has not been afforded a parole release hearing and is therefore unable to move to the drug treatment facility into which he was accepted—a possibility of which he was never informed when he waived. *Id.* ¶¶ 12–13. And Mr. Johnathan Hawkins, who has a low reading level, of which his CSO was aware, waived his right to a hearing during a one-minute meeting. J. Hawkins Decl. ¶¶ 2–3, 14. At this meeting, the PRJ asked him whether he was "competent" but did not explain what he meant by "competent" or ask any questions about his reading ability or prior education. *Id.* ¶ 13. And the CSO quickly read from the waiver paperwork, without giving Mr. Hawkins time to confirm whether the CSO was reading the entire document or picking and choosing different sections to read. *Id.* ¶ 14.

While all people who are not "capable of speaking effectively" for themselves are entitled to representation under *Gagnon* and the Due Process Clause, 411 U.S. at 790-91, "[t]he ADA and Rehabilitation Act . . . require more than compliance with due process requirements: they require that a disabled person be provided with 'meaningful access' to state provided services." *Armstrong*, 275 F.3d at 861. The ADA and Rehabilitation Act thus provide independent protection for people who may be able to speak effectively on their own behalf under *Gagnon* but would still lack meaningful access to parole revocation proceedings.

2.    <u>Plaintiffs Are Likely To Succeed On Their Rehabilitation Act Claim</u>

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The Rehabilitation Act has the same four elements as the ADA, except that the program or activity must be one that receives federal financial assistance. *See Bahl*, 695 F.3d at 783. On the only new element—federal financial assistance—Plaintiffs are likely to succeed because the ADC and the PPTB, a sub-department of the ADC, receive funding from the federal government. *See Holt v. Kelley*, No. 19-cv-81, 2020 WL 5821958, at *1 (E.D. Ark. Sept. 30, 2020) (ADC "receives federal funding").

## II.  ABSENT AN INJUNCTION, PLAINTIFFS WILL SUFFER IRREPARABLE HARM

Plaintiffs have suffered—and will continue to suffer—irreparable harm absent injunctive relief. Those harms include the ongoing deprivation of Plaintiffs' constitutional rights, incarceration without due process, and the denial of equal rights. These harms independently and together weigh strongly in favor of relief.

### A.  Plaintiffs Have Been And Will Continue To Be Deprived Of Their Constitutional Rights

"The deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Little Rock Fam. Plan. Servs. v. Jegley*, 549 F. Supp. 3d 922, 935 (E.D. Ark. 2021) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011, 1017 (8th Cir. 2023) (similar). As explained, Arkansas's flat ban on the provision of state-appointed counsel violates the Supreme Court's decision in *Gagnon* and the Eighth Circuit's decision in *Gasca* and is patently unconstitutional. *See supra* at 19–21. Absent injunctive relief, Arkansas will continue to enforce this

unconstitutional regulation, and Plaintiffs' right to counsel will continue to be violated. That, alone, constitutes irreparable harm. *See Farella v. Anglin*, 734 F. Supp.3d 863, 885 (W.D. Ark. 2024) (finding that the irreparable harm factor "weighs heavily in favor of injunctive relief" where "the right to counsel of the class" would "continue to be violated absent an injunction").

**B.    Plaintiffs Have Been And Will Continue To Be Incarcerated Without Due Process**

The "loss of liberty . . . is perhaps the best example of irreparable harm." *Id.* This is because the "loss of liberty" for time in detention is "'irretrievable' regardless of the [ultimate] outcome" at trial or a revocation hearing. *Winn v. Cook*, 945 F.3d 1253, 1260 n.1 (10th Cir. 2019) (quoting *Page v. King*, 932 F.3d 898, 904 (9th Cir. 2019)). Courts have regularly found that deprivation of liberty without due process constitutes irreparable injury. *See, e.g.*, *Sajous v. Decker*, No. 18-cv-2447, 2018 WL 2357266, at *13 (S.D.N.Y. May 23, 2018); *Diaz v. Kaiser*, No. 25-cv-5071, 2025 WL 3011852, at *14 (N.D. Cal. Sept. 16, 2025). As explained, Defendants are denying Plaintiffs their constitutionally protected rights to due process. *See supra* at 21–30. They have failed to provide parolees with adequate notice of their rights, including their right to counsel. They have adopted a policy or practice of coercing parolees to waive their rights to a hearing. And even when they do provide the opportunity for a hearing, those hearings are routinely conducted with constitutionally inadequate process.

