IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

TODD FASON, *et al.*                                                    PLAINTIFFS

v.                              Case No. 4:26-cv-00089-KGB

BOYCE HAMLET, *et al.*                                                  DEFENDANTS

## PRELIMINARY INJUNCTION ORDER

Before the Court is plaintiffs Todd Fason, NeDraya McGowan, and Robby Riedel's

("Plaintiffs") motion for temporary restraining order and/or preliminary injunction (Dkt. No. 2).

Defendants Boyce Hamlet, in his official capacity as Chair of the Arkansas Post-Prison Transfer

Board ("PPTB"); Lindsay Wallace, in her official capacity as Secretary of the Arkansas

Department of Corrections ("ADC"); Jim Cheek, in his official capacity as Director of the

Arkansas Division of Community Correction ("ACC"); and Jamie Barker, in his official capacity

as Chair of the Arkansas Board of Corrections ("ABC") (collectively "Defendants") responded to

the motion by filing a motion to dismiss (Dkt. No. 30). Plaintiffs replied to Defendants' motion

(Dkt. No. 47).

Also before the Court is Plaintiffs' motion to certify class (Dkt. No. 4). Defendants

responded to the motion (Dkt. No. 35), and Plaintiffs replied (Dkt. No. 48).

Plaintiffs allege that Defendants have instituted policies with respect to parole and post-

release supervision that violate 42 U.S.C. § 1983 based upon the right to due process under the

Fourteenth Amendment, Title II of the Americans with Disability Act, 42 U.S.C. § 12132

("ADA"), and § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Rehabilitation Act")[1] (Dkt. No. 1, at 1–2, 35–39).

Plaintiffs request that the Court enter a preliminary injunction against Defendants which: (1) enjoins Defendants from subjecting Plaintiffs and members of their class and subclass to policies, practices and conduct described in Plaintiffs' complaint; (2) requires Defendants to screen for, and where applicable, provide Plaintiffs and members of their class state-appointed counsel; (3) requires Defendants to provided Plaintiffs and members of their class procedural protections including adequate notice of alleged violations, the right to cross-examine and confront adverse witnesses, and the right to present mitigating evidence; and (4) requires Defendants to screen for, and where applicable, provide Fason, Riedel, and members of the subclass reasonable accommodations as necessary to ensure their meaningful access to the parole revocation process (Dkt. No. 2, at 7).

## I.    Background

This Court has jurisdiction pursuant to 28 U.S.C. § 1331, and venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).  On February 6, 2026, the Court held a hearing on the pending motion for temporary restraining order and/or preliminary injunction at which counsel for all parties were present (Dkt. No. 21).  Although the February 6, 2026, hearing was adversarial rather than *ex parte*, the Court concluded that it was not the sort of adversarial hearing that included an opportunity to present sufficient evidence, testimony, and argument so as to allow the basis of the

---

[1] "The ADA and § 504 of the Rehabilitation Act are 'similar in substance' and, with the exception of the Rehabilitation Act's federal funding requirement, 'cases interpreting either are applicable and interchangeable' for analytical purposes." *Bahl v. County of Ramsey,* 695 F.3d 778, 783 (8th Cir.2012) (quoting *Randolph v. Rodgers,* 170 F.3d 850, 858 (8th Cir. 1999)).  Throughout this Preliminary Injunction Order, the Court refers to "Plaintiffs' disability claims," meaning Plaintiffs' claims brought under both the ADA and § 504 of the Rehabilitation Act.

relief requested to be strongly challenged. Therefore, the Court considered only Plaintiffs' request for a temporary restraining order at that time. On the basis of evidence and arguments presented at the February 6, 2026, hearing, the Court denied a temporary restraining order on February 20, 2026 (Dkt. No. 46).

On February 24, 2026, the Court held a contested evidentiary hearing on Plaintiffs' request for a preliminary injunction, at which counsel for all parties were present (Dkt. Nos. 52; 54). The parties presented evidence and arguments at the hearing, and the issues have been fully briefed. Also ripe and before the Court are Plaintiffs' motion to certify class and Defendants' motion to dismiss (Dkt. Nos. 4; 30). The pending motions are ripe for adjudication.

## II.    Findings Of Fact

The Court makes the following findings of fact.[2] The Court will address these and additional factual matters in the context of its discussion of the legal issues; the Court makes the findings of fact addressed in that context as well. The Court has considered and weighed all of the evidence presented in the record at this stage; the Court has resolved any disputes consistent with the statements in this Preliminary Injunction Order.

At the preliminary injunction hearing, Brandon Mills testified that he is one of three current hearing officers—also known as parole revocation judges—employed by Defendants and, as the

---

[2] To the extent there were objections raised to the declarations and submissions of proof at the preliminary injunction hearing, the Court overrules the objections. The Court has "discretion to consider evidence in connection with a motion for preliminary injunction, including hearsay evidence, that would otherwise be inadmissible at trial." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986); *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010); *Sierra Club, Lone Star Chapter v. F.D.I.C.*, 992 F.2d 545, 551 (5th Cir. 1993); 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2949, (3d ed. 2013).

Court understands, specifically employed by the PPTB; these three hearing officers oversee all revocation hearings in Arkansas (Mills PI Hearing Testimony).

Plaintiffs allege that a "recently amended" Arkansas administrative code is in effect (Dkt. No. 3, at 29). At the preliminary injunction hearing, Defendants presented Final Rule 004.06.24-003 ("New Arkansas Regulation") which is codified in 16 CAR pt 22 (PI Hearing Def. Ex. 6).[3] The New Arkansas Regulation has an effective date listed as June 26, 2025 (*Id.*). Mills testified that: (1) the New Arkansas Regulation has been in place since June 26, 2025; (2) the New Arkansas Regulation is still in place; and (3) there are no other rules or regulations that he is aware of relating to revocation proceedings other than Arkansas statutes and the New Arkansas Regulation (Mills PI Hearing Testimony;.PI Hearing Def. Ex. 6). Mills also testified that PPTB policies have been undergoing rule changes and revision for the last three years and that, while other PPTB policies may still be in the process of being changed or revised, Mills is not aware of any changes planned that would relate to the right of counsel in parole revocation hearings or to the rule on revocation (Mills PI Hearing Testimony). The Court thus finds that the New Arkansas Regulation is the official policy of Defendants.

Plaintiffs provided a form purportedly used by Defendants entitled "Arkansas Community Correction Notice of Parole Violation Action" ("Notice Form") (Dkt. No. 2-32, at 2). Defendants also produced a Notice Form for a different parolee (PI Hearing Def. Ex. 4). Mills testified that

---

[3] The PPTB's "Policies and Procedures" page on its website lists "Revocation of Parole and Post-Release Supervision" as codified in 16 CAR pt 22. *Policies and Procedures*, Post Prison Transfer Board, https://doc.arkansas.gov/post-prison-transfer-board/policy-procedures/ (last visited Feb. 26, 2026). The website provides a link to: (1) a "single document" which brings up a PDF of the document admitted at the February 24, 2026, hearing as Defendants' Exhibit 6, Final Rule 004.06.24-003, and (2) an "online version" which brings up the online Code of Arkansas Rules, Code of Arkansas Rules, https://codeofarrules.arkansas.gov/Rules/Rule?levelType= title&titleID=16&chapterID=null&subChapterID=null&partID=null&subPartID=null&sectionI D=null (last visited Feb. 26, 2026).

this form is currently in use by Defendants (Mills PI Hearing Testimony).  In pertinent part, the

form states:

> 1.   You have the right to appear at a revocation hearing reasonably near the location of the alleged violation(s) or your arrest.  At the hearing, the hearing examiner will determine whether you have violated a condition or conditions of your parole, and, if so, whether your parole should be revoked
>
> 2.   You may call witnesses to testify at your hearing, or you may present their written statements.  You may present any documents or evidence that you think will assist you.
>
> 3.   You may be represented by an attorney at the hearing.  If you cannot afford an attorney and feel you need one, you may ask the Hearing Examiner to appoint one.  There is no right to have an attorney appointed in every case, but the Hearing Examiner can appoint one in certain circumstances.  Your Community Supervision Officer will provide you an application form for appointment of counsel upon request.
>
> 4.   You may confront and cross-examine witnesses against you unless the Hearing Examiner rules that there is good cause for not allowing confrontation.
>
> 5.   You may ask to have the hearing postponed for good cause
>
> 6.   After the hearing, you will receive a written statement as to the evidence relied on and the reasons for the action taken.
>
> 7.   The decision of the Hearing Examiner may be appealed in writing to the Arkansas Post Prison Transfer Board.

(Dkt. No. 2-32, at 2; PI Hearing Def. Ex. 4).  The Notice Form then states, "I have read (or had

read to me) the above rights and charges and I understand them.  I acknowledge receipt of a copy

of referenced violation report," and the Notice Form has spaces for the parolee's signature and a

witness's signature (*Id.*).

Plaintiffs provide several declarations which state that parolees were never provided with

a Notice Form or were not given a copy of the Notice Form after signing the Notice Form (*See,*

*e.g.*, Dkt. Nos. 2-4; 2-15; 2-16).   Plaintiffs also provide several declarations which state that their

CSOs[4] never informed parolees of their rights listed in the Notice Form (*See, e.g.,* Dkt. Nos 2-12;

2-16; 2-17).  Some parolees alleged that they were informed of their rights for the first time at the

---

[4]   The Court understands this term to refer to an Arkansas Department of Community Correction Community Supervision Officer ("CSO").

revocation hearing (*See, e.g.,* Dkt. Nos. 2-8; 2-19), and Mills testified that he informs parolees of certain rights listed in the Notice Form at revocation hearings (Mills PI Hearing Testimony).

There is no record evidence that CSOs consistently inform parolees of their rights as listed in the Notice Form. If CSOs provide notice of the rights listed in the Notice Form, the record evidence is inconsistent as to whether that notice is provided verbally only. If CSOs provide notice of the rights listed in the Notice Form, there is no record evidence that CSOs provide notice in writing using anything other than the Notice Form. Even when the Notice Form is provided by CSOs, the record evidence is that parolees are not consistently left with a copy of the Notice Form.

Further, there is record evidence from Mills that. as the hearing officer, he provides parolees with verbal notice at the revocation hearing of certain of the rights listed in the Notice Form (Mills PI Hearing Testimony).

Plaintiffs provided a form purportedly used by Defendants entitled "Arkansas Post-Prison Transfer Board REVOCATION HEARING WAIVER" ("Revocation Hearing Waiver Form") (Dkt. No. 2-32, at 3). Mills testified that this form is currently in use by Defendants (Mills PI Hearing Testimony). The Revocation Hearing Waiver Form permits parolees to waive their "revocation hearing" in exchange for a "suspended imposition of revocation with a 90-day reinstatement" or being "revoked to the Arkansas Division of Correction and [being] eligible for release consideration after six (6) months" (Dkt. No. 2-32, at 3). The Revocation Hearing Waiver Form does not mention preliminary hearings. Mills testified that this Revocation Hearing Waiver Form is used for parolees to waive their revocation hearing (Mills PI Hearing Testimony). Mills further testified that, if a parolee signed the form but was later determined by the hearing officer to be ineligible for waiver of a revocation hearing or the conditions agreed to in the Revocation Hearing Waiver Form, the Revocation Hearing Waiver Form would be rescinded, and a parolee

would have to sign a new Revocation Hearing Waiver Form in order to waive the right to a revocation hearing, if applicable (Mills PI Hearing Testimony).

Thus, based on the record before the Court at this stage, the Court finds that Defendants' practice to permit a parolee to waive their right to a revocation hearing is to utilize the Revocation Hearing Waiver Form.  Further, the Court finds that the Revocation Hearing Waiver Form addresses only revocation hearings, not preliminary hearings.

Defendants provided a form entitled "Arkansas Department of Community Correction REQUEST FOR LEGAL COUNSEL PAROLE REVOCATION HEARING" ("Screening Form") (Dkt. No. 31-1).  Mills testified that this document is currently used by Defendants (Mills PI Hearing Testimony).  At the February 24, 2026, hearing, Plaintiffs' counsel represented to the Court that Fason, McGowan, and Davis—who is no longer a plaintiff in this case—received the Screening Form upon request, after the initiation of this lawsuit (Pl. Counsel Opening PI Hearing Testimony).  The forms given to Fason, McGowan, and Davis were presented by Defendants (PI Hearing Def. Exs. 1; 2; 3).

The Screening Form asks about the parolee's:  (1) financial situation; (2) length of parole; (3) living situation; (4) age; (5) formal education; (6) ability to read and write; (7) times the parolee has appeared as a defendant in a criminal case; (8) amount of times he or she has represented himself or herself in court; (9) intention to plead guilty or not guilty; (10) excuses or explanations for violations the parolee admits to; and (11) "the reasons for your belief that you need an attorney to represent you at your Revocation Hearing and any additional factors that you believe the Hearing Examiner should consider in deciding whether or not your request for appointed counsel should be granted" (Dkt. No. 31-1).

McGowan provided the Court with several sworn declarations (Dkt. Nos. 2-42; 19-1; PI Hearing Pl. Ex. 51). McGowan states that he was not informed by his CSO that he could hire an attorney or be screened for and appointed an attorney (Dkt. No. 19-1, ¶ 11). McGowan then asked for a continuance of his first revocation hearing because he did not want to proceed without an attorney (*Id.*, ¶ 12). His CSO provided him continuance paperwork but did not provide any paperwork regarding his rights at the hearing (*Id.*). McGowan then asked for a continuance of his second revocation hearing because his witnesses and the arresting officers were not present (PI Hearing Pl. Ex. 51, ¶¶ 5, 6). Next, McGowan asked to be screened for an appointed attorney for the hearing (*Id.*, ¶ 7). Several hours later, another CSO provided the Screening Form, which was the first time anyone had provided McGowan with the form (*Id.*, ¶ 9). According to McGowan, the CSO stated "that she had never seen the form before and did not know how to fill it out" (*Id.*, ¶ 10). McGowan completed the Screening Form and returned it to the CSO (*Id.*, ¶ 11). Five days later, McGowan was told by a CSO not assigned to his case that he was denied the appointment of counsel because he had several court appearances and does not have disabilities (*Id.*, ¶¶ 12, 13). The CSO read this explanation from a file on their cell phone but did not give McGowan a copy (*Id.*, ¶ 13).

Plaintiffs provide several declarations which state that parolees requested counsel and received varying responses (*See* Dkt. No. 2-5, ¶ 10) ("I asked my CSO if I could have an attorney appointed to represent me, and she told me I could not."); (Dkt. No. 2-6, ¶ 8) ("I asked my parole officer if I could have an attorney, but he told me that it would take too long to appoint one."); (Dkt. No. 2-3) (parolee asked for appointed counsel at the revocation hearing, the hearing officer asked the parolee only what his highest level of education was, and the hearing officer said that the parolee was not eligible for an appointed attorney).

Mills testified that: (1) he has never appointed counsel to any parolee during his two years of service as a hearing officer; (2) he has only dealt with requests for state-appointed counsel around approximately eight times in his two-year tenure, with four of those requests coming in the last couple of months; (3) he would have to speak to a supervisor if he decided to appoint counsel; and (4) he was unsure how counsel would be appointed and that he would have to ask his supervisor (Mills PI Hearing Testimony). When asked what Mills would do if a parolee asked for a lawyer at a revocation hearing, Mills said that he would grant a continuance so that the parolee could hire counsel (*Id.*). Mills testified that, if a parolee asks for counsel at a revocation hearing, he as a practice typically just asks if the parolee wants to retain counsel and does not bring up appointed counsel (*Id.*). When asked by the Court what Mills would do if the parolee asked for a continuance to receive appointed counsel, Mills stated that he would offer the Screening Form only if a parolee specifically asked for a continuance for appointed counsel (*Id.*).

Thus, the Court finds, based on the record before it, that the Screening Form is used inconsistently, if at all, when parolees request counsel. Further, the Court finds that it is Defendants' practice not to provide the Screening Form to parolees, even when a parolee requests a continuance because they want to be represented by an attorney, unless the parolee specifically requests appointed counsel or the Screening Form. The Court also finds that parolees receive different responses when parolees ask for counsel, from both CSOs and hearing officers.