As a result of these due process violations, thousands of parolees in Arkansas are reincarcerated every year. Absent injunctive relief, Defendants will continue to conduct parole revocation hearings without due process, resulting in loss of liberty for scores of parolees.

**C.    Plaintiffs With Disabilities Have Been And Will Continue To Be Deprived Of Equal Treatment**

The "denial of equal treatment" is also itself an irreparable injury. *Ne. Fla. Chapter of Assoc. Gen. Contractors v. City of Jacksonville*, 508 U.S. 656, 666 (1993); *see also Gresham v.*

*Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir. 1984) ("irreparable injury may be presumed from the fact of discrimination"). Courts routinely hold that requiring people with disabilities to operate "under discriminatory conditions"—including by failing to provide necessary reasonable accommodations—"is itself a form of irreparable injury." *Bonnette v. D.C. Court of Appeals*, 796 F. Supp. 2d 164, 187 (D.D.C. 2011) (collecting cases). As discussed, the denial of the benefits of parole and the parole revocation process based on parolees' disabilities, in and of itself, constitutes disability discrimination. *See supra* at 30–38. Absent injunctive relief, Defendants will continue to conduct parole revocation hearings in a discriminatory manner— without systematically assessing whether parolees are entitled to counsel or need interpretive services to fully participate in the revocation process. As a direct result, Plaintiffs will be forced to continue navigating this process, which may result (and often results) in incarceration without the accommodations they need, and to which they are legally entitled.

## III.    THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVOR INJUNCTIVE RELIEF

The balance of the equities and public interest weigh strongly in favor of granting a temporary restraining order and preliminary injunction.

As to the equities, it is well-settled that "'the State has no interest in enforcing laws that are unconstitutional,'" and thus "an injunction preventing the State from enforcing unconstitutional acts 'does not irreparably harm the State.'" *Little Rock Fam. Plan. Servs.*, 549 F. Supp. 3d at 936. By contrast, Plaintiffs face the irreparable harms of being deprived of their constitutional rights, incarcerated without due process, and denied equal access to the parole revocation process by reason of their disabilities. Any argument Defendants might make about the additional cost to provide counsel, constitutionally adequate process, or reasonable accommodations is undercut by the fact that other states in the Eighth Circuit *do* provide such

protections. *See* Iowa Code § 908.2A (providing for appointed counsel); Minn. R. 2940.4200 (same); S.D. Codified L. § 7-16A-10 (same); *Gasca*, 500 F. Supp. 3d at 856-62 (requiring screening for appointment of counsel); *Farella*, 734 F. Supp. 3d at 885 (noting that another similarly sized county provided counsel at bail hearings in weighing grant of preliminary injunction). In any case, "there is no fiscal-strain exception to a remedy that merely requires compliance with the Constitution." *Farella*, 734 F. Supp. 3d at 885.

As to the public interest, "it is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled on other grounds by Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012). In particular, "[t]he right to counsel is a fundamental right" that "assures the fairness, and thus the legitimacy," of the criminal legal system. *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986) (citation omitted). "Of all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive for it affects his ability to assert any other rights he may have." *United States v. Cronic*, 466 U.S. 648, 654 (1984) (citation omitted). Due process is likewise of paramount importance. Any time "a person is unfairly incarcerated, the public pays a high price." *Faheem-El*, 600 F. Supp. at 1041. And the public has an equally strong interest in ensuring that people with disabilities are able to meaningfully access public programs.

Finally, the public has an interest in immediate judicial intervention. Dozens of parolees are accused of violating the conditions of their parole daily. Parolees often have to decide whether to waive their right to a hearing within days of their arrest. *See, e.g.*, A. Guyton Decl. ¶ 5 (three or four days); S. Collins Decl. ¶¶ 3, 5 (three days). If they choose not to waive, final revocation hearings often occur within days of such refusal. *See, e.g.*, S. Miner Decl. ¶¶ 7–8, 12–15 (within hours); J. Johnson Decl. ¶¶ 10, 14 (three days); A. Guyton Decl. ¶ 7 (five days); J. Swinford Decl.

¶¶ 5, 8 (six days); K. Luneau Decl. ¶¶ 12, 20 (six days); S. Collins Decl. ¶¶ 5, 11 (seven days).