Plaintiffs represent that they never received written notice of their denial of state-appointed counsel (PI Hearing Pl. Ex. 51, ¶ 13 ("The CSO read this explanation from a file on their cell phone but did not give me a copy of it"); Dkt. No. 2-4 (parolee recovering from brain surgery denied counsel and never given written decision); Dkt. No. 2-5 (parolee requested an appointed

attorney and told no by CSO); Dkt. No. 2-3 (parolee asked hearing officer for appointed attorney, and hearing officer asked about parolee's highest level of education and then denied the request)).

Defendants have presented written denials of McGowan, Davis, and Fason's request for counsel (PI Hearing Def. Exs. 1; 2; 3). These denials are in the form of emails sent to CSOs (*Id.*). McGowan, Davis, and Fason are not listed as recipients of the emails (*Id.*). The emails do not contain any instructions to the CSO to read or provide the denial to the parolee (*Id.*). No Arkansas statute requires that these emails be read or provided to parolees. The New Arkansas Regulation does not require that these emails be read or provided to parolees. Mills testified that—and Defendants FOIA response indicates (Dkt. No. 2-7)—Defendants have no other applicable policies or procedures in relation to revocation hearings.

Defendants provide no evidence that CSOs consistently communicate the contents of these internal emails regarding decisions on parolees' requests for state appointed counsel to parolees. Mills testified that sometimes hearing officers try to put the decision to deny counsel in the final written decision to revoke parole, but Mills stated that he could not say with certainty that hearing officers always did so (Mills PI Hearing Testimony). Plaintiffs provide several declarations from parolees who state that they were never provided the Disposition Form (*See, e.g.*, Dkt. No. 2-29 (explaining that, as of January 15, 2026, parolee has not received paperwork from May 9, 2024, revocation hearing); Dkt. No. 2-8 (stating "as of [December 12, 2025], I still have not received my parole hearing decision paperwork" when the revocation hearing occurred November 19, 2025); Dkt. No. 2-22 (stating "I still have not received any paperwork with the hearing decision. I can only assume that my parole was revoked based on the fact that I am still incarcerated" when the revocation hearing happened over a month earlier)).

Thus, the Court finds, based on the record before it, that Defendants communicate their decisions not to appoint counsel, if at all, through internal emails sent to CSOs. Based on declarations Plaintiffs present from several parolees stating that Defendants regularly fail to give notice to parolees of hearing officer's decisions, and the fact that there is no direction given to CSOs or record evidence of a policy requiring CSOs to provide the denial of appointed counsel to parolees, the Court finds it unlikely that the decision to deny the appointment of counsel is regularly and consistently provided to parolees who request the appointment of counsel. Given Mills' testimony that the denial of counsel is not always recorded in a final revocation decision, Plaintiffs' declarations which state that they were never given a final revocation decision, and the lack of record evidence that CSOs consistently communicate any denial of counsel decision to parolees, the Court finds that, even when a denial of counsel decision is communicated to parolees, parolees are unlikely to ever receive a written copy of that decision.

Plaintiffs presented a form titled "Arkansas Post Prison Transfer Board Disposition of Parole Revocation Hearing" ("Disposition Form") (Dkt. No. 2-45). Defendants presented a Disposition Form for a different parolee (PI Hearing Def. Ex. 5). Mills testified that the Disposition Form is currently in use by Defendants and that this form is used as the hearing officer's judgment in a final revocation (Mills PI Hearing Testimony). The Disposition Form lists the allegations made against the parolee, the parolee's pleas to those allegations, the evidence relied on, and the hearing officer's decision to revoke or not revoke the parolee's parole (Dkt. No. 2-45). The document then states, "[a]ppeal of this decision must be made in writing to the Arkansas Post Prison Transfer Board, 1302 Pike Ave., Suite D, North Little Rock, AR 72114, within thirty (30) days from the date of this hearing" (*Id.*). Underneath the notice of appeal is a signature block for the hearing officer (*Id.*). Beneath the hearing officer's signature is the

11

statement: "I certify the above listed offender was verbally informed of the hearing judge's decision or recommendation immediately following the hearing," and a signature block for a "witness" (*Id.*).

Mills testified that it was his understanding that parolees were given a written copy of the Disposition Form in accordance with Arkansas's statutes and regulations, but he has not and does not personally witness any parolee receiving a written form (Mills PI Hearing Testimony). Mills also testified that his decision would come sometime after the hearing, not immediately (*Id.*).

Plaintiffs provide several declarations from parolees who state that they were never provided the Disposition Form (*See, e.g.*, Dkt. No. 2-29 (explaining that, as of January 15, 2026, parolee has not received paperwork from May 9, 2024, revocation hearing); Dkt. No. 2-8 (stating "as of [December 12, 2025], I still have not received my parole hearing decision paperwork" when the revocation hearing occurred November 19, 2025); Dkt. No. 2-22 (stating "I still have not received any paperwork with the hearing decision. I can only assume that my parole was revoked based on the fact that I am still incarcerated" when the revocation hearing happened over a month earlier)).

Thus, the Court finds, based on the record before it at this stage, that Defendants do not consistently provide parolees with notice of the hearing officer's decision to revoke parole. Further, especially considering that the Disposition Form requires someone—presumably a CSO—only to certify that he or she has "verbally informed" the parolee of the hearing officer's decision, even when notice is provided, that notice is likely given orally only, rather than in written form.

Mills was asked what he would do if a parolee said during a hearing that the parolee is schizophrenic and without medication (Mills PI Hearing Testimony). He said that one option

would be to continue the case and have the parolee evaluated for competency and that, in many instances, he will check the circuit court docket regarding the underlying criminal proceeding and conviction (*Id.*). Mills acknowledged that he usually does not have proof of whether the parolee has been diagnosed with anything (*Id.*). Mills testified that he is unaware of whether the CSO has access to the parolee's ADC records, including medical records (*Id.*).

Mills was asked what he would do if a parolee said during a revocation hearing that the parolee could not hear (*Id.*). Mills said that, although he could not remember any instance of that happening, he would continue the hearing and have to find a sign language interpreter (*Id.*).

Named Plaintiff Fason states in his declaration that he has been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and takes 30 milligrams of Dextroamphetamine for his ADHD daily (Dkt. No. 2-31, ¶ 10). Fason has not had access to medication since incarceration (*Id.*). Further, Fason avers that his "community supervision officer and officials at Faulkner County Detention are aware of my disability." (*Id.*, ¶ 11). The highest level of education Fason received is the eleventh grade (*Id.*, ¶ 12). Fason confirms that he is indigent without financial means to litigate on his own (*Id.*, ¶ 13). Fason confirms that his ADHD "makes it very difficult for [him] to focus, organize information, and meaningfully participate in legal proceedings without assistance." (*Id.*, ¶ 10). Fason states that he has difficulty effectively advocating "due to complexity of the proceedings and my own mental health, medical, educational, and related challenges" (*Id.*, ¶ 18). In particular, ADHD makes it very difficult for Fason "to focus, organize information, and meaningfully participate in legal proceedings without assistance." (*Id.*). Fason sought his own treatment for drug addiction, with a spot opening up for him to receive treatment, but he was incarcerated due to the parole revocation allegations and was unable to take the spot

(*Id.*, ¶ 16). Fason states that he has had no law library access while incarcerated at Faulkner County Detention Center to use to prepare his case (*Id.*, ¶ 17).

Named Plaintiff Riedel also provides a declaration that states, in pertinent part, that he has "been diagnosed with anxiety and depression, which impact my daily life. [He] take[s] medication called Wellbutrin and Seroquel to manage the symptoms of these conditions." (Dkt. No. 2-44, ¶ 10). He was recently in drug rehabilitation where he was prescribed Wellbutrin and Seroquel to manage depression and anxiety; he has not been provided with these medications while in the Pulaski County Jail (Dkt. No. 19-2, ¶ 8). Riedel states: "Without my medicine I feel like I have a weight on my chest. My mind races[,] and it is hard to concentrate on anything. It is very hard to sleep, and I only sleep in short bursts. When I have my medication, my mind is calmer[,] and I can focus and be present." (*Id.*). Riedel also wears glasses to correct his vision (*Id.*, ¶ 11). He is nearsighted and has not been provided with glasses in the Pulaski County Jail (Dkt. No. 19-2, ¶ 9).

Riedel is indigent without financial means to litigate on his own (Dkt. No. 2-44, ¶ 12). Riedel avers that he has "a colorable claim" that he did not commit his alleged parole violations and that he "would have difficulty effectively advocating on [his] own behalf at [his] parole revocation hearing(s) given the complexity of the process and [his] own mental health." (*Id.*, ¶ 14). Riedel further states that he wants to assert his right to counsel at a revocation hearing and to have a girlfriend testify at the hearing as a witness (Dkt. No. 19-2, ¶ 7).

Shannon Miner, who testified at the February 24, 2026, hearing, stated in a sworn declaration that he never received a Notice Form (Dkt. No. 2-8, ¶ 12; Miner PI Hearing Testimony). Plaintiffs also provide several declarations which state that parolees were not provided notice of their rights (*See, e.g.,* Dkt. Nos. 2-10; 2-11; 2-12; 2-14). Plaintiffs also provide several declarations which state that parolees were not informed of the rights in the Notice Form

by their CSO and did not know they had the rights listed in the Notice Form (*See, e.g.*, Dkt. Nos. 2-29 (CSO did not inform parolee of right to have witnesses testify on his behalf or present physical evidence and parolee was not given any paperwork documenting alleged violation); 2-25 (CSO did not inform parolee of rights in hearing process, parolee did not get to read hearing waiver paperwork before signing, and parolee not informed of right to appeal revocation hearing waiver); 2-19 (parolee not informed he could have witnesses testify on his behalf or present evidence at the revocation hearing)).

Miner stated in his declaration that he requires assistance with reading and writing, was enrolled in special education classes as a child, and has been previously housed in specialized mental health units during previous periods of incarceration (Dkt. No. 2-8, ¶¶ 2, 3).   At the February 24, 2026, hearing, Miner testified that he could not read or write and was diagnosed with hyper attention disorder and schizophrenia, though his parole officer did not know about his diagnoses according to Miner (Miner Hearing Testimony).  During the February 24, 2026, hearing, Miner was unable to read documents provided to him.

Miner was arrested on November 18, 2025 (Dkt. No. 2-8; PI Hearing Def. Ex. 5).   On November 19, 2025, Miner stated that his CSO told him orally that Miner had violated the terms of his parole and provided Miner with paperwork stating that Miner waived his right to 72 hours' notice of his final revocation hearing and that he consented to proceeding with the hearing that day (Dkt. No. 2-8, ¶ 13).  Miner did not believe he ever received paperwork listing his offenses (*Id.*, ¶ 11).  Miner felt like he had no choice but to sign the paperwork, and he signed the paperwork (*Id.*).

At the February 24, 2026, hearing, Defendants produced the "paperwork" which Miner signed, which was a Notice Form listing Miner's violations and rights to a revocation hearing, not a Revocation Hearing Waiver Form (PI Hearing Def. Ex. 4).  Miner's revocation hearing was held

November 19, 2025, approximately one hour after Miner was given the Notice Form (Dkt. No. 2-8, ¶ 15). Miner states that his CSO did not inform Miner of the right to have witnesses testify on his behalf or the possibility of being screened for appointed counsel (*Id.*, ¶ 14–17).

Mills was the hearing officer presiding over Miner's revocation hearing (PI Hearing Def. Ex. 4). Mills' Disposition Form is dated November 19, 2025 (*Id.*). Miner states that he never received the Disposition Form (Dkt. No. 2-8, ¶ 20).

### III.    State Sovereign Immunity Under The Eleventh Amendment

The Court concludes that state sovereign immunity under the Eleventh Amendment to the United States Constitution does not bar Plaintiffs' claims. "The Eleventh Amendment confirms the sovereign status of the States by shielding them from suits by individuals absent their consent." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (citing *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996)). However, "[t]o ensure the enforcement of federal law. . . the Eleventh Amendment permits suits for *prospective* injunctive relief against state officials acting in violation of federal law." *Id.* (emphasis added) (citing *Ex Parte Young*, 209 U.S. 123 (1908)). "A state official is amenable to suit to enjoin the enforcement of an unconstitutional state statute only if the officer has 'some connection with the enforcement of the act.'" *Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 960 (8th Cir. 2015) (citing *Ex Parte Young*, 209 U.S. at 157).

To determine whether an action against state officials in their official capacities avoids an Eleventh Amendment bar to suit, "a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997))

(O'Connor, J., concurring).  Plaintiffs' complaint "clearly satisfies [the Court's] 'straightforward inquiry.'"  *Verizon Maryland, Inc.*, 535 U.S. at 645.

Supreme Court precedent also makes clear that sovereign immunity under the ADA for purposes of Plaintiffs' disability claims is not absolute.  *United States v. Georgia*, 546 U.S. 151 (2006); *Tennessee v. Lane*, 541 U.S. 509 (2004).  Rather, courts must consider:  "(1) which aspects of the State's alleged conduct violated Title II [of the ADA]; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid."  *Georgia*, 546 U.S. at 159.  To the extent that Plaintiffs are able to state claims under the ADA, Defendants can be held liable under the ADA if Defendants' conduct also violates the Fourteenth Amendment.  Defendants are also potentially liable under the *Georgia* rule in the absence of a Fourteenth Amendment violation if the Court determines that the abrogation of sovereign immunity is valid for another reason.  Therefore, sovereign immunity does not necessarily shield Defendants from Plaintiffs' ADA claims.

Furthermore, Defendants, who are sued in their official capacities, are amenable to suit in this action.  Defendants can be sued for prospective injunctive relief in this action, as they have "'some connection with the enforcement of the act,'" meaning the statutes and regulation governing revocation hearings.  *Digital Recognition Network, Inc.*, 803 F.3d at 960 (citing *Ex Parte Young*, 209 U.S. at 157).

## IV.   *Younger* Abstention

The Court concludes that abstention under *Younger v. Harris*, 401 U.S. 37 (1971), is not appropriate in this case.  Defendants argue that this Court should abstain from exercising

jurisdiction under the *Younger* abstention doctrine.  Federal courts have a "virtually unflagging obligation" to decide cases that fall within their jurisdiction.  *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 817 (1976).  However, exceptions to this obligation exist in limited circumstances.  *Younger* outlines one of those exceptions.

### A.    Application Of *Younger*

This Court is not convinced that *Younger* abstention applies in this case, given that adjudicating Plaintiffs' claims does not require the Court to interfere with ongoing state proceedings in the way that *Younger* counsels against.  As the Supreme Court has explained, *Younger* abstention is intended to "preclude[] federal intrusion," not mere impact, "into ongoing state [proceedings]."  *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 78 (2013).  *Younger* does not prevent federal courts from adjudicating any issue that may be related to an ongoing state proceeding.  Rather, *Younger* is designed to avoid cutting off state proceedings that can and will answer the same constitutional questions raised in federal court.  However, as the Supreme Court made clear in *Gerstein v. Pugh*, 420 U.S. 103 (1975), *Younger* does not apply when the state proceedings will not and cannot answer the plaintiffs' constitutional questions.  As explained in this Order, the parties' briefing, and the record evidence at this stage of the proceeding, the parole revocation process does not provide parolees an adequate opportunity to raise their constitutional challenges.

Further, the relief that Plaintiffs seek here is not directed at stopping the State of Arkansas or Defendants from prosecuting anyone or revoking their parole.  Instead, Plaintiffs ask this Court to ensure:  (1) before their parole revocation hearings occur the opportunity to be screened for appointed counsel consistent with *Gagnon v. Scarpelli*, 411 U.S. 778 (1973); (2) the due process protections as set out in *Morrissey v. Brewer*, 408 U.S. 471 (1972), before, during, and after parole

revocation hearings; and (3) before their parole revocation hearings occur having individualized inquiries into whether a specific modification for any particular disability would be reasonable under the circumstances when the parolee makes a timely request for accommodation or Defendants have notice of the parolee's disability. This Court can grant preliminary injunctive relief on Plaintiffs' claims without interfering in the substance of the revocation process and without monitoring all future parole revocation proceedings.