And most final revocation hearings occur within fourteen days of arrest. *See* Ark. Admin. Code

§ 158.00.3-4.2(b). For the Named Plaintiffs, that would mean that their final revocation hearings

are—or are likely to be—scheduled for this week or early next week. *See* Compl. ¶¶ 103, 120, 128,

134. Indeed, Mr. Fason's hearing is already scheduled for February 3. *Id.* ¶ 120.

Every day without a temporary restraining order or preliminary injunction results in

mounting violations. Each day, additional parolees are forced to face final revocation hearings

without counsel; are coerced into unknowingly waiving their rights; are deprived of due process

protections leading up to and during revocation hearings; are denied the necessary

accommodations to properly participate in revocation hearings; and are reincarcerated without due

process or equal treatment.

The public interest thus strongly favors the grant of an injunction.[6]

## IV.    PROVISIONAL CLASS CERTIFICATION IS WARRANTED

As explained in further detail in the accompanying class certification motion, this Court

should provisionally certify the following class and subclass to grant preliminary injunctive relief:

---

[6]    Because this is a non-commercial case that involves only non-monetary injunctive relief, and because it serves a public interest to protect constitutional rights and there can be no proper showing of any likelihood of harm or probable loss should the injunction be granted, the Federal Rule of Civil Procedure 65(c) security bond requirement should be waived. *See, e.g., Hopkins v. Jegley*, 508 F. Supp. 3d 361, 454 (E.D. Ark. 2020) (waiving Rule 65(c) bond because the defendants offered no evidence they would be financially harmed if wrongfully enjoined and plaintiffs were "serving a public interest in acting to protect constitutional rights"); *Turtle Island Foods SPC v. Soman*, 424 F.Supp. 3d 552, 579 (E.D. Ark. 2019) (waiving Rule 65(c) bond because "the State has not requested security in the event this Court grants a preliminary injunction nor is there evidence regarding whether, or in what amount, the State will be financially harmed if the Court grants a preliminary injunction"); *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016) (explaining that the Rule 65(c) security requirement is within the discretion of the trial court and that "some courts have not required a bond . . . because of [an] important public interest" a case may pose or "where the damages resulting from a wrongful issuance of an injunction have not been shown").

- **Parole Revocation Class**: All adult parolees who are in the custody, or under the supervision, of the ADC, and who currently face, or will in the future face, parole revocation proceedings administered by Defendants.

- **Parolees with Disabilities Subclass**: All adult parolees who are in the custody, or under the supervision, of the ADC; who have a disability, as defined by 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B); who need accommodations in order to meaningfully access and participate equally in the parole revocation process; and who currently face, or in the future will face, parole revocation proceedings administered by Defendants.

"Numerous courts have found provisional certification alone sufficient for purposes of awarding preliminary relief." *Padres Unidos de Tulsa v. Drummond*, 783 F. Supp. 3d 1324, 1350 (W.D. Okla. 2025) (collecting cases). Although "[i]n granting such provisional certification, the Court must still satisfy itself that the requirements of Rule 23 have been met. . . . Its analysis is tempered . . . by the understanding that such certifications may be altered or amended before the decision on the merits." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 179–80 (D.D.C. 2015) (internal citation and quotation marks omitted).

Plaintiffs' concurrently filed motion for class certification and accompanying exhibits, which are incorporated by reference here, demonstrate that the proposed class and subclass satisfy the requirements of Rule 23(a), (b)(1) and (b)(2). The class is sufficiently numerous, Fed. R. Civ. P. 23(a)(1), as it comprises thousands of people similarly situated to Plaintiffs who have been or will be subject to Defendants' unlawful policies and practices. Pls.' Br. in Supp. of Mot. for Class Cert. ("Class Cert. Br.") at 6–8. Similarly, the subclass is sufficiently numerous, as a large proportion of the class has diagnosed disabilities that impact their ability to meaningfully access

43

parole revocation proceedings. *Id.* at 18–19. The class also satisfies the commonality requirement, Fed. R. Civ. P. 23(a)(2), because the key legal issues in the action—including whether the Defendants' have a policy and practice of denying basic due process rights to parolees facing revocation—are "capable of classwide resolution." *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 998 (8th Cir. 2016); *see also* Class Cert. Br. at 8–12. The subclass also satisfies the commonality requirement because the key legal issue—whether the Defendants' failure to screen individuals with disabilities for reasonable accommodations for their revocation proceedings and failure to provide reasonable accommodations required for parolees to meaningfully access revocation proceedings violates the ADA and Rehabilitation Act—is similarly capable of classwide resolution. *See* Class Cert. Br. at 19–21. The class and subclass also satisfy the typicality requirement in Rule 23(a)(3) because "other class members have claims similar to the named plaintiff[s]." *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995); Class Cert. Mot. at 12–13, 21–22. Finally, the class and subclass satisfy the adequacy requirement in Rule 23(a)(4) because the Named Plaintiffs possess a strong personal interest in the subject matter of the lawsuit and are represented by experienced counsel with expertise in complex civil rights litigation. Class Cert. Br. at 13–15, 22–23.