Even if *Younger* principles apply to this case, however, *Younger* abstention is not warranted. Since *Younger*, the Supreme Court has issued a series of decisions that have clarified and expanded the *Younger* abstention doctrine. *Minnesota Living Assistance, Inc. v. Peterson*, 899 F.3d 548, 551 (8th Cir. 2018) (collecting cases). Three lines of inquiry for determining whether *Younger* abstention is appropriate emerge from these decisions. *Id.*, at 551–52 (citing *Sirva Relocation, LLC v. Richie*, 794 F.3d 185, 192-93 (1st Cir. 2015) (distilling a three-part inquiry from the Court's abstention analyses)). The Court is required first to decide whether the underlying state proceeding falls within one of the three "exceptional circumstances" where *Younger* abstention is appropriate. *See Sprint*, 571 U.S. at 78. Second, if the underlying proceeding fits within a *Younger* category, the Court is required to determine whether the state proceeding satisfies what are known as the "*Middlesex*" factors. *See id.*, at 81 (discussing *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423 (1982)). Third, even if the underlying state proceeding satisfies the first two inquiries, the Court is required to assess whether abstention is nevertheless inappropriate because an exception to abstention applies. *See New Orleans Pub. Serv., Inc. v. Council of City of New Orleans (NOPSI)*, 491 U.S. 350, 367 (1989).

The *Younger* abstention doctrine applies "only if state proceedings: (1) are pending at the time of the federal action; (2) implicate important state interests; and (3) provide an adequate

opportunity for raising federal constitutional questions." *Middlesex*, 457 U.S. at 432 (1982). All three factors must be present for this Court to abstain.

Defendants argue that all three of *Younger*'s *Middlesex* factors are present (Dkt. No. 31, at 17–24). Further, Defendants also argue that, even if Plaintiffs are challenging policies, practices, and procedures that allegedly violate federal law in a systemic fashion, the *Younger* analysis still applies and requires abstention, relying primarily on *O'Shea v. Littleton*, 414 U.S. 488 (1974), and *Ogala Sioux Tribe v. Fleming*, 904 F.3d 603 (8th Cir. 2018) (Dkt. No. 31, at 14–17).

Plaintiffs assert that, "[e]ven assuming parole revocation proceedings qualify under *Younger*'s first prong," the second and third prongs are lacking, so *Younger* abstention is inappropriate (Dkt. No. 47, at 16–17). Plaintiffs maintain that they lack an adequate opportunity to raise their challenges in state proceedings under the third *Middlesex* factor and that exceptions for practices that cause irreparable harm and that are flagrantly unconstitutional also apply (*Id.*, at 17).

###    B.    The *Middlesex* Factors

The Court begins its *Younger* analysis by examining the third *Middlesex* factor. The Court determines that *Younger* abstention is unwarranted because the relevant "state proceeding" does not "provide[] an adequate opportunity to raise constitutional challenges" as required by *Younger*. *Minnesota Living*, 899 F.3d at 553. To the extent Defendants contend that Plaintiffs can raise their constitutional challenges at their revocation hearings themselves, the record evidence before the Court at this stage contradicts that. Parolees have tried to request counsel both before and during their hearings, and those requests are routinely denied without any screening for whether the parolee satisfies *Gagnon*. The record evidence supports that Defendants deny Plaintiffs their other due process rights as set forth by *Morrissey* before, during, and after the revocation hearing and

that requests for accommodation are routinely denied without any attempt to conduct individualized inquiries into whether a specific modification for a particular person's disability would be reasonable under the circumstances when the parolee makes a timely request for accommodation or when Defendants have notice of the parolee's disability (*See, e.g.*, Dkt. Nos. 2-3; 2-4; 2-5; 3, at 28–30 (collecting similar examples when parolees request other due process rights); 3, at 33–36 (same for requests for disability accommodations)). These types of deprivations of these rights before, during, and after revocation hearings are the constitutional violations and violations of federal law that Plaintiffs are challenging.

Defendants contend that Plaintiffs can pursue their challenges in administrative appeals to the PPTB, as well as in collateral litigation under the Arkansas Administrative Procedure Act ("APA"). Defendants argue that this administrative appeal and APA review mandates abstention under *Oglala Sioux Tribe v. Fleming*, where the Eighth Circuit rejected the application of *Gerstein* concluding that plaintiffs had an adequate opportunity to raise their claims in state courts. 904 F.3d 603, 612–13 (8th Cir. 2018). The Court finds that *Oglala* is distinguishable for many reasons.

The Court finds that neither the PPTB appeal nor an APA appeal process provides an "adequate opportunity" for review here. Before a hearing officer, Plaintiffs are not permitted to raise constitutional challenges to procedures. After the initial hearing, Plaintiffs appeal and review process is similarly inadequate. The PPTB and APA forums fail to allow Plaintiffs to raise their constitutional challenges before they suffer irreparable harm. *See also Rodriguez v. Providence Cmty. Corr. Inc.*, 155 F. Supp. 3d 758, 766 (M.D. Tenn. 2015) ("when it comes to the adequacy of the state court proceedings as an opportunity to address constitutional harms, the opportunity must be available *before* the harm is inflicted.") (citing *Gerstein* 420 U.S. at 107–08 n.9). In the case of the PPTB, Plaintiffs are unable to raise their constitutional challenges before it because the

21

PPTB lacks jurisdiction to adjudicate constitutional claims.  Ark. Code Ann. § 16-93-206 (setting

the jurisdiction of the PPTB).  That fact distinguishes this case from *Oglala Sioux Tribe* because,

in *Oglala Sioux Tribe*, the state's Seventh Judicial Circuit Court—the court where parents would

first litigate their claims—was a court of general jurisdiction capable of hearing the parents' federal

claims.  Because the PPTB lacks that jurisdiction, the only available forum to raise federal claims

is under the APA. [5]

     However, both an administrative appeal to the PPTB—an administrative body lacking

jurisdiction to adjudicate federal claims—and collateral litigation under the APA are practically

unavailable to nearly all parolees for several reasons, including but not limited to the following.

     First, this Court agrees that *Younger* abstention "presupposes the opportunity to raise and

have timely decided by a competent state tribunal the federal issues involved." *Gibson v. Berryhill*,

411 U.S. 564, 577 (1973) (emphasis added); *accord Gerstein v. Pugh*, 420 U.S. 103 (1975);

*Yamaha Motor Corp., U.S.A. v. Riney*, 21 F.3d 793, 797 (8th Cir. 1994).  To be timely, the state

---

[5] Defendants argue that this Court's decision in *Reed v. Kelley*, Case No. 5:17-cv-00257-KGB-JTK, 2018 WL 6816157, at *3 (E.D. Ark. June 27, 2018), stands for the proposition that parole revocation decisions are governed by the APA and that the APA affords available judicial review (Dkt. No. 31, at 22).  The Court finds that *Reed* is distinguishable on multiple fronts.  First, *Reed* dealt with a petition for writ of *habeas corpus* under 28 U.S.C. § 2254.  The constitutional claims that Reed asserted in his writ of *habeas corpus* were not the sort of transient due process claims that Plaintiffs bring here.  Second, the minimal factual record before the Court in *Reed* was sufficient, in that case, to determine that APA review was available and that there was no sufficient justification for the procedural default.  There, the plaintiff in *Reed* only cited his own confusion about how to appeal.  Here, the extensive factual record establishes that APA review is not meaningfully available to Plaintiffs, the modified Proposed Class, and the modified Proposed Disability Subclass.  Moreover, the standard for availability under *Younger* is not the same as procedural default under 28 U.S.C. § 2254.  The totality of the circumstances on the record establishes, at this preliminary stage, that APA review is not available to individuals for a host of factors.  That evidence was not presented in *Reed*, and the plaintiff in Reed did not object to the Proposed Findings and Recommendations to supplement the factual record with information like that available before the Court today.  Finally, even if *Reed* and similar cases were applicable, which the Court finds they are not, the *Younger* exceptions still apply, meaning the Court should not abstain.

proceeding must allow the plaintiff to raise his constitutional claims before he is irreparably injured. *Gibson*, 411 U.S. at 577 & n.16. Under Defendants' theory of appeals to the PPTB or collateral litigation under the APA, Plaintiffs could challenge the deprivation of their rights only after being subject to a constitutionally deficient hearing and irreparably harmed. The Court determines that is not adequate. Due process encompasses "the opportunity to be heard . . . 'at a meaningful time and in a meaningful manner.'" *Barry v. Barchi*, 443 U.S. 55, 66 (1979) (citation omitted). The options for Plaintiffs to be heard at an administrative appeal to the PPTB or collateral litigation under the APA are not at a meaningful time or in a meaningful manner.

Second, appeals to the PPTB or collateral litigation under the APA do not provide an adequate opportunity to raise constitutional challenges and are not practically available to Plaintiffs because, based on the record evidence before the Court at this stage, the review process often cannot be completed prior to the termination of a person's parole revocation sentence— rendering any relief the process might provide ineffectual. Although Defendants have argued that a parolee can appeal decisions to the PPTB, as well as seek state-court juridical review of an administrative proceeding (Dkt. No. 31, at 21–22), such appeals do not mitigate the risk of irreparable harm, especially given the timing of the appeals process. *See New Arkansas Regulation* 5.1–6.2 (no time constraints on PPTB's review of appeal); Ark. Code. Ann § 25-15-212(d)(1) (requiring agencies to transfer a full record within 30 days of service of a petition in state court, but allowing extensions of up to 90 days before state court review starts); Dkt. No. 2-32 (revocation waiver stating that without a waiver, a parolee can have parole revoked for a maximum of one year but that some parolees are eligible for a 90 day sentence or a 6 month sentence). Given this timeline, it is likely that many members of the Plaintiffs' proposed class and subclass will never be able to obtain review of their revocation decisions.

Defendants argue that this mootness issue does not apply.  Raised for the first time at the Court's February 24, 2026, hearing, Defendants turn to *Oglala Sioux Tribe* and argue that the Arkansas Supreme Court's mootness exception for "matters of substantial public interest that are likely to be litigated in the future" means that meaningful review is available.  *Burnett v. State*, 2023 Ark. 162, 4; *see Oglala Sioux Tribe*, 904 F.3d at 614.  The Court is unconvinced.  As an initial matter, there is no guarantee that the mootness exception would apply here.  Defendants only cite to *Burnett* for the proposition that a moot question could be reviewed (PI Hearing Def. Opening Arg.).  However, in *Burnett*, the Arkansas Supreme Court declined to hear the case under the mootness exception, even though it acknowledged the substantial nature of a criminal defendants' "right to appointment of counsel at a pretrial hearing."  2023 Ark. 162.  Based on the limited record before the Court, it seems unlikely that the mootness exception would apply here.

Even if the Arkansas Supreme Court's *Burnett* mootness exception applies, collateral review of any determination would not remedy the irreparable injury that Plaintiffs have, at this preliminary stage, shown they suffer.  Without a meaningful opportunity to present their constitutional claims for adjudication before suffering irreparable harm, the third *Middlesex* factor is not satisfied, so *Younger* does not apply.

The review process is practically unavailable for a third reason.  Many parolees are unable to file administrative appeals because the record evidence before the Court at this stage establishes that many parolees are not provided notice of the hearing officer's final revocation decision, much less an actual written decision to appeal (*See, e.g.*, Dkt. Nos. 2-8; 2-22; 2-24; 2-35).  The New Arkansas Regulation states that any administrative appeal to the PPTB "must be made in writing . . . within thirty (30) days from the date of the revocation hearing decision . . ."  *New Arkansas Regulation* 5.1(b)(3).  However, because many parolees do not receive notice of the decision, they

are unable to meet this deadline.  While the regulations state that this 30-day deadline may be "waived by the Board," *Id.*, there is no guarantee that the Board will do so, much less any evidence that the Board routinely does so.  Without a written copy of the form requesting counsel, a written decision on the denial of counsel, a written notice providing the process for appeal, or appeal forms, the appeals process is practically unavailable.

There is a fourth reason the review process is practically unavailable.  For the limited subset of parolees who do receive notice and are able to file appeals regarding an underlying determination, the record evidence before the Court at this stage shows that the PPTB will deny them (*See, e.g.*, Dkt. No. 2-3; 2-30).  As explained previously, the PPTB lacks jurisdiction to adjudicate the merits of Plaintiffs' federal claims.  Ark. Code Ann. § 16-93-206.  This makes the PPTB unavailable, but even if the PPTB had jurisdiction to hear Plaintiffs' federal claims, the PPTB has a vested interest in upholding its own procedures and regulations, including the procedures and regulation barring the screening for and appointment of counsel.  These vested interests render denial on appeal by the PPTB unsurprising.  Thus, the PPTB does not provide a neutral and unbiased forum for adjudicating Plaintiffs' challenges.  *See, e.g., Walker v. Wegner*, 624 F.2d 60, 62 (8th Cir. 1980) (declining to abstain where state administrative process would not provide an "adequate opportunity to adjudicate" the plaintiffs' constitutional challenge to that very administrative process); *cf. Gibson*, 411 U.S. at 575–77 (finding a remedy not adequate when judging body may be biased or have personal interest preventing fair adjudication).

The fifth reason the review process is practically unavailable is that the language of the APA itself limits the practical availability of the review process by obscuring a parolee's right to appeal.  The APA states that "any person, except an inmate under sentence to the custody of the Division of Correction, who considers himself or herself injured . . . by final agency action shall

25

be entitled to judicial review of the action." Ark. Code Ann. § 25-15-212(a) (emphasis added). While the Arkansas Supreme Court has held that exception to be unconstitutional, *see Clinton v. Bonds*, 816 S.W.2d 169, 172 (Ark. 1991), it remains in the Arkansas Code. Thus, many parolees likely are misled as to their ability to file suit under the APA. The concern that parolees are misled about their ability to file suit under the APA is amplified by the record before the Court that detention facilities lack physical law libraries and that the digital law library is frequently unavailable due to high demand or the system being down (Miner PI Hearing Testimony; Dkt. No. 2-31, ¶ 17).

For all of these reasons, the Court determines that *Younger* abstention is inappropriate because the third *Middlesex* factor has not been satisfied. Because all three factors must be present to apply *Younger* abstention, this Court does not find it necessary to address whether the other *Middlesex* factors are present in the instant case.

### C.    The Exceptions To *Younger*

Regardless of whether the third *Middlesex* factor has been satisfied, which the Court finds it has not, the Court determines that it should not abstain under *Younger* because both of its exceptions apply. The exceptions to *Younger* are as follows: (1) there are "extraordinary circumstances" under which "irreparable injury" will result absent federal court intervention, or (2) the challenged practice is "flagrantly and patently violative of express constitutional prohibitions." *Younger*, 401 U.S. at 53–54. The Court agrees with Plaintiffs that both exceptions apply here.

As explained, Plaintiffs will face irreparable injury absent federal court intervention by being incarcerated without having: (1) before their parole revocation hearings occur the opportunity to be screened for appointed counsel consistent with *Gagnon*; (2) the due process

26

protections set out in *Morrissey*, before, during, and after their parole revocation hearings; and (3) before their parole revocation hearings occur individualized inquiries into whether a specific modification for any particular disability would be reasonable under the circumstances when the parolee makes a timely request for accommodation or Defendants have notice of the parolee's disability. Those injuries cannot be remedied through later state proceedings for reasons explained in this Order.

In addition, the regulation and practices that Plaintiffs challenge are "flagrantly and patently violative of express constitutional prohibitions." *Younger*, 401 U.S. at 53–54. The Court acknowledges that, while *Younger* uses the example of an exception for a flagrantly unconstitutional statute, the exception generally applies to all state action. *See Middlesex*, 457 U.S. at 437 (analyzing whether state disciplinary rule was "flagrantly and patently" unconstitutional). Here, the regulation stating that parolees "shall not have the right to have counsel appointed by the State" is unconstitutional. *New Arkansas Regulation* 4.2(g)(2). Defendants do not attempt to defend this regulation on its plain language. Instead, Defendants attempt to read the regulation as stating that parolees shall not have a "categorical" or "absolute" right to appointed counsel. That is not what the regulation says. It flatly denies any right to state-appointed counsel. Further, the record evidence at this stage of the proceeding that demonstrates Defendants' routine practice of refusing to provide parolees with, or even screen parolees for, state-appointed counsel is consistent with that plain reading.

For all of these reasons, the Court declines to abstain under *Younger*.