Provisional class certification is appropriate under Rule 23(b)(1), as it is the only practicable means by which the individual Named Plaintiffs and the class and subclass members can challenge Defendants' unconstitutional parole revocation processes and violations of the ADA and Rehabilitation Act. *See id.* at 15–16, 23–24. Individualized litigation presents a potential for inconsistent or contradictory judgments, which would force Defendants to adopt conflicting revocation procedures for different class members and increase the delay and expense to all parties and the judicial system. By contrast, a class action will result in substantial benefit to the litigants

by establishing clear standards for the state's parole revocation system and to the Court by allowing the Court to resolve numerous individual claims based on a single set of proof in a case concerning Defendants' uniform policies, practices, and procedures.

Provisional class certification is also appropriate under Rule 23(b)(2), as Defendants have acted and failed to act on grounds generally applicable to the class: their policies, procedures, and practices (and their concomitant lack of policies) have affected all class members. *See id.* at 15–16, 23–24.

## CONCLUSION

For all these reasons, Plaintiffs respectfully request that the Court:

- Hold a hearing on this motion as soon as practicable;

- Issue a temporary restraining order prohibiting Defendants from subjecting Named Plaintiffs and members of the provisional class and subclass to the unlawful policies, practices, and conduct described in Plaintiffs' complaint and above;

- Issue a temporary restraining order requiring Defendants to screen for and, where applicable, provide Named Plaintiffs and members of the provisional class state-appointed counsel as required by *Gagnon v. Scarpelli*, 411 U.S. 778 (1973);

- Issue a temporary restraining order requiring Defendants to provide Named Plaintiffs and members of the provisional class the procedural protections described in *Morrissey v. Brewer*, 408 U.S. 471 (1972), including adequate notice of Plaintiffs' and the provisional class members' alleged violations, the right to cross-examine and confront adverse witnesses, and the right to present mitigating evidence and witnesses;

- Issue a temporary restraining order requiring Defendants to screen for, and where applicable, provide Mr. Fason and Mr. Riedel and members of the provisional subclass

reasonable accommodations as necessary to ensure their meaningful access to the parole revocation process;

- Convert the temporary restraining order to a preliminary injunction;

- Waive security for the temporary restraining order and preliminary injunction otherwise required by Fed. R. Civ. P. 65(c).

DATED: February 2, 2026    Respectfully submitted,

By: */s/ John C. Williams*
John C. Williams (Ark. Bar No. 2013233)
Hadiyah Cummings (Md. Bar No. 2504281001)
ARKANSAS CIVIL LIBERTIES UNION FOUNDATION, INC.
904 West 2nd Street
Little Rock, AR 72201
Tel.: 501-374-2842
john@acluarkansas.org
hadiyah@acluarkansas.org

Bridget Geraghty (*motion to appear pro hac vice forthcoming*)
Emily C. Keller (*motion to appear pro hac vice forthcoming*)
Olivia Fritz (*motion to appear pro hac vice forthcoming*)
RODERICK & SOLANGE MACARTHUR JUSTICE CENTER
160 East Grand Avenue, 6th Floor
Chicago, IL 60611
Tel.: 312-503-8282
Fax: 312-503-0891
bridget.geraghty@macarthurjustice.org
emily.keller@macarthurjustice.org
olivia.fritz@macarthurjustice.org

Samir Deger-Sen (*motion to appear pro hac vice forthcoming*)
S.Y. Jessica Hui (*motion to appear pro hac vice forthcoming*)
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Tel.: 212-906-1200
Fax: 212-751-4864
samir.deger-sen@lw.com
jess.hui@lw.com

Christine C. Smith (*motion to appear pro hac vice forthcoming*)

Chanelle N. Jones (*motion to appear pro hac vice forthcoming*)
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
Tel.: 202-637-2200
Fax: 202-637-2201
christine.smith@lw.com
chanelle.jones@lw.com

*Attorneys for Plaintiffs and the Proposed Class*

**<u>Certificate of Service</u>**

I hereby certify that on February 2, 2026, I filed the foregoing via the CM/ECF system and will serve Defendants Boyce Hamlet, Lindsay Wallace, Jim Cheek, and Jamie Barker by serving a copy with the Complaint and Summons.

*/s/ John C. Williams*
John C. Williams