## V.      Class Certification

### A.      Class Allegations

Plaintiffs seek certification of a proposed class of: "all adult parolees who are in the custody, or under the supervision, of the ADC, and who currently face, or will in the future face, parole revocation proceedings administered by Defendants (the 'Proposed Class')." (Dkt. No. 5, at 8).  Relying upon Fason and Riedel as proposed class representatives, Plaintiffs also seek certification of a subclass bringing claims pursuant to Title II of the ADA and § 504 of the Rehabilitation Act (Dkt. No. 5, at 8-9).  The proposed subclass consists of: "all adult parolees who are in the custody, or under the supervision of the ADC, who have a disability, as defined by 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B) who need accommodations in order to meaningfully access and participate equally in the parole revocation process, and who currently face, or in the future will face, parole revocation proceedings administered by Defendants (the 'Proposed Disability Subclass')." (Dkt. No. 5, at 9).

Plaintiffs' proposed class and subclass definitions are not binding, and the Court may modify the proposed definitions if the Court deems it necessary to do so.  *See, e.g.*, *Moore v. City of Little Rock*, Case No. 4:19-cv-00556-JM, 2020 WL 5520889 ("In performing this rigorous analysis, '[a] court is not bound by the proposed definitions of the class,' . . . and 'has the authority to redefine a proposed class in such a way as to allow the class action to be maintained.'") (citations omitted); *Murphy v. Gospel for Asia, Inc.*, 327 F.R.D. 227, 234 (W.D. Ark. 2018) (same); *In re Zurn Pex Plumbing Products Liability Litigation*, 267 F.R.D. 549, 558 (D. Minn. 2010), *aff'd*, 644 F.3d 604, (8th Cir. 2011) ("The Court has the authority to redefine a proposed class in such a way as to allow the class action to be maintained."); *see generally* 2 Newberg and Rubenstein on Class

Actions § 7:27 (6th ed. and Supp. 2025) (explaining that courts in every circuit have held that courts have judicial discretion to alter a class or subclass's definition).

The Court understands from the record evidence that individuals on parole in Arkansas are transferred from the custody of the Arkansas Department of Correction to the custody of the Arkansas Department of Community Correction and assigned to CSOs whose job it is to ensure that all conditions are followed; if revoked, parolees may return to prison and the custody of the ADC (*See, e.g.*, Dkt. Nos. 2-10; 2-11; 2-12); *see also FAQs*, Post Prison Transfer Board, https://doc.arkansas.gov/post-prison-transfer-board/faqs/ (last visited Feb. 26, 2026).  For these reasons, the Court deems it necessary to modify the proposed class definitions accordingly.

The Court modifies the proposed class and subclass definitions as follows, and the modified definitions will be considered at this preliminary stage:

> All adult parolees who are in the custody of the ADC, or under the supervision of the ACC, and who currently face, or will in the future face, parole revocation proceedings administered by Defendants (the "Proposed Class").

> All adult parolees who are in the custody of the ADC, or under the supervision of the ACC, who have a disability, as defined by 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B) who need accommodations in order to meaningfully access and participate equally in the parole revocation process, and who currently face, or in the future will face, parole revocation proceedings administered by Defendants (the "Proposed Disability Subclass").

### B.    Legal Standard For Class Certification

The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki,* 442 U.S. 682, 700–701 (1979).  To justify a departure from that rule, "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *East Tex. Motor Freight System, Inc. v. Rodriguez,* 431 U.S. 395, 403 (1977) (quoting *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 216 (1974)).

29

Class certification is governed by Federal Rule of Civil Procedure 23. Rule 23 requires that a proposed class satisfy all four prerequisites of Rule 23(a) and at least one of the provisions of Rule 23(b) to be certified. *Comcast Corp. v. Behrend*, 569 U.S. 27, 32 (2013); *Blades v. Monsanto Co.*, 400 F.3d 562, 568–69 (8th Cir. 2005). Rule 23(a) contains four requirements applicable to all proposed classes: (1) the class is so numerous that joinder of all members is impracticable (numerosity); (2) there are questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and (4) the representative parties will fairly and adequately protect the interests of the absent class members (adequacy). Fed. R. Civ. P. 23(a). District courts must engage in a rigorous analysis to determine whether the prerequisites of Rule 23 have been satisfied. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982).

Plaintiffs seek certification under Rules 23(b)(1)(A) and (b)(2). Plaintiffs assert that "the action can involve a party opposing the class who acted on grounds that apply generally to the class." (Dkt. No. 5, at 9 (citing Fed. R. Civ. P. 23(b)(2)). Plaintiffs also assert, in the alternative, that under Rule 23(b)(1)(A) they may show that "prosecuting separate actions by or against individual class members would create a risk of . . . inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." (Dkt. No. 5, at 9-10 (citing Fed. R. Civ. P. 23(b)(1)(A)).

In the alternative, Plaintiffs also seek "provisional certification" of the modified Proposed Class and modified Proposed Disability Subclass (Dkt. No. 48). *See generally* 2 Newberg and Rubenstein on Class Actions § 4:30 (6th ed. and Supp. 2025) (explaining that a "provisional class certification" characterizes a class certified after undertaking a full certification analysis). "In granting. . . provisional certification," which Plaintiffs alternatively seek in connection with their

request for a preliminary injunction, a court "must still satisfy itself that the requirements of Rule 23 have been met." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 179–80 (D.D.C. 2015). "'Courts routinely grant provisional class certification for purposes of entering injunctive relief' prior to a final ruling on class certification." *Mercado v. Noem*, 800 F. Supp. 3d 526, 559 (S.D.N.Y. 2025) (citation omitted) (collecting cases). Further, courts often do so before full discovery. *See, e.g.*, *Barbara v. Trump*, 790 F. Supp. 3d 80, 100–01 (D.N.H. 2025) (denying request for discovery before granting class certification, where defendants "fail to identify any discovery that would have a meaningful impact on any issue surrounding certification"). To the extent Defendants request discovery at this stage of the proceedings, the Court denies the request at this time.

"The Court has an ongoing duty to assure that the class claims in this action are certifiable under Federal Rule 23." *E. Maine Baptist Church v. Union Planters Bank*, N.A., 244 F.R.D. 538, 540 (E.D. Mo. 2007) (citing *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1145 (8th Cir. 1999); *Briggs v. Anderson*, 796 F.2d 1009, 1017 (8th Cir. 1986) (citing *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 160 (1982))). "Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation." *Day v. Celadon Trucking Servs., Inc.*, 827 F.3d 817, 830 (8th Cir. 2016) (quoting *Gen. Tel. Co.*, 457 U.S. at 160 (footnote omitted)).

### C.    Discussion

The Court has conducted a rigorous analysis on the record at this stage and finds that the certification of the modified Proposed Class and modified Proposed Disability Subclass should be granted for purposes of preliminary injunctive relief. The Court determines that the modified Proposed Class and modified Proposed Disability Subclass satisfy the Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy. The Court further finds that litigating class

members' claims individually would "create a risk of inconsistent or varying adjudications. . . that would establish incompatible standards of conduct" for Defendants' parole revocation proceedings.  Fed. R. Civ. P. 23(b)(1)(A).  Moreover, Defendants' parole revocation policies and procedures "apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  For these reasons, the Court provisionally certifies the modified Proposed Class and the modified Proposed Disability Subclass.  *See Gasca v. Precythe*, Case No. 17-CV-04149-SRB, 2019 WL 112789, at *1 (W.D. Mo. Jan. 4, 2019).

### 1.    Rule 23(a) Factors

#### a.    Numerosity

The Court finds that the modified Proposed Class and modified Proposed Disability Subclass satisfy the numerosity requirement.  Fed. R. Civ. P. 23(a)(1).  Defendants do not argue against numerosity.  Plaintiffs have identified thousands of potential class members (Dkt. Nos. 2-2; 5, at 12–14).

Moreover, the Court notes that the inclusion of those who will face revocation proceedings in the future does not defeat numerosity, nor does it defeat "Rule 23's implicit requirement that a class 'must be adequately defined and clearly ascertainable.'"  *McKeage v. TMBC, LLC*, 847 F.3d 992, 998 (8th Cir. 2017) (quoting *Sandusky Wellness Ctr. v. Medtox Sci., Inc.*, 821 F.3d 992, 996 (8th Cir. 2016)).  To establish ascertainability, a class simply must be identifiable using "objective criteria."  *McKeage*, 847 F.3d at 998.  The Court agrees that requirement is plainly met here.  Whether someone meets the modified Proposed class or modified Proposed Disability Subclass definitions is an objective inquiry.

### b.    Commonality

The Court finds that the requirement for commonality is satisfied for the modified Proposed Class and modified Proposed Disability Subclass.  Fed. R. Civ. P. 23(a)(2).  The constitutional rights asserted are immutably held by all persons implicated under the Supreme Court cases that set out the due process requirements.  Accordingly, common questions of law abound irrespective of the facts of each class member's individual circumstances.  The Court finds that the commonality requirement is satisfied for the modified Proposed Class and modified Proposed Disability Subclass.  Fed. R. Civ. P. 23(a)(2).

The crux of this case is commonality—the rule requiring a plaintiff to show that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Rule 23(a)(2) "does not require that every question of law or fact be common to every member of the class."  *Paxton v. Union Nat. Bank*, 688 F.2d 552, 561 (8th Cir. 1982) (citation omitted).  The Eighth Circuit has stated that "a single common question 'will do' for purposes of Rule 23(a)(2)."  *Ebert v. General Mills, Inc.*, 823 F.3d 472, 478 (8th Cir. 2016) (citing *Dukes*, 564 U.S. at 350).

Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury."  *Falcon*, 457 U.S. at 157.  This does not mean merely that they have all suffered a violation of the same provision of law.  Instead, their claims must depend upon a common contention, and that common contention must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.  "What matters to class certification. . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of

33

common answers." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348–50 (2011) (internal quotation and citation omitted).

Plaintiffs challenge Defendants' statewide regulation providing that parolees "shall not have the right to have counsel appointed by the State," *New Arkansas Regulation* 4.2(g)(2), as well as Defendants' across-the-board failure to inform parolees of their right to counsel, to screen parolees for counsel, and to note the reasons for denying counsel in the record (Dkt. No. 48, at 11). Plaintiffs also argue that Defendants have a widespread practice of depriving parolees of the reasonable accommodations they need to participate equally in the parole revocation process and that Defendants' due process failures uniquely harm parolees with disabilities (Dkt. No. 48, at 15). *See, e.g.*, *Yates v. Collier*, 868 F.3d 354, 366 (5th Cir. 2017) (affirming certification of disability subclass that asserted that the Eighth Amendment claims that applied to the general class uniquely impacted individuals with disabilities, and explaining that the "subclass[] shared the common questions . . . identified for the General Class," as well as the "common contention . . . that [defendants] failed to provide reasonable accommodations to inmates suffering from disabilities" (alteration in original accepted) (citation omitted)).

Plaintiffs stress that in this case, the common questions of fact and law linking all class members in the modified Proposed Class is and has always been whether Defendants fail to screen for counsel as required by *Gagnon* and whether Defendants violate parolees' other due process rights articulated in *Morrissey*, before, during, and after revocation proceedings. As to the modified Proposed Disability Subclass, the common question of fact and law linking all subclass members is whether Defendants conduct individualized inquiries into whether a specific modification for a particular person's disability would be reasonable under the circumstances when the parolee makes a timely request for accommodation or Defendants have notice of the parolee's disability.

Defendants do not deny that all class members are subject to the same parole revocation process governed by Defendants' written policies and procedures and unwritten customs. The Court finds that there are common questions under Rule 23 as to the modified Proposed Class and modified Proposed Disability Subclass. This is so because injunctive relief as it relates to the constitutionality of Defendants' policies, procedures, and customs will resolve the single claim for the entire class or subclass. *See Dukes*, 564 U.S. at 350.

### c.    Typicality And Adequacy

The Court finds that Fason, McGowan, and Riedel ("Named Plaintiffs") are typical and adequate representatives of the modified Proposed Class and that Fason and Riedel are typical and adequate representatives of the modified Proposed Disability Subclass. Fed. R. Civ. P. 23(a)(3–4). The third and fourth components of Rule 23(a) require that the claims or defenses of the class representatives be typical of those of the class, and that the class representatives will fairly and adequately protect the interests of the class.

As the Court noted above, the question of the constitutionality of Defendants' policies, procedures, and customs is common to the entire class, and potential injunctive relief will remedy the constitutional violations that apply to the class. *See DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995) (citation omitted) (finding named plaintiff's claims "typical of the remainder of the class given the nature of the injunctive relief sought" and noting "[t]he burden of demonstrating typicality is fairly easily met so long as other class members have claims similar to the named plaintiff"); *Donaldson v. Pillsbury Co.*, 554 F.2d 825, 831 (8th Cir. 1977) ("When the claim arises out of the same legal or remedial theory, the presence of factual variations is normally not sufficient to preclude class action treatment."). Named Plaintiffs' claims are typical of the

modified Proposed Class and modified Proposed Disability Subclass because they are the same claims as the class and subclass.

Moreover, there is no suggestion that the claims of the Named Plaintiffs are atypical from the claims of other class members.  Also, the Court has no reason to doubt the ability of the named Plaintiffs and their attorneys to represent fairly and adequately the interests of the class.

Defendants argue that the named members of the class and subclass will not qualify as representative parties once their parole revocation hearings have occurred because their claims will become moot (Dkt. No. 35, at 7).  In effect, Defendants argue that Fason, McGowan, and Riedel will not be typical and adequate representatives of the class of which they are no longer members (*Id.*, at 7–8).  However, it is well-established that a class representative may continue to represent the class, even if his individual claim becomes moot following class certification, so long as there remains a live controversy between the defendants and the class members.  *See Sosna v. Iowa*, 419 U.S. 393, 399–401 (1975).  If this Court certifies the modified Proposed Class and modified Proposed Disability Subclass before the Named Plaintiffs' revocation hearings, they would remain proper class representatives.

Even if the Court does not certify the class before the Named Plaintiffs' hearings and the Named Plaintiffs' claims are deemed moot, the Named Plaintiffs would still be proper class representatives who can fairly and adequately represent the interest of the modified Proposed Class and modified Proposed Disability Subclass.  That is because mootness of a named plaintiff's individual claim does not moot a putative class action if the claim is "so inherently transitory that individual plaintiffs cannot even expect to maintain it long enough to obtain a decision on . . . class certification."  2 W. Rubenstein, *Newberg & Rubenstein on Class Actions* § 2:13 (6th ed. 2022 and Supp. 2025).  This rule arises from *Sonsa v. Iowa*, 419 U.S. 393, 402 n.11 (1975).  *See Gerstein v.*

*Pugh*, 420 U.S. 103, 110 n.11 (1975) (explaining the mootness exception to certification); *County of Riverside v. McLaughlin*, 500 U.S. 44, 52 (1991) (same).  As the Court explained in *McLaughlin*, the plaintiffs' claims to a prompt probable cause hearing were so "'inherently transitory that the trial court [would] not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires.'"  *Id*. (quoting *U.S. Parole Commission v. Geraghty*, 445 U.S. 388, 399 (1980)).  In *Geraghty*, the Supreme Court held that a named plaintiff could continue to challenge on appeal a district court's denial of certification to a class of parolees subject to certain parole release guidelines, even though he had been released from prison while the appeal was pending and lost his "'personal stake' in the merits of the litigation."  *Geraghty*, 445 U.S. at 390, 400.

Here, as in *Gerstein*, "the pace of litigation and the inherently transitory nature of the claims at issue conspire to make [the *Sosna*] requirement [of pre-mootness certification] difficult to fulfill."  *United States v. Sanchez-Gomez*, 584 U.S. 381, 388 (2018).  Parole revocation proceedings are typically completed within weeks of an initial notice of an alleged parole violation (*See* Dkt. No. 3, at 42 (noting that most final revocation hearings occur within fourteen days of arrest)).  *See also New Arkansas Regulation*, 4.2(b).  That holds true for the Named Plaintiffs in this case.  Class certification is difficult, if not impossible, to achieve during this time.  Meanwhile, new parolees will face revocation proceedings each week and continue to suffer the same types of due process violations as the Named Plaintiffs (*See* Dkt. No. 1, ¶ 91 ("Defendants initiate parole revocation proceedings several times each week.")).  This is the situation the "inherently transitory" exception was created to address.  *See Farella v. Anglin*, Case No. 22-cv-5121, 2023 WL 5005384 (W.D. Ark. Aug. 5, 2023), *appeal pending*, No. 24-2914 (8th Cir.).

### 2.    Rule 23(b) Analysis

The modified Proposed Class and modified Proposed Disability Subclass seek certification under Rule 23(b)(2) and 23(b)(1)(A).  The Court finds that class certification under each of these provisions is appropriate for the modified Proposed Class and modified Proposed Disability Subclass.

### a.    Rule 23(b)(2)

The basic requirements of Rule 23(b)(2) are that the party opposing the class must have "acted or refused to act on grounds that apply generally to the class," and the party seeking certification must be seeking "final injunctive relief or corresponding declaratory relief" that is appropriate "with respect to the class as a whole."  Fed. R. Civ. P. 23(b)(2).  Because final injunctive relief must be with respect to the class as a whole, the injunctive relief must be cohesive. *Dukes*, 564 U.S. at 360; *Ebert*, 823 F.3d at 480.  The Supreme Court in *Dukes* explained as follows:

> Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.  It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant.  Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.

*Dukes*, 564 U.S. at 360–61.  The requirement of "cohesiveness is the touchstone of a (b)(2) class, as a (b)(2) class 'share[s] the most traditional justification[ ] for class treatment,' in that 'the relief sought must perforce affect the *entire class at once.*'"  *Ebert*, 823 F.3d at 480 (quoting *Dukes*, 564 U.S at 361–62).

### i.    Modified Proposed Class

Defendants argue that the modified Proposed Class is not cohesive because "parole revocation proceedings . . . are inherently individualized," and thus "'each individual class member

would be entitled to a different injunction or declaratory judgment against the defendant.'" (Dkt. No. 35, at 18–19).  The Court is not convinced.

Plaintiffs have not asked this Court to decide whether any one individual was deprived of due process under *Gagnon* and *Morrissey*—much less for an "injunction declaring that 'counsel must be appointed'" to every individual class member (*Id.*, at 19).  Rather, Plaintiffs ask this Court to enforce *Gagnon* and *Morrissey* by requiring Defendants to remove the ban on state-appointed counsel, provide a mechanism to screen parolees for appointed counsel under *Gagnon,* and actually do so, and set up a system to provide other due process protections, including the right to confrontation and notice (Dkt. No. 48, at 18).  That injunction would "provide relief to each member of the class."  *Dukes*, 564 U.S. at 360.  Defendants' assertion that the modified Proposed Class is not cohesive is based upon a misguided understanding of the relief that Plaintiffs seek. The Court finds that the modified Proposed Class satisfies the cohesion requirement underlying Rule 23(b)(2).

### ii.    Modified Proposed Disability Subclass

Defendants also argue that the modified Proposed Disability Subclass is not cohesive and should not be certified under Rule 23(b)(2) (Dkt. No. 35, at 19–22).  Defendants claim that the modified Proposed Disability Subclass is not cohesive because parolees have "widely varying conditions" that would require different accommodations under the ADA (*Id.*, at 21).  The Court finds that Defendants' argument, particularly when tailored to the relief sought, is overbroad.  The modified Proposed Disability Subclass is sufficiently cohesive.

The Court recognizes that members of the subclass might eventually require different accommodations to fit the needs of different disabilities (*Id.*, at 21–22).  However, that different accommodations will be required is not a barrier to certification because Plaintiffs have not asked

the Court to assess any individuals' entitlement to a particular accommodation under the ADA or Rehabilitation Act. Defendants characterize the relief sought broadly and suggest that individualized determinations will be needed to evaluate rights under the ADA (*Id.*, at 22). The Court does not read Plaintiffs' request so sweepingly. Rather, the Court understands Plaintiffs' request to be a request for a single injunction that requires Defendants to conduct individualized inquiries into whether a specific modification for a particular person's disability would be reasonable under the circumstances when the parolee makes a timely request for accommodation or Defendants have notice of the parolee's disability (Dkt. No. 48, at 20). Courts have consistently determined that this sort of class wide relief is appropriate because of its general applicability. *See, e.g.*, *Postawko v. Missouri Dep't of Corr.*, 910 F.3d 1030, 1038 (8th Cir. 2018) (affirming certification of class alleging that defendants uniformly applied a screening and treatment policy where class members' medical records and disabilities varied); *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001), *overruled on other grounds by Johnson v. California*, 543 U.S. 499, 125 (2005); *McKay v. Cnty. Election Comm'rs for Pulaski Cnty.*, 158 F.R.D. 620, 625–26 (E.D. Ark. 1994).

Lastly, the Court determines that *Harris v. Union Pacific Railroad Co.* is distinguishable. 953 F.3d 1030 (8th Cir. 2020). The Eighth Circuit in *Harris* determined that class certification was inappropriate because the issue was whether the employment policy discriminated against disabled employees. *Id.*, at 1035. To determine whether that policy discriminated against disabled employees, the court was required to assess individually each potential claim. That individualized inquiry led the class to lack the needed cohesion under *Dukes*. The Court finds that, in the present case, the challenge is to Defendants' policy of systemically refusing to conduct individualized inquiries into whether a specific modification for a particular parolee's disability would be

reasonable under the circumstances when the parolee makes a timely request for accommodation or Defendants have notice of the individual's disability. The Court cannot determine whether a parolee has a disability, what accommodations were needed for that parolee, or whether a decision to deny accommodations was justified with one single injunction. Instead, the Court can determine whether Plaintiffs are entitled to a single injunction requiring Defendants to conduct individualized inquiries into whether a specific modification for a particular parolee's disability would be reasonable under the circumstances when the parolee makes a timely request for accommodation or Defendants have notice of the parolee's disability. The possibility of that singular and uniform injunction permits certification under Rule 23(b)(2).

### b.    Rule 23(b)(1)(A)

Plaintiffs argue that the modified Proposed Class should also be certified under Rule 23(b)(1)(A) because prosecutions of separate actions by the class members would create a risk of inconsistent judgments with respect to the members of the class which would establish incompatible standards of conduct for the Defendants (Dkt. No. 5, at 22-23). The same arguments apply to the modified Proposed Disability Subclass. Plaintiffs ask this Court to ensure for the modified Proposed Class: (1) before their parole revocation hearings occur the opportunity to be screened for appointed counsel consistent with *Gagnon*, and (2) the due process protections as set out in *Morrissey*, before, during, and after parole revocation hearings. Plaintiffs ask this Court to ensure for the modified Proposed Subclass: (3) before their parole revocation hearings occur having individualized inquiries into whether a specific modification for any particular disability would be reasonable under the circumstances when the parolee makes a timely request for accommodation or Defendants have notice of the parolee's disability. Those questions pose the risk of "inconsistent or varying adjudications." Fed. R. Civ. P. 23(b)(1)(A).

41

As to the modified Proposed Class, if one court were to require Defendants to implement the screening for appointed counsel consistent with *Gagnon* or the due process protections set out in *Morrissey* while another disclaimed any rights, there would be a substantial risk of inconsistent judgments with respect to the members of the class and incompatible standards for Defendants. Defendants argue that there is no risk of incompatible standards or decisions because the system contemplates individual determinations (Dkt. No. 35, at 23). While Defendants are correct that individual determinations of *Gagnon* rights do not pose a risk of inconsistent or incompatible standards, Defendants argument does not address the incompatible standards of conduct related to the policy by which Defendants screen for and apply *Gagnon* rights. The relief Plaintiffs seek is to enforce *Gagnon* and *Morrissey* by requiring Defendants to remove the ban on state-appointed counsel and screen parolees for appointed counsel under *Gagnon* and to provide the due process protections as set out in *Morrissey*, before, during, and after parole revocation hearings. Defendants' argument ignores that, when individual plaintiffs in individual cases adjudicate challenges to Defendants' revocation policy and procedure, it creates a risk of inconsistent judgments with respect to the members of the class and a risk of establishing incompatible standards of conduct for Defendants. Were the Court to deny class certification, thereby compelling each member of the modified Proposed Class to challenge individually the revocation policy and procedure as to each of the named Defendants, there would be a substantial risk of inconsistency. *See Gasca*, 2019 WL 112789, at *1–2.

The same is true of the modified Proposed Disability Subclass. Litigation of each disabled parolee's claims would run the risk of conflicting rulings about what standards Defendants must use to conduct individualized inquiries into whether a specific modification for any particular disability would be reasonable under the circumstances when the parolee makes a timely request

42

for accommodation or Defendants have notice of the parolee's disability. For the same reasons the Court finds that Rule 23(b)(1)(A) certification is warranted for the modified Proposed Class, the Court also finds it proper for the modified Proposed Disability Subclass.

For all of these reasons, the Court finds that certification of the modified Proposed Class and modified Proposed Disability Subclass is appropriate at this stage of the litigation, subject to the Court's ongoing duty to assure that the class claims in this action are certifiable under Federal Rule 23 and the Court's ability modify its ruling in the light of subsequent developments in the litigation.

## VI.    Preliminary Injunction Legal Standard

District courts in the Eighth Circuit must consider four factors in deciding whether to grant a preliminary injunction:

> (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that the movant will succeed on the merits; and (4) the public interest.

*Wilbur-Ellis Co., LLC v. Erikson*, 103 F.4th 1352, 1355–56 (8th Cir. 2024) (quoting *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013)). "While no single factor is determinative, the probability of success factor is the most significant." *Id.* at 1356 (quoting *Home Instead*, 721 F.3d at 497). Furthermore, in the Eighth Circuit, laws passed through the democratic process are entitled to a "higher degree of deference." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008). In such cases, it is never sufficient for the moving party to establish that there is a "fair chance" of success. *Id.* Instead, the appropriate standard, and threshold showing that must be made by the movant, is "likely to prevail on the merits." *Id.* Only if the movant has demonstrated that it is likely to prevail on the merits should the Court consider the remaining factors. *Id.*

"A preliminary injunction is an extraordinary remedy, and the burden of establishing the propriety of an injunction is on the movant," here, Plaintiffs. *See Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021) (quoting *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)). The Court recognizes here that Plaintiffs may bear a heavier burden than usual because the preliminary injunction provides substantially all the relief they would obtain after a trial on the merits. *Rathmann Group v. Tanenbaum,* 889 F.2d 787, 790 (8th Cir. 1989).

At the end of the day, however, "[a] district court has broad discretion when ruling on a request for preliminary injunction." *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1035 (8th Cir. 2016) (quoting *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 893 (8th Cir. 2013)).

## VII.    Likelihood Of Success On The Merits:  Due Process Claims

Plaintiffs allege that Defendants fail to comport with the due process requirements articulated in *Gagnon* and *Morrissey* (Dkt. No. 3, at 28–39). Specifically, Plaintiffs allege that: (1) Defendants fail to screen for counsel as required in *Gagnon* (*Id.*, at 28–30); and (2) Defendants violate parolees' other due process rights before, during, and after revocation proceedings, which rights are required by *Morrissey* (*Id.*, at 30–39).

### A.    Legal Framework

Under the Fourteenth Amendment to the United States Constitution:  "No state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Due Process Clause "imposes procedural limitations on a State's power to take away protected entitlements." *DA's Office v. Osborne,* 557 U.S. 52, 67 (2009).

"A liberty interest inherent in the Constitution arises when a prisoner has acquired a substantial, although conditional freedom such that 'the loss of liberty entailed [by its revocation]

is a serious deprivation requiring that the [prisoner] be accorded due process.'" *Edwards v. Lockhart,* 908 F.2d 299, 301 (8th Cir. 1990) (alteration in original) (quoting *Whitehorn v. Harrelson*, 758 F.2d 1416, 1420 (11th Cir. 1985) (quoting *Gagnon v. Scarpelli,* 411 U.S. 778, 781(1973)); *see also Shattuck v. Lewis,* Case No. 4:24-cv-00336-HEA, 2024 WL 3291764, at *9 (E.D. Mo. July 3, 2024) (A "liberty interest inherent in the Due Process Clause arises when a person has a substantial—although conditional—freedom, such as when he is on probation or parole"). The "dispositive characteristic that marks the point at which the Due Process Clause itself implies a liberty interest . . . is the fact of release from incarceration." *Callender v. Sioux City Residential Treatment Facility*, 88 F.3d 666, 668 (8th Cir. 1996).

In parole revocation proceedings, the Supreme Court has found that due process requires states to implement certain procedures and safeguards. *Gagnon,* 411 U.S. 778; *Morrissey*, 408 U.S. 471. In *Gagnon*, the Supreme Court stated that:

> Specifically [in *Morrissey*], we held that a parolee is entitled to two hearings, one a preliminary hearing at the time of his arrest and detention to determine whether there is probable cause to believe that he has committed a violation of his parole, and the other a somewhat more comprehensive hearing prior to the making of the final revocation decision.

411 U.S. at 782. "[T]he determination that reasonable ground exists for revocation of parole should be made by someone not directly involved in the case." *Morrissey,* 408 U.S. at 485. "[T]he parolee should be given notice that the hearing will take place and that its purpose is to determine whether there is probable cause to believe he has committed a parole violation." *Id*. at 486–87. "The notice should state what parole violations have been alleged." *Id*. at 487.

As to waiver of hearings, "*Morrissey* makes clear that the default is to conduct preliminary and revocation hearings and that parolees are constitutionally entitled to such hearings." *Gasca v. Precythe*, 500 F. Supp. 3d 830, 850 (W.D. Mo. 2020) (hereinafter "*Gasca District Court Order*")

(citing *Gagnon*, 411 U.S. at 786 ("*Morrissey* mandated preliminary and final revocation hearings."); *Morrissey*, 408 U.S. at 485 ("[D]ue process would seem to require" a preliminary hearing to determine whether probable cause exists), 487–88 ("There must also be an opportunity for a hearing, if it is desired by the parolee, prior to the final decision on revocation by the parole authority.")). Nevertheless, a parolee may waive his or her right to these hearings. *Id.* "There is a presumption against the waiver of constitutional rights." *Brookhart v. Janis*, 384 U.S. 1, 4 (1966). "At the preliminary hearing, a probationer or parolee is entitled to notice of the alleged violations of probation or parole, an opportunity to appear and to present evidence in his own behalf, a conditional right to confront adverse witnesses, an independent decisionmaker, and a written report of the hearing." *Gagnon,* 411 U.S. at 786 (citing *Morrissey*, 408 U.S. at 487). "The final hearing is a less summary one because the decision under consideration is the ultimate decision to revoke rather than a mere determination of probable cause," *id.*, but the "minimum requirements of due process" include:

> written notice of the claimed violations of [probation or] parole; (b) disclosure to the [probationer or] parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking [probation or] parole.

*Id.* (alterations in original) (quoting *Morrissey*, 408 U.S. at 489).

As to the right to state-appointed counsel in revocation proceedings, the Supreme Court stated:

> Although the presence and participation of counsel will probably be both undesirable and constitutionally unnecessary in most revocation hearings, there will remain certain cases in which fundamental fairness—the touchstone of due process—will require that the State provide at its expense counsel for indigent probationers or parolees.

*Gagnon,* 411 U.S. at 790.  The Supreme Court went on to say that:

> Presumptively, it may be said that counsel should be provided in cases where, after being informed of his right to request counsel, the probationer or parolee makes such a request, based on a timely and colorable claim (i) that he has not committed the alleged violation of the conditions upon which he is at liberty; or (ii) that, even if the violation is a matter of public record or is uncontested, there are substantial reasons which justified or mitigated the violation and make revocation inappropriate, and that the reasons are complex or otherwise difficult to develop or present.  In passing on a request for the appointment of counsel, the responsible agency also should consider especially in doubtful cases, whether the probationer appears to be capable of speaking effectively for himself.

*Id.*, at 790–91.  Finally, the Court stated that "[i]n every case in which a request for counsel at a preliminary or final hearing is refused, the grounds for refusal should be stated succinctly in the record."

The parties agree that the due process rights articulated in *Gagnon* and *Morrissey* apply to Arkansas parole revocation hearings (PI Hearing Def. Closing; Mill PI Hearing Testimony; Dkt. No. 3, at 28).  Arkansas Code Annotated § 16-93-1908 ("Section 1908") and Arkansas Code Annotated § 16-93-705 ("Section 705") address "Revocation of Post-Release Supervision" and "Revocation—Procedures and Hearings Generally," respectively.  Section 1908 appears to apply only to "a felony offense committed on or after January 1, 2025," Ark. Code. Ann. § 16-93-1901, while Section 705 appears to encompass procedures in all other revocation proceedings.  The title "Revocation of Post-Release Supervision" also appears to imply that Section 1908 applies only to "post-release supervision" rather than "parole."  *See* Ark. Code. Ann. § 16-93-1902(5) ("'Post-release supervision' means a period of community supervision for an offender after his or her

release from incarceration"). The Court will use the term "parolees" to describe both individuals to whom Section 705 and Section 1908 applies.[6]

### B.   Alleged Due Process Violations

The Court examines each *Gagnon* and *Morrissey* due process deficiency alleged.

### 1.   Preliminary Hearings And Waiver

Under Section 705, "[a] parolee arrested for violation of parole shall be entitled to a preliminary hearing to determine whether there is reasonable cause to believe that he or she has violated a condition of parole." Ark. Code. Ann. § 16-93-705(b)(1).

However, a preliminary hearing shall not be required if:

(1) the parolee waives a preliminary hearing;
(2) the parolee knowingly and intelligently waives a final parole revocation hearing; or
(3) the final parole revocation hearing is held within fourteen (14) calendar days after the arrest and reasonably near the place where the alleged violation occurred or where the parolee was arrested.

Ark. Code. Ann. § 16-93-705(e).

Unlike Section 705 which states that a preliminary hearing shall not be required "if the parolee waives the preliminary hearing", Ark. Code. Ann. § 16-93-705(e), Section 1908, states that

---

[6] Plaintiffs represent that "post-release supervision" and "parole" are subject to the same revocation hearing requirements in Arkansas and that ACC—the agency responsible for overseeing all community supervision—uses the terms interchangeably (Dkt. No. 3, at 3 n.1). The New Arkansas Regulation states that parole "refers to offenders who committed offenses prior to January 1, 2025," and "parole is included without limitation in the definition of post-released supervision." *New Arkansas Regulation*, 2(18). The New Arkansas Regulation also states that post-release supervision "means a period of community supervision for an offender after his or her release from incarceration which includes without limitation parole . . ." *Id.*, 2(19). Since the New Arkansas Regulation applies equally to individuals on parole or post-release supervision and because Section 705 and Section 1908 are substantially similar, the Court will use the term "parolees" to refer to both sets of individuals, noting when a difference between Section 705 and Section 1908 is present.

a preliminary hearing shall not be required if the offender "knowingly and intelligently" waives the preliminary hearing.  Ark. Code. Ann. § 16-93-1908(e)(1)

Under both Section 705 and Section 1908, parole cannot be revoked before a final revocation hearing unless the final parole revocation hearing is "knowingly and intelligently waived by the parolee." Ark. Code. Ann. § 16-93-705(c)(1)(A);  § 16-93-1908(c)(1)(A)

The New Arkansas Regulation states:

> A revocation hearing shall be scheduled by the revocation hearing judge or the Board's designee within seven (7) days after the offender's arrest and conducted within fourteen (14) days after the offender's arrest, excluding weekends, holidays, or delays caused by acts of nature.

*New Arkansas Regulation* 4.2(b).  The New Arkansas Regulation also states that "[a] preliminary hearing is not required when the revocation is conducted within fourteen (14) days after the offender's arrest." *New Arkansas Regulation* 4.2(c).  Further:

> upon scheduling the revocation hearing, the offender shall, as referenced in [Section 705 and Section 1908] be served with the following documents, including without limitation (A) Violation Report, (B) Notice of Parole Violation Action, and (C) waiver option.

*New Arkansas Regulation* 4.2(c).

As to waiver of the revocation hearing, the New Arkansas Regulation states that:

> Prior to the revocation hearing, the offender shall be offered the option to waive the revocation hearing and agree to a term of incarceration that is dependent on the facts surrounding the violation or violations of the conditions of post-release supervision.
>
> (1) The offender shall be informed of the possible outcomes of the revocation hearing.
>
> (2) The offender must voluntarily and intelligently agree to waive his or her right to the revocation hearing and attest that the decision to waive was not the result of any (A) threats, (B) promises, or (C) any form of coercion

*New Arkansas Regulation* 4.5(a).

49

According to the New Arkansas Regulation, a parolee can appeal their waiver to the PPTB, *New Arkansas Regulation* 4.5(b), and an "offender shall be provided notice of his or her right to appeal the waiver of a revocation hearing. This notification of the right to file an appeal will be provided in the waiver document." *New Arkansas Regulation* 6.1(b).

The Revocation Hearing Waiver Form permits parolees to waive their "revocation hearing" in exchange for a "suspended imposition of revocation with a 90-day reinstatement" or being "revoked to the Arkansas Division of Correction and [being] eligible for release consideration after six (6) months" (Dkt. No. 2-32, at 3). The form does not mention preliminary hearings. No form for waiver of preliminary hearings has been provided.

Plaintiffs provide many declarations which state that parolees were never informed of the distinction between a preliminary hearing and final revocation hearing (*See, e.g.,* Dkt. No 2-3; 2-9; 2-11; 2-20). Defendants provide no evidence of how preliminary hearings are conducted or allege that they ever occur.

Based on the record evidence at this stage, the Court finds that Plaintiffs are likely to succeed on the merits of their claims that Defendants violate parolees right to a preliminary hearing as articulated in *Gagnon* and *Morrissey*. There is no evidence that any parolee receives a preliminary hearing or that any such preliminary hearing is conducted by someone not directly involved in the case. *See Gagnon*, 411 U.S. at 782 ("Specifically [in *Morrissey*], we held that a parolee is entitled to two hearings, one a preliminary hearing at the time of his arrest and detention to determine whether there is probable cause to believe that he has committed a violation of his parole . . ."), 785 ("[T]he determination that reasonable ground exists for revocation of parole should be made by someone not directly involved in the case.").

Section 705 and Section 1908 state that a preliminary hearing "shall not be required" if the parolee waives the preliminary hearing, waives the final parole revocation hearing, or the final revocation hearing is held within 14 calendar days after the arrest. Ark. Code. Ann. § 16-93-705(e), § 16-93-1908(e). The New Arkansas Regulation states that a preliminary hearing is not required when the revocation is conducted within 14 days after the offender's arrest. *New Arkansas Regulation* 4.2(c).

There is no evidence that a preliminary hearing revocation waiver form is used by Defendants nor is there record evidence of any procedure for parolees to waive a preliminary hearing, other than waiving their right to a final revocation hearing through the Revocation Hearing Waiver Form. There is no record evidence at this stage that parolees who declined to waive their right to a final revocation hearing had a preliminary hearing (*See, e.g.,* Dkt. Nos. 2-18; 2-19; 2-30). While many parolees stated that they met with their CSO prior to their final revocation hearing, *Morrissey* requires that a preliminary hearing be conducted by someone "not directly involved in the case." *Morrissey,* 408 U.S. at 485. Several parolees stated that their CSO testified against them at their revocation proceeding (*See, e.g.,* Dkt. Nos. 2-16; 2-30; 2-28; 2-24 ("The [hearing officer] asked my PO [Parole Officer] if she had any witnesses. This surprised me because my PO told me that she would not be at my hearing. My PO did not explain to me that she would be making a case against me. I though this entire time that she would be on my side."). There is no record evidence that anyone other than a CSO met with parolees prior to the final revocation hearing to conduct a preliminary hearing.

To the extent that parolees' preliminary hearings are conducted by CSOs, the Court finds that such a procedure likely violates the mandate in *Morrissey* that a preliminary hearing be

conducted by someone "not directly involved in the case" given the apparent adversarial nature of CSOs in the revocation process.

There also appears to be no support in *Gagnon* or *Morrissey* for Section 705, Section 1908, and the New Arkansas Regulation's contention that a parolee is not entitled to a preliminary hearing if the final revocation hearing is held within 14 calendar days.

Therefore, the Court finds that Plaintiffs are likely to succeed on their claims that Defendants violate parolees right to a preliminary hearing as articulated in *Gagnon* and *Morrissey*.

## 2.    Right to Counsel

According to Section 705: "Except as provided in subsection (d) of this section, the parolee shall have the right . . . to be represented by counsel." Ark. Code. Ann. § 16-93-705(b)(4), (c)(3).

Section 705(d) states that at a preliminary hearing or final revocation hearing:

(1) The parolee shall have the right to confront and cross-examine adverse witnesses unless the revocation hearing judge or the board or its designee specifically finds good cause for not allowing confrontation; and

(2) The parolee may introduce any relevant evidence of the alleged violation, including letters, affidavits, and other documentary evidence, regardless of its admissibility under the rules governing the admission of evidence.

Thus, Section 705(d) does not limit the right to counsel in any way and, according to Section 705, parolees have the right "to be represented by counsel." Section 705 does not mention state-appointed counsel.

According to Section 1908: "[e]xcept as provided in subsection (d) of this section, the offender has the right . . . to be represented by counsel at the preliminary hearing," Ark. Code. Ann. § 16-93-1908(b)(4), and "at the revocation hearing," Ark. Code. Ann. § 16-93-1908(c)(3).

Section 1908(d) is identical to that of Section 705(d).  Therefore, Section 1908(d) does not limit the right to counsel in any way, and according to Section 1908, parolees have a right "to be represented by counsel."  Section 1908 does not mention state-appointed counsel.

According to the New Arkansas Regulation, "[t]he offender shall have the right to . . . be represented by counsel; however, the offender shall not have the right to have counsel appointed by the State." *New Arkansas Regulation* 4.2(g)(2).

According to the Notice Form, a parolee:

> may be represented by an attorney at the hearing.  If you cannot afford an attorney and feel you need one, you may ask the Hearing Examiner to appoint one.  There is no right to have an attorney appointed in every case, but the Hearing Examiner can appoint one in certain circumstances.  Your Community Supervision Officer will provide you an application form for appointment of counsel upon request.

(Dkt. No 2-32, at 2).

Plaintiffs provide evidence that the Screening Form was not used consistently, if at all, when parolees requested counsel (*See* Dkt. No. 2-5, ¶ 10 ("I asked my CSO if I could have an attorney appointed to represent me, and she told me I could not."); Dkt. No. 2-6, ¶ 8 ("I asked my parole officer if I could have an attorney, but he told me that it would take too long to appoint one."); Dkt. No. 2-3 (parolee asked for appointed counsel at the revocation hearing, the hearing officer asked the parolee only what his highest level of education was, and the hearing officer said that the parolee was not eligible for an appointed attorney)).  McGowan also stated that he was not informed by his CSO of his right to be screened for and appointed an attorney, requested an attorney at his first revocation hearing, was granted a continuance, but was not provided the Screening Form (Dkt. No. 19-1, PI Hearing Pl. Ex. 51).  McGowan stated that, once he requested a continuance of his second revocation hearing and specifically requested a Screening Form, he was then provided a Screening Form by his CSO who, according to McGowan, stated "that she had never seen the form before and did not know how to fill it out" (PI Hearing Pl. Ex. 51, ¶ 10).

Mills testified that:  (1) he has never appointed counsel to any parolee during his two years of service as a hearing officer; (2) he has only dealt with requests for state-appointed counsel around approximately eight times in his two-year tenure, with four of those requests coming in the last couple of months; (3) he would have to speak to a supervisor if he decided to appoint counsel; and (4) he was unsure how counsel would be appointed and that he would have to ask his supervisor (Mills PI Hearing Testimony).  When asked what Mills would do if a parolee asked for a lawyer at a revocation hearing, Mills said that he would grant a continuance so that the parolee could hire counsel (*Id.*).  Mills testified that, if a parolee asks for counsel at a revocation hearing, he as a practice typically just asks if the parolee wants to retain counsel and does not bring up appointed counsel (*Id.*).  When asked by the Court what Mills would do if the parolee asked for a continuance to receive appointed counsel, Mills stated that he would offer the Screening Form only if a parolee specifically asked for a continuance for appointed counsel (*Id.*).

As to notice of the denial of counsel, McGowan stated that he was read aloud the denial of his request for appointed counsel by a CSO and not given a copy of the denial (PI Hearing Pl. Ex. 51, ¶ 13).  Defendants presented written denials of McGowan, Davis, and Fason's request for counsel (PI Hearing Def. Exs. 1; 2; 3).  These denials are in the form of emails sent to CSOs (*Id.*).  McGowan, Davis, and Fason are not recipients of the emails (*Id.*).  The emails do not contain any instructions to the CSO to read or provide the denial to the parolee (*Id.*).  Mills testified that sometimes they put the decision to deny counsel in the Disposition Form, but he could not say with certainty that they always did so (Mills PI Hearing Testimony).

Plaintiffs presented evidence that several parolees never received notice of their denial of state-appointed counsel or were denied state-appointed counsel in various ways unrelated to the internal emails provided by Defendants (*See, e.g.,* Dkt. No. 2-4 (parolee recovering from brain

surgery denied counsel and never given written decision); Dkt. No. 2-5 (parolee requested an appointed attorney, told no by CSO, and never given decision by hearing officer); Dkt. No. 2-3 (parolee asked hearing officer for appointed attorney and hearing officer asked about parolee's highest level of education and then denied the request)).

Based on the foregoing evidence, the Court finds that Plaintiffs are likely to succeed on the merits of their due process claims that Defendants fail to screen parolees for counsel as required in *Gagnon*.

Section 705 and Section 1908 provide a parolee with the right "to be represented by counsel" but are silent on access to state-appointed counsel or procedures on how to acquire state-appointed counsel. The Notice Form states that a parolee "may ask the Hearing Examiner" to appoint counsel if the parolee "cannot afford one" and that a CSO "will provide you an application form for an appointment of counsel upon request." (Dkt. No. 2-32, at 2).

However, the Court finds that this procedure is not implemented by Defendants and that the New Arkansas Regulation is in direct contradiction with the right to counsel articulated *Gagnon*.

First, as to Defendants' process for screening for appointed counsel, several declarations provided by Plaintiffs state that parolees requested counsel and never received any written forms or decision (Dkt. Nos. 2-3; 2-4; 2-5). Further, despite these requests for counsel, Mills testified that he had only dealt with the appointment of counsel around eight times in two years, with four of those requests coming in the last couple of months (Mills Testimony Hearing; Dkt. Nos. 2-3; 2-4; 2-5; Def. Exs; 1; 2; 3). McGowan had to specifically ask for the Screening Form—which was not provided the first time he asked for a continuance because he wanted an attorney—before a CSO provided the Screening Form, and the CSO then told McGowan, according to McGowan,

that the CSO had never seen the Screening Form before (Pl. Ex. 51). This practice aligns with Mills's testimony, in which Mills stated that if a parolee asked for counsel at a revocation hearing, he would continue the revocation hearing but not provide the screening form (Mills PI Hearing Testimony). Mills also stated that he had never appointed counsel in his two-year tenure as a hearing officer and that he would have to ask his supervisor what to do if he ever decided to grant appointed counsel (*Id.*).

Second, the New Arkansas Regulation states clearly and unambiguously: "the offender shall not have the right to have counsel appointed by the State." *New Arkansas Regulation* 4.2(g)(2). The Court finds unpersuasive Defendants' argument that the language of the New Arkansas Regulation should be interpreted to mean that *not all* parolees have a right to state appointed counsel or that the right to counsel is *not guaranteed*. The language of the New Arkansas Regulation is clear: parolees do not have the right to state-appointed counsel. That regulation is in direct contradiction to the holding in *Gagnon*. *Gagnon*, 411 U.S. at 790 (fundamental fairness—the touchstone of due process—requires states to provide state-appointed counsel in certain cases).

The Court also finds, based on the foregoing evidence, that Plaintiffs are likely to succeed on the merits of their claims that Defendants have violated their due process right to have the grounds for refusal of appointment of counsel "stated succinctly in the record."

Plaintiffs presented evidence that parolees have received responses in various forms to their requests for counsel. Defendants represent that hearing officers' decisions to deny state appointed counsel are recorded in internal emails sent from the hearing officer to the revocation officer (Def. Ex. 1–3). There is no directive requiring CSOs to inform parolees of these decisions, and there is no mechanism in place to ensure that parolees are given or read the decision. Based on the

inconsistency in procedures for responding to requests for state appointed counsel, and the procedure articulated by Defendants consisting of internal emails that may or may not be communicated to parolees, Plaintiffs are likely to succeed on the merits of their claim that Defendants have not stated the grounds for refusal to appoint counsel "succinctly in the record."

Therefore, the Court finds that Plaintiffs are likely to succeed on the merits of their due process claims that Defendants fail to screen parolees for counsel as required in *Gagnon*.

### 3.      Other Due Process Rights

Under Section 705, if a parolee does not waive a preliminary hearing, the parolee:  (1) "shall have the right to hear and controvert evidence against him or her, [and] to offer evidence in his or her own behalf," Ark. Code. Ann. § 16-93-705(b)(4); (2) "shall have the right to confront and cross-examine adverse witnesses unless the revocation hearing judge or the board or its designee specifically finds good cause for not allowing confrontation,"  Ark. Code. Ann. § 16-93-705(d)(1); and (3) "may introduce any relevant evidence of the alleged violation, including letters, affidavits, and other documentary evidence, regardless of its admissibility under the rules governing the admission of evidence."  Ark. Code. Ann. § 16-93-705(d)(2).

At a final revocation hearing, the parolee has identical rights.  Ark. Code. Ann. § 16-93-705(c)(3), (d)(1), (d)(2).  Section 1908 provides parolees with the same rights at preliminary hearings and final revocation hearings as those in Section 705.  Ark. Code. Ann. § 16-93-1908 (b)(4), (c)(3), (d)(1), (d)(2).

If parole or post release supervision is revoked, "the board or its designee shall prepare and furnish to the parolee a written statement of evidence relied on and the reasons for revoking parole."  Ark. Code. Ann. § 16-93-705(c)(4); § 16-93-1908(c)(4).

The New Arkansas Regulation states that:

> If the post-release supervision is revoked, the Board or its designee shall prepare and provide to the offender, within seven (7) days from the date of the revocation hearing, a written statement of evidence relied on and the reasons for revoking post-release supervision.

*New Arkansas Regulation* 4.3(a)(2), 4.3(b)(2).  Once revoked, "[t]he offender shall be provided notice of the right to appeal the revocation decision.  This notification of the right to file an appeal will be included in the copy of the revocation decision."  *New Arkansas Regulation* 5.1(a).  To appeal a revocation, "[t]he appeal must be made in writing by the offender or his or her attorney to the Board within thirty (30) days from the date of the revocation hearing decision unless the time period or other requirements are waived by the Board."  *New Arkansas Regulation* 5.1(b)(3).

The appeal "shall be presented to the Board as soon as practicable after it is received" and "will be screened, reviewed and presented to the Board for review."  *New Arkansas Regulation* 5.2(a).

The Notice Form states, "[a]fter the hearing, you will receive a written statement as to the evidence relied on and the reasons for the action taken," and "[t]he decision of the Hearing Examiner may be appealed in writing to the Arkansas Post Prison Transfer Board." (Dkt. No. 2-32, at 2).

The Disposition Form states, "[a]ppeal of this decision must be made in writing to the Arkansas Post Prison Transfer Board, 1302 Pike Ave., Suite D, North Little Rock, AR 72114, within thirty (30) days from the date of this hearing" (Dkt. No. 2-45).  Beneath the hearing officer's signature is the statement, "I certify the above listed offender was verbally informed of the hearing judge's decision or recommendation immediately following the hearing," and a signature block for a "witness" (*Id.*).

Mills testified that it was his understanding that parolees were given a written copy of the Disposition Form in accordance with Arkansas's statutes and regulations, but he acknowledged

that he did not personally witness any parolee receiving a written form (Mills PI Hearing Testimony). Mills also testified that his decision would come some time after the hearing, not immediately (*Id.*). Plaintiffs provide several declarations from parolees who state that they were never provided the Disposition Form (*See, e.g.,* Dkt. Nos. 2-8; 2-22; 2-24; 2-35).

The Court finds that Plaintiffs are likely to succeed on their other due process claims, specifically that Defendants violate their right to receive a written statement by the factfinder as to the evidence relied on and the reasons for revoking parole, as articulated in *Morrissey*.

While Section 705, Section 1908, and the New Arkansas Regulation all state that a parolee is entitled to a written revocation decision, the Disposition Form requires a "witness," who the Court understands to be a CSO, only to certify that "the above listed offender was verbally informed of the hearing judge's decision or recommendation immediately following the hearing." (Dkt. No. 2-45).

First, the statement which the "witness" certifies is inconsistent with Mills's testimony, who stated that he does not issue decisions immediately following the hearing. Second, Plaintiffs have provided several declarations which state that parolees were never provided the Disposition Form (*See, e.g.*, Dkt. No. 2-24 (parolee never received Disposition Form and asked an officer to look up the results of the hearing); Dkt. No. 2-28 (same); Dkt. No. 2-30 (parolee appealed after receiving no decision and the appeal was "upheld" without stating what the decision was)). Third, Mills testified that he never witnessed a parolee receiving any written form, and Defendants provided no evidence that CSOs provide written forms.

Given the fact that the Disposition form asks CSOs to certify that they "verbally informed" parolees of their revocation decision and due to Plaintiffs' declarations that no written decisions

were provided, the Court finds that Plaintiffs are likely to succeed on the merits of their due process claims related to being provided a written revocation decision as articulated in *Morrissey*.

## VIII.   Likelihood Of Success On The Merits:  Disability Claims

Plaintiffs bring direct actions against Defendants for disparate treatment and failure to make reasonable accommodations in violation of Title II of the ADA and § 504 of the Rehabilitation Act (Dkt. No. 1, ¶¶ 147–168).

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  To succeed on their ADA claim, Plaintiffs must prove four elements:  (1) they are disabled within the meaning of the statute, (2) they are qualified for the program, (3) they have been excluded from or denied the benefits of the program by reason of their disability, and (4) the program is run by a public entity.  *Folkerts v. City of Waverly, Iowa*, 707 F.3d 975, 983 (8th Cir. 2013); *see also Layton v. Elder,* 143 F.3d 469, 472 (8th Cir. 1998).  For a *prima facie* § 504 violation, a qualified individual with a disability must be denied, on the basis of the individual's disability, the benefits of a program or activity of a public entity receiving federal funds.  *Folkerts*, 707 F.3d at 983 (citing *M.P. ex rel. K. & D.P. v. Indep. Sch. Dist. No. 721,* 326 F.3d 975, 981–82 (8th Cir. 2003)).

Based on the record evidence at this stage, Plaintiffs are likely to succeed on the first, second, and fourth elements.  The Court also determines that Plaintiffs are likely to succeed on the third element of their disability claims.

The ADA defines a disability as "a physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A).  Congress has made clear that the

term "'disability" "shall be construed in favor of broad coverage." *Id.* § 12102(40(A)). Fason states in his declaration that he has been diagnosed with ADHD, which makes it very difficult for him to focus, organize information, and effectively advocate for himself (Dkt. No. 2-31). Riedel states in his declaration that that he has been diagnosed with anxiety and depression, which impact his daily life, including sleeping and concentrating (Dkt. Nos. 2-44; 19-2). Riedel also states that he is nearsighted and needs glasses in order to read (*Id.*).

Fason and Riedel also qualify for parole and the process that accompanies a parole revocation determination (Dkt. Nos. 2-31; 2-44; 19-2). A "qualified individual with a disability" under the ADA is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). Parole is a service, program, or activity of a public entity. "Courts have broadly construed the 'services, programs, or activities' language in the ADA to encompass 'anything a public entity does.'" *Bahl v. County of Ramsey*, 695 F.3d 778, 787 (8th Cir. 2012).

Plaintiffs also are likely to succeed in demonstrating that Fason, Riedel, and the modified Proposed Disability Subclass they represent are likely to be excluded from, denied the benefit of, and denied meaningful access to the parole revocation process by means of their disabilities. Under Title II of the ADA and the Rehabilitation Act, discrimination by a public entity includes failing to make reasonable modifications or accommodations for the disabled individual, so that he can participate in the programs or activities provided by the public entity. *See* 28 C.F.R. § 35.130(b)(7); 34 C.F.R. § 104.44(a). Title II and its regulations require that "qualified persons with disabilities receive effective communication that results in 'meaningful access' to a public

entity's services." *Folkerts v. City of Waverly, Iowa*, 707 F.3d 975, 984 (8th Cir. 2013) (quoting *Bahl,* 695 F.3d at 784 (citing *Loye v. County of Dakota,* 625 F.3d 494, 496–97, 500 (8th Cir. 2010))); *see* 28 C.F.R. § 35.160(a)(1). "Depending on the circumstances, this may require the use of auxiliary aids and services, such as interpreters for the hearing impaired." *Loye,* 625 F.3d at 496–97 (internal quotation marks omitted). Under the meaningful access standard, aids and services "are not required to produce the identical result or level of achievement for handicapped and nonhandicapped persons," but they nevertheless "must afford handicapped persons equal opportunity to. . . gain the same benefit." *Id.*, at 499 (quoting *Alexander v. Choate,* 469 U.S. 287, 305 (1985)). The inquiry "is inherently fact-intensive" and "largely depends on context." *See Argenyi v. Creighton Univ.,* 703 F.3d 441, 449 (8th Cir. 2013) (quoting *Liese v. Indian River Cnty. Hosp. Dist.,* 701 F.3d 334, 342–43 (11th Cir. 2012)).

An individual may have an obligation to make a timely request for accommodation. *See Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999) (citing *Lue v. Moore,* 43 F.3d 1203, 1206 (8th Cir. 1994); *Wynne v. Tufts Univ. School of Med.,* 976 F.2d 791, 795 (1st Cir. 1992), *cert. denied,* 507 U.S. 1030 (1993)). However, "[w]hile it is true that public entities are not required to guess at what accommodations they should provide, the requirement does not narrow the ADA or RA so much that [the public entity] may claim [an individual] failed to request an accommodation when it declined to discuss the issue with him." *Randolph*, 170 F.3d at 858–59.

The record evidence at this stage demonstrates that Fason and Reidel, as Named Plaintiffs of the modified Proposed Disability Subclass, requested accommodation based on their disability and that their disabilities were known, or reasonably should have been known, by Defendants (Dkt. No 2-31 (Fason has ADHD, takes medication for this condition, his CSO and officials at Faulkner County Detention are aware of his disability, and he has not been provided medication while in

Faulkner County Detention); Dkt. Nos. 2-44; 19-2 (Riedel has anxiety and depression, takes medication for these conditions, needs glasses to read, and has not been provided with medication or glasses while in Pulaski County Jail); *see also* Dkt. No. 2-18 (parolee diagnosed with Tinnitus which makes it hard, and in some instances impossible, was ignored by his CSO when the parolee told his CSO that he could not hear the hearing officer at his revocation hearing even with the phone closer to the parolee's ear)).

The Supreme Court has held that Title III of the ADA requires that "an individualized inquiry must be made to determine whether a specific modification for a particular person's disability would be reasonable under the circumstances. . . ." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688 (2001). This is so because the "refusal to consider [an individual's] personal circumstances in deciding whether to accommodate his disability runs counter to the clear language and purpose of the ADA." *Id.* "[T]he ADA was enacted to eliminate discrimination against *'individuals'* with disabilities." *Id.* (emphasis added). The ADA's legislative history, furthermore, makes evident that the ADA requires public entities to engage in an individualized inquiry before denying a disabled individual's proposed accommodation. The House Committee on Education and Labor's report on the ADA, states that, under Title III, public accommodations "are required to make decisions based on facts applicable to individuals." H.R. Rep. No. 101-485, pt. 2, at 102. A number of courts have held that Title II also requires public entities to engage in an individualized inquiry when determining whether an accommodation is reasonable, and courts have applied an individualized inquiry requirement in the prison context. *See Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 77–78 (2d Cir. 2016); *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 254 (D.D.C. 2015) (finding that state denied a deaf prison inmate "meaningful

access to prison services" where prison employees "did *nothing* to evaluate [plaintiff's] need for accommodation" and did not "engage in any meaningful assessment of his needs").

As an affirmative defense, a defendant may demonstrate that the requested accommodation would constitute an undue burden. *Randolph*, 170 F.3d at 858 (citing *Gorman v. Bartch,* 152 F.3d 907, 911 (8th Cir. 1998)).

Based on the record evidence at this stage, Named Plaintiffs Fason and Riedel and the members of the modified Proposed Disability Subclass are likely to prevail on their claims that Defendants failed to conduct individualized inquiries into whether a specific modification for any particular disability would be reasonable under the circumstances when the parolee made a timely request for accommodation or Defendants had notice of the parolee's disability (*See* Dkt. Nos. 2-31; 2-44; 19-2*; see also* Dkt. No. 2-22 (parolee with schizophrenia and bipolar disorder not given prescribed medication on day of revocation hearing); Dkt. No. 2-24 (parolee with ADHD not given medication and struggled to focus throughout revocation hearing); Dkt. No. 2-13 (parolee did not have glasses necessary to read paperwork handed to him by CSO and had to borrow some from someone else); Dkt. No. 2-1 (parole agent asked parolee to sign waiver form, parolee needs glasses which he did not have and which made it difficult for the parolee to read and understand, and parole agent did not provide parolee with copy of violation report); Dkt. No. 2-18 (parolee diagnosed with Tinnitus which makes it hard, and in some instances impossible to hear, was ignored by his CSO when the parolee told his CSO that he could not hear the hearing officer at his revocation hearing even with the phone closer to the parolee's ear)).

## IX.    Irreparable Harm

A plaintiff seeking a preliminary injunction must establish that the claimant is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. NRDC, Inc*., 555 U.S. 7,

20 (2008). The deprivation of constitutional rights "unquestionably constitutes irreparable injury.'" *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see Ng v. Bd. of Regents*, 64 F.4th 992, 998 (8th Cir. 2023) ("denial of a constitutional right is a cognizable injury and an irreparable harm"); *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011, 1017 (8th Cir. 2023) ("In most instances, constitutional violations constitute irreparable harm." (citing *Powell v. Ryan*, 855 F.3d 899, 904 (8th Cir. 2017) (en banc)); *Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action*, 558 F.2d 861, 867 (8th Cir. 1977) ("Planned Parenthood's showing that the ordinance interfered with the exercise of its constitutional rights and the rights of its patients supports a finding of irreparable injury.")

Plaintiffs argue that the deprivation of parolees' constitutional due process rights, especially in the light of Defendants' flat ban on state-appointed counsel in the New Arkansas Regulation, constitutes an ongoing and irreparable harm in Plaintiffs' and class members' revocation hearings (Dkt. No. 3, at 47–48). Defendants argue that there is no irreparable harm because there is no ban on state-appointed counsel and that plaintiffs are unlikely to succeed on the merits of their other due process rights (Dkt. No. 31, at 31).

As to their disability claims, Plaintiffs maintain that, absent injunctive relief, Defendants will continue to conduct parole revocation hearings without engaging in the individualized inquiries with parolees who may be entitled to an accommodation for such hearings, accommodations such as counsel or interpretive services necessary to participate fully in the revocation process (Dkt. No. 3, at 49). Defendants' only response to this allegation is to repeat Defendants' view that Plaintiffs are unlikely to succeed on the merits of their disability claims (Dkt. No. 31, at 31).

The Court finds that as to Plaintiffs' due process claims, based on the record before the Court, Plaintiffs are likely to suffer irreparable harm. The record at this point shows that Plaintiffs and class members will suffer irreparable harm to their due process rights in their revocation proceedings without injunctive relief. Although Defendants have argued that a parolee can appeal decisions to the PPTB, as well as seek state-court juridical review of an administrative proceeding (Dkt. No. 31, at 21–22), such appeals do not mitigate the risk of irreparable harm, especially given the timing of the appeals process. *See New Arkansas Regulation* 5.1–6.2 (no time constraints on PPTB's review of appeal); Ark. Code. Ann § 25-15-212(d)(1) (requiring agencies to transfer a full record within 30 days of service of a petition in state court, but allowing extensions of up to 90 days before state court review starts); Dkt. No. 2-32 (revocation waiver stating that without a waiver, a parolee can have parole revoked for a maximum of one year but that some parolees are eligible for 90 day sentence or 6 month sentence).

The Court also finds that as to Plaintiffs' disability claims, based on the record before the Court, Plaintiffs are likely to suffer irreparable harm. Plaintiffs have provided evidence that Defendants fail to undertake any individualized inquiry as to whether parolees are entitled to accommodations under the ADA and Rehabilitation Act or how to accommodate such disabilities when the parolee requests accommodation or Defendants have notice of the disability. Plaintiffs and members of the modified Proposed Disability Subclass are likely to suffer irreparable harm in the form of denial of equal treatment, the very treatment which the ADA and Rehabilitation Act seek to address. *See Ne. Fla. Chapter of Assoc. Gen. Contractors v. City of Jacksonville*, 508 U.S. 656, 666 (1993) ("When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but

for the barrier in order to establish standing.  The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit"); *Mathis v. United States Parole Comm'n*, 749 F. Supp. 3d 8, 25 (D.D.C. 2024) (finding irreparable harm when the government forced parolees to comply with supervision conditions without the accommodations they need to have an equal opportunity to succeed, and finding that "Parolees imminently face the prospect of complying with supervision requirements that do not reasonably accommodate their disabilities" which is the irreparable harm of denial of equal treatment); *Gresham v. 40 Windrush Partners, Ltd*., 730 F.2d 1417, 1423 (11th Cir. 1984) ("irreparable injury may be presumed from the fact of discrimination and violations of fair housing statutes"); *Bonnette v. D.C. Court of Appeals*, 796 F. Supp. 2d 164, 187 (D.D.C. 2011) ("forcing Plaintiff to take the MBE under discriminatory conditions is itself a form of irreparable injury") (collecting cases).

### X.    Balance Of The Harms And Public Interest

"The balance-of-harms and public-interest factors merge when the Government—or, in this case, a state official in his official capacity—is the [nonmoving] party." *Eggers v. Evnen*, 48 F.4th 561, 564–65 (8th Cir. 2022) (alteration in original) (internal citations omitted).  The Court must examine this case in the context of the relative injuries to the parties and to the public. *Dataphase*, 640 F.2d at 114.  The Eighth Circuit has stated that "whether the grant of a preliminary injunction furthers the public interest . . . is largely dependent on the likelihood of success on the merits because the protection of constitutional rights is always in the public interest." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 752 (8th Cir. 2008).

Plaintiffs argue that Defendants have no interest in enforcing laws that are unconstitutional, preventing Defendants from enforcing unconstitutional acts does not irreparably harm the state,

any argument about the cost of providing counsel is undercut by other states in the Eighth Circuit's provision of counsel, and that the public has an interest in protecting constitutional rights and immediate judicial intervention (Dkt. No. 3, at 50).

Defendants argue that an injunction which enjoins a state from effectuating statutes enacted by representatives of its people will cause irreparable harm, that "without a sufficient number of appointed counsel, the hearing process would be delayed, leading to longer times in detention or (if the parolee is released) increased crime," and that an "ongoing federal audit" is not in the public interest (Dkt. No. 31, at 32).

The Court finds that the balance of the harms and the public interest weighs in favor of Plaintiffs. The Court finds Defendants' arguments unpersuasive, particularly those regarding the harm suffered in enjoining statutes to the extent they are unconstitutional and that requiring Defendants to comply with the screening requirements in *Gagnon* results in an ongoing federal audit or will lead to "increased crime."

The public has an interest in protecting constitutional rights and in ensuring that individuals with qualifying disabilities are not discriminated against by the government. Plaintiffs have shown that they are likely to succeed on the merits of their claims and are likely to suffer irreparable harm absent a preliminary injunction. The harm that will be suffered by parolees who face revocation of their liberty without any attempt by Defendants to assess whether to accommodate a known disability to provide meaningful access to the parole revocation process will outweigh any harm Defendants claim that they will suffer in conducting an individualized inquiry into whether an accommodation for a person's disability would be reasonable when a timely request for accommodation has been made or Defendants have notice of the individual's disability. Any harm Defendants suffer in screening parolees for appointed counsel or providing due process rights, as

required by *Gagnon* and *Morrissey*, does not outweigh the harm to the public and Plaintiffs of being denied their constitutional rights in revocation proceedings which may result in incarceration. Therefore, the Court finds that the balance of the harms and the public interest weighs in favor of granting a preliminary injunction.

## XI. Posting Of Bond

Under Federal Rule of Civil Procedure 65(c), "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." However, the "amount of the bond rests within the sound discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of that discretion." *Stockslager v. Carroll Elec. Coop. Corp.*, 528 F.2d 949, 951 (8th Cir. 1976). This Court may not "abuse[] that discretion due to some improper purpose, or otherwise fail[] to require an adequate bond or to make the necessary findings in support of its determination." *Hill v. Xyquad, Inc.*, 939 F.2d 627, 632 (8th Cir. 1991); *Rathmann Grp. v. Tanenbaum*, 889 F.2d 787, 789 (8th Cir. 1989) (citing *Roth v. Bank of the Commonwealth*, 583 F.2d 527, 539 (6th Cir. 1978) (finding error, not because the trial court failed to require a bond in any particular amount, but because the court failed to exercise the discretion required by Rule 65(c) of considering the question of requiring a bond)).

Defendants, who are sued in their official capacity only and for prospective injunctive relief, seek to require this Court to impose a bond on indigent Plaintiffs seeking to enforce constitutional rights and rights under the ADA and Rehabilitation Act during parole revocation proceedings (Dkt. No. 31, at 34–35). The Court exercises its discretion and declines to issue a bond.

Plaintiffs are indigent and unable to pay the bond, so requiring a bond here "would function to bar poor people from obtaining judicial redress." *Johnson v. Bd. of Police Comm'rs*, 351 F. Supp. 2d 929, 952 (E.D. Mo. 2004). *See also Bass v. Richardson*, 338 F. Supp. 478, 490 (S.D.N.Y. 1971) (same).

Further, Defendants have shown no "damages resulting from a wrongful issuance of an injunction. . . ." *Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016). Defendants seek "an amount sufficient to cover the cost of state-appointed counsel," providing no detail or further information to support such a request (Dkt. No. 31, at 35). Moreover, Defendants concede that *Gagnon* and *Morrissey* apply; Plaintiffs seek an injunction requiring Defendants to provide the due process protections required by those cases, including to screen for state-appointed counsel. Further, Plaintiffs seek an injunction requiring Defendants to comply with what Plaintiffs are likely to succeed in proving are Defendants' preexisting obligations under the ADA, Rehabilitation Act, and controlling cases.

In addition, the Court finds that, given the issues involved in this case and the Court's determination regarding the weight of the public interest, the Court will not require a bond. *See Richland/Wilkin Joint Powers Auth.*, 826 F.3d at 1043 (recognizing that, with NEPA claims, some courts have not required a bond, or have only required a minimal bond, but affirming the district court's decision to waive the bond requirement based on its evaluation of the public interest in the specific case and because of the important public interest in the enforcement of NEPA).

## XII.    Relief

Based on the foregoing, the Court grants Plaintiffs' request for a preliminary injunction, in part (Dkt. No. 2). To the extent Plaintiffs request the Court to order Defendants to disclose adverse evidence five days in advance of revocation hearings, such notice is not required by *Gagnon* and

*Morrissey* and the motion, to that extent only, is therefore denied (PI Hearing Closing Argument). Having determined that Plaintiffs have met their burden to justify the grant of a preliminary injunction, the Court grants the following preliminary relief. This preliminary injunction remains in effect until further order from this Court. No party is barred from seeking modified or additional relief.

### A. Hold Preliminary Hearings

The Court hereby Orders Defendants and all those acting in concert with them, including employees, agents, and successors in office, to hold for the modified Proposed Class preliminary hearings when facing parole revocation, except when the right to a preliminary hearing is waived, as articulated in *Morrissey*.

The preliminary hearing must be "at the time of [a modified Proposed Class member's] arrest and detention to determine whether there is probable cause to believe that [the modified Proposed Class member] has committed a violation of his [or her] parole]." *Gagnon*, 411 U.S. at 782. The preliminary hearing must occur before the final revocation hearing. *Id.* The determination that reasonable grounds exist for revocation of parole should be made by someone not directly involved in the case. *Morrissey,* 408 U.S. at 485. Thus, the CSO who testifies against the modified Proposed Class member at the final revocation hearing is ineligible to conduct the preliminary hearing. The modified Proposed Class member should be given written notice of when the preliminary hearing will take place, that the purpose of the preliminary hearing is to determine whether there is probable cause to believe that he has committed a parole violation, and the parole violations that have been alleged. *Id.*, at 485–87.

At the preliminary hearing, the modified Proposed Class member is entitled to notice of the alleged violations of parole, an opportunity to appear and present evidence on his own behalf,

an independent decisionmaker, and a conditional right to confront adverse witnesses. *Gagnon*, 411 U.S. at 786. Defendants and all those acting in concert with them, including employees, agents, and successors in office, shall also provide to the modified Proposed Class member a written report of the final decision made at a preliminary hearing. *Id.*

Any waiver of the right to a preliminary hearing that is the result of inaccurate or incomplete information or that is coerced or encouraged is likely to be unknowing and involuntary, and Plaintiffs are likely to prevail in demonstrating that denying the modified Proposed Class member the hearings to which they are constitutionally entitled under *Morrissey* is a violation of due process. *Gasca District Court Order,* at 851.

### B.    Screen For State Appointed Counsel And Provide Written Decisions

The Court hereby orders Defendants and all those acting in concert with them, including employees, agents, and successors in office, to inform members of the modified Proposed Class of their right to counsel as articulated in *Gagnon*; screen for state appointed counsel upon request by a modified Proposed Class member as required by *Gagnon*; appoint state appointed counsel when consistent with *Gagnon*; and state "succinctly in the record" the grounds for refusing appointed counsel for modified Proposed Class members in accord with *Gagnon*, should counsel be denied.

Modified Proposed Class members must be informed of their right to request state-appointed counsel. *Gagnon*, 411 U.S. 790. Given the fact that Defendants rely on the Notice Forms to inform parolees of their rights and that Plaintiffs have offered several accounts of parolees never being informed of their rights, the Court orders Defendants and all those acting in concert with them, including employees, agents, and successors in office, to provide the modified Proposed Class with a copy of the Notice Form which informs parolees of their right to request

state-appointed counsel.   To the extent that a modified Proposed Class member cannot read, Defendants and all those acting in concert with them, including employees, agents, and successors in office, are ordered to read the right to request state-appointed counsel to the modified Proposed Class member in addition to providing the copy of the Notice Form.

If a modified Proposed Class member "requests counsel," *id.*, regardless of whether that individual specifically asks for "appointed" counsel or the Screening Form, Defendants and all those acting in concert with them, including employees, agents, and successors in office, must screen the modified Proposed Class member for eligibility for state-appointed counsel, *id.*  State appointed counsel is presumptively to be provided to modified Proposed Class members when:

(1)     The modified Proposed Class member presents a timely and colorable claim that he or she has not committed the alleged violation of the conditions upon which he or she is at liberty;

(2)     Even if the violation is a matter of public record or is uncontested, there are substantial reasons which justified or mitigated the violation and make revocation inappropriate, and that the reasons are complex or otherwise difficult to develop or present; and

(3)     In especially doubtful cases, the modified Proposed Class member appears to be incapable of speaking effectively for himself.

*Id.*, at 790–91.

If Defendants and all those acting in concert with them, including employees, agents, and successors in office, choose to use the Screening Form or some other form to comply with the screening requirements, the form must ask questions which take into account these three scenarios in which state appointed counsel is presumptively to be provided.  *Id.*

Defendants and all those acting in concert with them, including employees, agents, and successors in office, must also state "succinctly in the record" the grounds for refusing appointed counsel, should counsel be denied. Internal emails sent to CSOs are not sufficient in providing modified Proposed Class member with notice of the decision to deny appointed counsel. Given the several declarations by Plaintiffs which state that parolees were denied counsel without being given a screening form, that parolees never heard whether they were appointed counsel, that decisions to deny counsel did not consider the three situations contemplated in *Gagnon*, as well as the fact that a decision read to parolees orally by a CSO gives the parolee no meaningful opportunity to appeal or preserve the decision, the Court orders Defendants and all those acting in concert with them, including employees, agents, and successors in office, to provide modified Proposed Class members with a written notice of the decision to deny appointed counsel with a succinct statement of why counsel was denied.

### C.    Provide Required Due Process Protections in Revocation Hearings and Provide Written Revocation Decisions To Parolees

The Court hereby orders Defendants and all those acting in concert with them, including employees, agents, and successors in office, to comply with the requirements in *Morrissey* during, before, and after modified Proposed Class members' final revocation hearings. Specifically, as to the modified Proposed Class, Defendants and all those acting in concert with them, including employees, agents, and successors in office, must:

(1)    Provide written notice of the claimed violations of parole. Given the fact that the Notice Form is Defendants' method of providing notice of the claimed violations of parole and notice of a parolee's rights—and that Plaintiffs provided declarations from many parolees who stated they were never informed of their rights—the Court Orders Defendants and all those acting in concert with them, including employees,

74

agents, and successors in office, to provide a copy of the Notice Form, or any other form used by Defendants and all those acting in concert with them, including employees, agents, and successors in office, which lists the modified Proposed Class member's claimed violation of parole, to the modified Proposed Class member.

(2)    Disclose to the modified Proposed Class member the evidence against the modified Proposed Class member.

(3)    Provide the modified Proposed Class member an opportunity to be heard in person and to present witnesses and documentary evidence.

(4)    Provide the modified Proposed Class member an opportunity to confront and cross-examine adverse witnesses, unless the hearing officer specifically finds good cause for not allowing confrontation.

(5)    Provide a neutral and detached hearing body or officer to preside over the revocation hearing.

*Gagnon*, 411 U.S. 786.

After the revocation hearing, Defendants and all those acting in concert with them, including employees, agents, and successors in office, must provide to modified Proposed Class members a written statement by the factfinder which states the ultimate revocation decision, the evidence relied on, and the reasons for revoking parole, if parole is revoked. *Id.* Simply reading the Disposition Form—or any other written form articulating the final revocation decision—is insufficient and a violation of due process as articulated in *Gagnon*.

Any waiver of the right to a revocation hearing that is the result of inaccurate or incomplete information or that is coerced or encouraged is likely to be unknowing and involuntary, and

Plaintiffs are likely to prevail in demonstrating that denying parolees the hearings to which they are constitutionally entitled under *Morrissey* is a violation of due process. *Gasca District Court Order,* at 851.

        **D.**     **Engage In Individualized Accommodation Inquiries When Requested Or When On Notice Of A Disability**

With respect to the modified Proposed Disability Subclass, the Court hereby orders Defendants and all those acting in concert with them, including employees, agents, and successors in office, to conduct individualized inquiries into whether a specific modification for a particular Proposed Disability Subclass member's disability would be reasonable under the circumstances when the Proposed Disability Subclass member makes a timely request for accommodation or Defendants and all those acting in concert with them, including employees, agents, and successors in office, have notice of the Proposed Disability Subclass member's disability.

**XIII.**  **Motion To Dismiss**

Defendants move to dismiss this case claiming that: (1) the case should be dismissed in its entirety under the *Younger* abstention doctrine; and (2) Plaintiff's Fourteenth Amendment due-process claim, claims arising under the ADA, and claims arising under the Rehabilitation Act should be dismissed under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim (Dkt. No. 31). Because the Court finds that *Younger* does not apply in this case and that Plaintiffs are entitled to a preliminary injunction, the Court denies Defendants' motion to dismiss (*Id.*).

**XIV.**  **Conclusion**

For the foregoing reasons, the Court:

(1)      grants, in part, and denies, in part, Plaintiffs' motion for temporary restraining order and/or preliminary injunction as to Plaintiffs' request for a preliminary injunction (Dkt. No. 2);

(2)     denies Defendants' motion to dismiss (Dkt. No. 30); and

(3)     grants Plaintiffs' motion to certify class (Dkt. No. 4).

It is so ordered this 27th day of February, 2026.

_____
Kristine G. Baker
Chief United States District Judge